**LEVI & KORSINSKY, LLP**
Eduard Korsinsky (EK-8989)
30 Broad Street, 24th Floor
New York, New York 10004
Tel.:  (212) 363-7500
Fax:  (212) 363-7171
Email: ek@zlk.com

*Counsel for Plaintiffs and Lead Counsel for the Class*

[Additional Counsel on Signature Page]

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re NAVIENT CORPORATION SECURITIES LITIGATION | Master File No. 17-8373 (RBK/AMD)<br><br>**AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

        Lead Plaintiff Jesse Wayne Pritchard, individually and on behalf of all other persons similarly situated (hereinafter "Plaintiffs"), by their undersigned attorneys, alleges in this Amended Class Action Complaint for Violation of the Federal Securities Laws (the "Complaint") the following upon knowledge with respect to their own acts, and upon facts obtained through an investigation conducted by their counsel, which included, *inter alia*: (a) review and analysis of relevant filings made by Navient Corporation ("Navient" or the "Company") with the United States Securities and Exchange Commission (the "SEC"); (b) review and analysis of

Navient's public documents, conference calls and press releases; (c) review and analysis of securities analysts' reports and advisories concerning the Company; (d) review and analysis of complaints and other document relating to the cases against Navient; and (e) information readily obtainable on the Internet.

Plaintiffs believe that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. Most of the facts supporting the allegations contained herein are known only to the defendants or are exclusively within their control.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons who purchased or otherwise acquired Navient securities between January 18, 2017 and October 4, 2017, inclusive (the "Class Period"), seeking to recover damages for violations of the federal securities laws under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.      The U.S. Department of Education disburses roughly $95 billion to $100 billion per year through federal student loan programs (compared to $7 billion to $9 billion by private lenders). The total amount of student loan debt outstanding is estimated to exceed $1 trillion, according to some analysts. The sheer size of the debt creates a significant problem for the U.S. economy. Many financial experts believe that this student loan debt is a "bubble," one that is on the verge of exploding in light of the ever-increasing borrower delinquency rates.

3.      Navient is a student loan servicer and, as alleged herein, is at least partially responsible for the precarious position of the student loan debt in this country. While the Company held itself out to borrowers, investors, and the U.S.

Government to be a highly efficient, compliant student-loan servicer with low default rates due to their 'data-driven,' 'customer-centric' practices (which supposedly helped borrowers find solutions unique to their circumstance and in the borrowers' best interest), Navient is in fact accused of violating numerous consumer regulations for predatory lending and illicit servicing conduct. This case focuses on Navient's public representations concerning its business and how those representations ultimately caused investors millions of dollars in losses when the truth about Navient's servicing practices was revealed.

4.      By way of background, before the Class Period, Navient encouraged borrowers to rely upon Navient for help in finding personalized payment plans in the customer's best interest. At various points in time (for instance, during Navient's presentations at the September 12, 2016 Barclays Global Financial Services Conference and November 8, 2016 third quarter investor call), Navient made statements such as "Helping our Customers navigate the path to financial success is everything we stand for." Navient also told investors that, "In Its Role As Student Loan Servicer, Navient Helps Borrowers Successfully Repay Their Loans" and that Navient works with borrowers to help them assess multiple repayment options and successfully repay loans.

5.      The U.S. Department of Education ("ED") also publicly encourages borrowers to consult their federal student loan servicer to determine the best repayment option or alternative for that individual borrower. In several places on its website, the ED has advised borrowers to contact their student loan servicer before applying for any alternative repayment plan or forbearance, with statements such as the following: "Work with your loan servicer to choose a federal student loan repayment plan that's best for you;" "Before you apply for an income-driven repayment plan, contact your loan servicer if you have any questions. Your loan servicer will help you decide whether one of these plans is right for you;" and

3

"Always contact your loan servicer immediately if you are having trouble making your student loan payment." Navient's public statements comported with the ED's depiction of what a loan servicer should be.

6.   On January 18, 2017, the Consumer Financial Protection Bureau ("CFPB"), the Attorney General of Illinois ("IL AG"), and the Attorney General of Washington ("WA AG") filed lawsuits against Navient claiming multiple violations relating to predatory lending practices as well as unfair and deceptive loan servicing practices. Of significance, these lawsuits claimed that Navient was funneling borrowers into "forbearance" arrangements instead of "income drive repayment" plans (which allow borrowers to repay loans in accordance with their respective incomes) (hereafter, "IDR"). The lawsuits also cited Navient for issues relating to misallocation and failed allocation of payment, failure to release co-signer relating to the payment allocation and lack of disclosure, and issues relating to IDR renewal communications and resulting loss of IDR benefits. While some of these practices had been remedied, partially due to the ED's change in lending practices, some of these non-compliant, unfair, and deceptive practices were continual and on-going practices at Navient. The CFPB, IL AG, and WA AG complaints all put Navient on notice that such practices were not legal.

7.   Navient responded to the law suits immediately by denying all allegations. Navient issued a press release on January 18, 2017, stating that:

> The allegations of the Consumer Financial Protection Bureau are unfounded, and the timing of this lawsuit—midnight action filed on the eve of a new administration—reflects their political motivations.
>  . . .
> Navient has a well-established, superior track-record of helping student loan borrowers succeed in repayment. 49 percent of loan balances serviced by Navient for the federal government are enrolled in income-driven repayment plans. Assertions that we do not educate borrowers about IDR plans ignore the facts.

. . .

Navient has a responsibility to its customers, shareholders, and employees to defend itself—publicly and in court—against this unsubstantiated, unjustified and politically driven action. We cannot and will not accept agenda-driven ultimatums designed to get headlines rather than help for student borrowers. We will vigorously defend against these false allegations and continue to help our customers achieve financial success.

8.    Instead of addressing the problems or making efforts to fix non-compliant and misleading behaviors, Navient instead called them "unsubstantiated" and  "unjustified" and continued with their deceptive, misleading, manipulative, and non-compliant practices. During the course of the Class Period (which continued until October 4, 2017), Navient repeatedly told investors that its primary objective was to assist its borrowers in accordance with their particular financial needs and, in so doing, fulfill their regulatory obligations as one of the largest student loan servicers in the country.

9.    Unbeknownst to Plaintiffs, Navient continued its illicit servicing practices throughout 2017 in spite of the lawsuits filed by the States' Attorneys General and CFPB. During the Class Period, Defendants had a corporate practice of driving people into forbearance and away from IDR plans. In forbearance plans, interest accumulates and generally increases the amount of money owed on the loan. A loan in forbearance is also not, technically, in default, but instead in a 'current' repayment. This improves the overall appearance of Navient's operational status.

10.    Navient orchestrated this 'forbearance scheme' through a unique employee compensation program that incentivized employees to spend as little time as possible on calls with borrowers. Navient also instructed its employees to encourage forbearance whenever possible, and only offer IDR as a last resort. Importantly, the process for describing and enrolling a student in forbearance as opposed to an IDR plan was much quicker. Further, Navient's employee

compensation programs mandated strict durational limits on calls with borrowers, thus allowing Navient to decrease labor costs by forcing Navient employee representatives to process more loans in a shorter amount of time.

11.     Defendants benefitted from placing borrowers into forbearance. Navient avoided operating costs by improperly placing borrowers into forbearance. Placing borrowers into forbearance allowed Navient to report fewer loans in default or delinquency and more loans listed as current. This practice allowed Navient to look less risky to investors as well as allowed them to artificially inflate earnings per share ("EPS"). Loan status and EPS were large factors in determining Executive Officer bonuses, thus the Individual Defendants had strong incentive to manipulate these metrics.

12.     Investors stayed in the dark until October 5, 2017. On October 5, 2017, the Pennsylvania Attorney General ("PA AG") filed a complaint against Navient (the "PA AG Lawsuit"), focusing in particular on Navient's scheme to place borrowers into forbearance (instead of IDR plans) as well as various problems with loan servicing.

13.     Investors reacted sharply to news of the PA AG's Lawsuit. Following a televised interview of the PA AG as well as numerous reports from several news outlets, Navient's stock price declined from $14.70 to $12.60 on unusually heavy volume in the span of just one day. According to Barrons.com, Navient's market capitalization fell from $4 billion to $3.5 billion during this period. As a result of Navient's efforts to conceal the true nature of its loan servicing practices, investors were tricked into buying stock and lost millions of dollars when the truth was finally revealed.

14.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

15.     The claims asserted herein arise under and pursuant to §§ 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

16.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

17.     Venue is proper in this District pursuant to § 27 of the Exchange Act and 28 U.S.C. §1391(b), as defendant has its principal executive offices located in this District and a significant portion of the defendants' business, actions, and the subsequent damages, took place within this District.

18.     In connection with the acts, conduct and other wrongs alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

19.     Plaintiff Jesse Wayne Pritchard purchased Navient securities at artificially inflated prices during the Class Period and were damaged upon the revelation of the defendants' fraud. Plaintiff filed his certification evidencing his transaction previously with the Court in connection with his motion for appointment as Plaintiff. Plaintiff's certification is incorporated herein by reference.

20.     Defendant Navient provides asset management and business processing services to education, health care, and government clients at the federal, state, and local levels in the United States.  Navient is incorporated in Delaware and maintains an office in Moorestown, New Jersey. The Company's securities were traded on the Nasdaq Global Select Market ("NASDAQ") under the ticker symbol "NAVI" and,

as of September 30, 2017, there were 263,012,203 shares of Navient common stock outstanding

21.    Defendant John F. Remondi ("Remondi") has been the Company's Chief Executive Officer throughout the Class Period.

22.    Defendant Somsak Chivavibul ("Chivavibul") has been the Company's Chief Financial Officer from April 2014 until March 26, 2017.

23.    Defendant Christian M. Lown ("Lown") has been the Company's Chief Financial Officer since March 27, 2017.

24.    Defendants Remondi, Chivavibul, and Lown are sometimes referred to herein as the "Individual Defendants."

25.    Each of the Individual Defendants:

   a.  directly participated in the management of the Company;

   b.  was directly involved in the day-to-day operations of the Company at the highest levels;

   c.  was privy to confidential proprietary information concerning the Company and its business and operations;

   d.  was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

   e.  was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

   f.  was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

   g.  approved or ratified these statements in violation of the federal securities laws.

26.     The Company is liable for the acts of the Individual Defendants and its other employees under the doctrine of respondeat superior and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

27.     The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to the Company under respondeat superior and agency principles.

28.     The Company and the Individual Defendants are referred to herein, collectively, as the "Defendants."

29.     The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Navient's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. Each Individual Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein.

## SUBSTANTIVE ALLEGATIONS

A.      **Background**

30.     Navient engages in servicing of federal and private student loans for more than 12 million borrowers, including originating federal and private loans, marketing student loans and loan packages to schools and students, and servicing and collecting loans, under one corporate structure.

31.     Following a corporate reorganization in 2014, Navient was the successor to SLM Corporation and Navient, LLC. As part of this reorganization, Navient assumed certain liabilities related to the servicing and collection activities of SLM Corporation, Navient, LLC, and their subsidiaries, Sallie Mae, Inc. and Sallie Mae Bank. Among the liabilities assumed by Navient are all of the pre-reorganization servicing and collection conduct described in this Complaint. SLM Corporation was awarded the servicing contract with the ED in 2009, and that contract continues to be in force to the present (subject to various modifications that the parties to that contract have executed). All documents related to that contract were signed in the name of SLM Corporation or, subsequently, Navient, LLC. Accordingly, as a result of the 2014 corporate reorganization, Navient is currently the entity that contracts with the ED for the servicing of federal student loans.

32.     Navient operates in a heavily regulated industry, rendering compliance with applicable laws and regulations critical to the Company's business. Navient was subject to, *inter alia*, the SCRA, CFPA, FDCRA, and other federal and state consumer protection and privacy laws.

33.     Navient is one of the ten major loan servicer that have contracts with the ED and one of four larger servicers awarded Title IV Additional Servicer (TIVAS) contracts. Title IV financial aid is federally funded aid such as Federal Pell Grant, Federal Supplemental Educational Opportunity Grant (SEOG), Federal Perkins Loan, Federal Subsidized and Unsubsidized Direct Loans. TIVAS contractors service these loans and grants. On August 27, 2014, the ED extended its TIVAS contract with Navient to service federal loans for five more years. As

Navient outlined in its 2016 10-K, under the terms of the contract extension, the allocation of additional volume will be determined twice each year based on the relative performance of the servicers utilizing five performance metrics: borrowers in current repayment status (30 percent), borrowers more than 90 but less than 271 days delinquent (15 percent), borrowers 271 days or more but less than 360 days delinquent (15 percent), a survey of borrowers (35 percent), and a survey of ED personnel (5 percent). Quarterly scores in each metric are to be averaged together twice each year to calculate the final result for each metric.

34.    As of December 31, 2016, Navient serviced approximately 6.2 million accounts or $197.0 billion in loans and recorded $840 million in education related revenue. The education related revenue accounted for 82.8% of Navient's revenue in 2016. Navient earned $151 million of revenue under the contract for the year ended December 31, 2016. The $151 million from ED service contracts accounted for 17.9% of Navient's education related revenue in 2016. Intercompany loan servicing, including FFELP Loans owned by Navient, accounted for $389 million while other education related revenues, such as revenue from private education loans, accounted for $300 million. Navient noted in its 2016 10-K Risk Factors section, "If Navient is unable to improve its performance and increase its relative standing compared to the three other servicing companies with whom it competes, its ability to maintain or increase its servicing business with ED may be materially adversely affected."

35.    ED revenue was critical to Navient's overall operations. Because of its importance to the Company, the Individual Defendants actively monitored Navient's ED operations, including the Company's servicing practices.

36.    As of December 31, 2016, Navient's principal assets consisted of: $111 billion education loan portfolio ($87.7 billion in FFELP Loans, $23.3 billion in Private Education Loans); a leading education loan servicing platform that services

loans for more than 12 million DSLP Loan, FFELP Loan and Private Education Loan customers (including cosigners), including 6.2 million customer accounts serviced under Navient's contract with ED; and a leading business processing platform through which we provide services for over 1,000 clients in the education, health care and public sectors. Navient is the largest servicer of education loans, servicing over $300 billion in education loans for more than 12 million customers.

**B.    Federal Student Loan Repayment Options**

37.    Federal Student loans are loans funded or guaranteed by the federal government. Federal Student loans are also unique in that they are: 1) primarily need-based and made to borrowers regardless of credit history, with automatic approval if the student meets program requirements; 2) the interest rate is capped by the federal government; and 3) have a variety of repayment options available to borrowers, including repayment based on the borrower's income.

38.    Borrowers typically access federal loans before private loans because federal student loans have lower interest rates and better repayment options.

39.    Students may utilize private loans to cover the gap between the cost of college and the total federal aid. These loans are extended to borrowers based on the lender's assessment of the borrower's creditworthiness and likelihood of repaying the loan, thus such loans often require a cosigner for approval or more favorable terms. No matter what kind of federal student loan a borrower has, and no matter the channel by which the government provided the loan to the borrower, the management or "servicing" of federal student loans is administered by private entities, such as Defendants.

40.    Upon first entering repayment, a federal student loan borrower is assigned to or selects a specific repayment plan. That borrower has the right to change his/her repayment plan assignment or selection at any time, including if the borrower is experiencing financial hardship or distress.

41.     The ED offers numerous repayment plans to eligible borrowers with federal student loans, which are designed to help borrowers manage their student loan debt and make monthly repayment of these loans more affordable. These repayment plans include several IDR plans, such as Income-Based Repayment ("IBR") and Pay As You Earn Repayment ("PAYE"). Most federal student loans are eligible for at least one IDR plan.

42.     The monthly amount that the borrower will pay under the IDR plans is set at an amount that is intended to be more affordable based on the borrower's income and family size, and may be as low as $0 per month.

43.     In addition to providing a more affordable monthly payment, most IDR plans offer several other benefits for federal student loan borrowers, especially borrowers experiencing long-term financial hardship. For borrowers with subsidized loans whose monthly payment amount does not fully cover accrued interest, the federal government will pay any remaining unpaid interest that accrues on those loans during the first three consecutive years of enrollment in the plan.

44.     This interest subsidy can be a significant benefit to such borrowers because they generally have no obligation to ever pay the remaining unpaid interest that accrues during those three years. Furthermore, because that unpaid interest is paid in full by the federal government, it is not added to the principal balance of the loan. When interest is not paid, it can be added to the principal balance of the loan; additional interest is then charged on the increased principal balance of the loan, which could significantly increase the total amount repaid over the life of the loan. Thus, the interest subsidy available to many borrowers enrolled in IDR plans can reduce these additional harmful effects, mitigating the financial strain on those borrowers.

45.     Another benefit available to borrowers who are enrolled in an IDR plan is forgiveness of the remaining balance of their federal loan, either after making 20-

25 years of qualifying payments for most IDR plans or 10 years of qualifying payments while working full time for certain public service employers.

46.    Federal student loans are generally also eligible for forbearance, which is a short-term, temporary postponement of payment. With forbearance, a borrower experiencing financial hardship or illness may be able to stop making payments or reduce his or her monthly payment for a defined period of time.

47.    Forbearance is typically not suitable for borrowers experiencing financial hardship or distress that is not temporary or short-term. Borrowers who enroll in forbearance face significant costs, which generally increase the longer the borrower is in forbearance. These include the accumulation of unpaid interest and the addition of that unpaid interest to the principal balance of the loan. In addition, in some cases, following a forbearance, a loan may be reamortized, where the monthly payments may be recalculated, which can lead to an increase in the borrower's monthly payment amount. As a result of these costs, long-term enrollment in forbearance can dramatically increase the total amount due each month after the forbearance period ends and over the repayment term for a borrower's federal loans.

48.    U.S. News and World reports discussed the dangers of forbearance, "The problem with forbearance is that interest still accrues on all loans, even subsidized Stafford loans, and if you do not pay the interest, it is capitalized – or added – on to the principal balance at the end of the forbearance period. This means that borrowers who use forbearance end up paying interest on top of interest, which isn't good. The capitalizing interest can also cause your monthly payment to increase because of the larger balance, depending on your payment plan. So if you can't afford your student loan payments today, you may have an even harder time affording them once the forbearance has concluded."

49.     Because IDR plans enable borrowers to avoid or reduce these costs associated with forbearance, for borrowers whose financial hardship is not temporary and short-term, enrolling in an IDR plan is usually a significantly better option than forbearance.

50.     Because of the number and complexity of repayment options available for federal loans, a conversation about alternative repayment plans and the borrower's financial situation is usually time-consuming.

51.     Moreover, since a borrower is required to submit a paper or online application, and include certain income tax documentation with that application, to enroll in an IDR plan, the process of enrolling a borrower in such plans sometimes requires multiple, lengthy conversations with the borrower.

52.     In contrast, enrollment in forbearance can often be completed over the phone, in a matter of minutes, and generally without the submission of any paperwork.

53.     Putting a borrower into forbearance is less labor-intensive both in terms of call-length and paperwork, thus it is more efficient for Navient to put borrowers into forbearance rather than expend the time and labor necessary to discuss and then enroll a borrower into an IDR plan.

54.     The ED has publicly encouraged borrowers to consult their federal student loan servicer to determine the best repayment option or alternative for that individual borrower. In several places on its website, the ED has advised borrowers to contact their student loan servicer before applying for any alternative repayment plan or forbearance, with statements such as the following: "Work with your loan servicer to choose a federal student loan repayment plan that's best for you"; "Before you apply for an income-driven repayment plan, contact your loan servicer if you have any questions. Your loan servicer will help you decide whether one of these

15

plans is right for you"; and "Always contact your loan servicer immediately if you are having trouble making your student loan payment."

## C.    IDR Recertification

55.    In addition to the paperwork required to enroll a borrower in an IDR plan, a borrower in such a plan must also complete an annual recertification form each year to document his/her current income and family size, which is then used to adjust the borrower's payment amount. Processing this renewal paperwork further increases the employee time that Navient must devote to borrowers who enroll in an IDR plan.

56.    This affordable payment amount applies for a period of twelve months. At the end of this twelve-month period, the affordable payment amount will expire unless the borrower renews his/her enrollment in the plan before the expiration date. To do so, the borrower must "recertify" his/her income and family size by submitting updated information, including documentation of income each year.

57.    If the twelve-month period expires because the borrower has not timely recertified income and family size, several negative consequences are likely to occur. First, the borrower's monthly payment amount may immediately increase from a low affordable amount to one that is typically in the hundreds or even thousands of dollars.

58.    Other significant consequences that will occur when the twelve-month period expires without a timely recertification include (1) the addition of any unpaid, accrued interest to the principal balance of the loan; (2) for subsidized loans in the first three years of enrollment in an IDR plan, the loss of an interest subsidy from the federal government for each month until the borrower renews his/her enrollment; and (3) for some borrowers who enroll in forbearance when the twelve-month period expires, delayed progress towards loan forgiveness because the borrower is no longer making qualifying payments that count towards loan forgiveness. These

16

consequences are all irreversible, thus it is extremely important that loan servicers give borrowers clear and timely notice of the process and timeline for renewal.

**D.    Cosigner Release**

59.    A cosigner is generally necessary for a borrower to obtain a private student loan, or to obtain that loan with more favorable terms.

60.    Once a borrower enters repayment on his/her private student loan, he or she generally can apply to release the cosigner from the loan after meeting certain eligibility criteria. This option is generally available to most Navient borrowers with cosigned private student loans.

61.    Since at least January 2010, one of the eligibility criteria that Navient has required private student loan borrowers to meet before they can apply to release a cosigner is that the borrower must make a minimum number of consecutive, on-time payments consisting of both principal and interest. Since January 21, 2014, Navient has required the borrower to "make 12 consecutive, on-time principal and interest payments" before applying for cosigner release. Prior to January 21, 2014, and depending on the applicable terms of the borrower's loan, Navient required borrowers to make between 12 and 48 "consecutive, on-time principal and interest payments" before applying for cosigner release. Navient did not, however, specifically define for borrowers what it meant by "consecutive" or "on-time" payments.

**E.    Borrower Repayment**

62.    One of Navient's primary responsibilities as a student loan servicer is to process payments made by borrowers and cosigners on their student loan accounts. A borrower in repayment will sometimes make a payment that is a multiple of the monthly payment amount due. For example, a borrower whose monthly payment amount due is $100 may choose to pay $200 or $300 instead of $100. This type of overpayment is a called a "multiplier overpayment."

63.     Borrowers or cosigners may specifically designate how payments are made, whether it is a lump sum to pay off a specific loan, if the payment should only be applied to one specific account, if the payment should be made pro rata amongst many loans, if the payment should apply to the principle, or if should be applied to interest.

64.     Navient has used a default allocation methodology that was not disclosed on any billing statement, promissory note, or printed or online resource available to borrowers until 2013. The default allocation methodology varied based on whether the loan was federal or private, as well as whether the borrowed submitted an underpayment, overpayment, or an overpayment that was a multiple of the borrower's monthly payment amount due.

65.     For private loans with cosigners, when a borrower makes such a "multiplier overpayment," Navient generally applies the payment to satisfy the borrower's current monthly payment due, and then places the borrower in a "paid ahead" status for the subsequent months that have been satisfied by the excess payment.

66.     For each month that the borrower is in a "paid ahead" status on his/her private student loan, Navient sends the borrower a bill indicating that the payment due for that month is $0 because the borrower is not required to make any payment that month in order to remain current on his/her loan. Thus, there is no "on-time principal and interest payment" that is even due that month.

**F.     The Complaints filed by the Consumer Financial Protection Bureau and State Attorneys General in Illinois and Washington Put Defendants on Notice of Violations.**

67.     On January 18, 2017, the CFPB, the IL AG, and the WA AG filed lawsuits against filed a lawsuit against Navient claiming multiple violations relating to predatory lending practices, as well as unfair and deceptive loan servicing practices relating failures to disclose all loan payment options resulting in the funneling borrowers into forbearance versus IDR, issues relating misallocation and failed allocation of payment, failures to release co-signers relating to the payment allocation practices and lack of disclosure, and issues relating to IDR renewal communications and borrowers' subsequent loss of IDR benefits.

68.     The complaints alleged Navient made subprime loans to students who would not otherwise qualify, including borrowers with poor credit who took out loans to attend schools with high dropout rates as part of custom "packages" for schools to persuade the schools to make Sallie Mae (Navient's predecessor) a "preferred lender." These packages consisted of government-backed Federal Family Education Loans Program (FFELP) loans; private loans for borrowers who qualified for Sallie Mae's standard products (prime loans); and private loans for borrowers who were ineligible for Sallie Mae's standard loan products (subprime loans). By becoming a "preferred lender," Sallie Mae was able to originate a higher volume of the highly-profitable FFELP and prime loans.

69.     These subprime loans would often be accompanied by high interest rates as well as high origination fees. The complaints allege that Sallie Mae unfairly and deceptively engaged in a series of acts and practices to facilitate originating expensive, risky loans to many borrowers who had virtually no chance of repaying them, and that such loans were acceptable because Sallie Mae only required that the overall package of loan products made to a school needed to be profitable, not each loan within the package.

70.     The complaints also allege that, despite Navient's representations that they would help borrowers experiencing financial difficulties find solutions that

were in the best interest of the borrowers, Navient instead steered borrowers into forbearance as opposed to IDR plans that were usually a significantly better option than forbearance. This practice was in spite of statements on Navient's website that state that forbearance is appropriate for borrowers who "have a problem making on-time payments due to a temporary financial difficulty."

71.    The complaints state that due to Navient's incentive compensation plan, which compensated employees, in part, based on average call time, it was financially detrimental for employees to engage in the lengthy conversations needed to appropriately determine the right solution for each borrower. This problem was compounded by the fact that conversations about IDR and the amount of paper work required to initially enroll borrowers in IDR plans, and then later renew IDR plans, was vastly more time-consuming than the time needed to put a borrower into a forbearance plan.

72.    The complaints also allege that Navient failed to both clearly notify borrowers of a specific renewal deadline for the borrowers' IDR plans and to clearly disclose the extreme, negative consequences of that a borrower may face if timely IDR renewal was not made.

73.    The complaints note that this practice was particularly egregious for those borrowers receiving electronic communications as the e-mails Navient sent (as Sallie Mae) had a subject line simply stating "Your Sallie Mae Account Information" or "New Document Ready to View," but did not indicate that the emails contained any important renewal information. Navient tracked the number of borrowers who click on the hyperlinks contained within these emails that Navient sent to borrowers about IDR renewal, thus knew or should have known that many borrowers did not view the electronic renewal notices.

74.    The complaints further alleged deceptive practices regarding release of cosigners, particularly in defining what "consecutive" or "on-time" payments were

and how over-payments were applied. These cosigner release programs required a "consecutive, on-time principal and interest payment" for 12 to 48 months. When a borrower seeking to release of a cosigner would make a "multiplier overpayment," the borrower would be played in a "paid ahead" status for the subsequent months that had been satisfied by the excess payment, and then would get a bill indicating that the payment due for the subsequent months was $0. When a borrower in "paid ahead" status failed to make payment on a $0 balance, it was deemed to be a failure to make a "consecutive, on-time principal and interest payment" for the month, thus resetting the borrower's progress to zero months.

75.    The complaints also alleged general loan payment processing problems relating to failing to disclose how payments were allocated, repetitive failure to process payments as instructed, and failure to post payment at all. As a result of these practices, borrowers would receive harassing phone calls, would incur improper late fees and increased interest charges, and would have inaccurate, negative information reported to consumer reporting agencies.

76.    In association with the loan payment processing fees, the complaints alleged a failure within Navient's systems to identify, effectively track, or understand the problems that borrowers were experiencing and take action to correct these problems.

## G.    Navient's Response to the States' Attorneys General and CFPB's Allegations

77.    Navient responded to the law suits immediately, denying all allegations. Navient's  press release on January 18, 2017 stated:

> The allegations of the Consumer Financial Protection Bureau are unfounded, and the timing of this lawsuit—midnight action filed on the eve of a new administration—reflects their political motivations.
>  . . .

Navient has a well-established, superior track-record of helping student loan borrowers succeed in repayment. 49 percent of loan balances serviced by Navient for the federal government are enrolled in income-driven repayment plans. Assertions that we do not educate borrowers about IDR plans ignore the facts.

. . .

Navient has a responsibility to its customers, shareholders, and employees to defend itself—publicly and in court—against this unsubstantiated, unjustified and politically driven action. We cannot and will not accept agenda-driven ultimatums designed to get headlines rather than help for student borrowers. We will vigorously defend against these false allegations and continue to help our customers achieve financial success.

78.    Instead of addressing the problems or making efforts to fix non-compliant and misleading behaviors, Navient instead called them "unsubstantiated" and "unjustified" and continued with their deceptive, misleading, manipulative, and non-compliant practices.

79.    Investors relied on Navient's statements in response to these complaints, and believed that Navient was acting in accordance with its representations about its servicing practices and overall commitment to the financial health of its borrowers. This was untrue, however, and, as a result, artificially inflated Navient's stock price.

## H.    Navient Continued Its Illicit Servicing Practices into 2017 Despite the States' Attorneys General Complaints and Regulator Charges

80.    Navient, instead of announcing efforts to make any changes or reforms, denied all allegations and continued to tout itself as the industry leader in loan servicing, with compliant, 'customer-centric,' 'data-driven' loan servicing practices with the capacity to competently expand its student loan servicing base.

81.    In Navient's 2017 4th Quarter Investor Deck, Navient reported the following forbearance rates: 12.9% in 2016 and 11.2% in 2017 for FFELP Loans Segment "Core Earnings" Basis and 3.4% in 2016 and 3.8% in 2017 for Private

Education Loans Segment "Core Earnings" Basis. Within the Private Education Loan Segment, forbearance rates were 5.7% in 2016 and 6.8% in 2017 for Troubled Debt Restructurings ("TDR") loans and 1.6% for both 2016 and 2017 for non-TDR loans. These statistics show that there has been little, if any change in Navient's practices from 2016 through 2017. In fact, it is noteworthy that the forbearance rate for Navient's non-TDR Private Education loans remained constant while the TDR Private Education loans increased.

82.     Information obtained from former Navient employees confirms that the Company did not change its practices during 2017, but instead maintained its predatory servicing practices.

83.     CW1, a Navient employee from March 23, 2015 to Nov 11, 2016 as a loan specialist based in the Muncie, Indiana office, verified many of the egregious practices alleged in the CFPB, IL AG, and WA AG complaints.  CW1 worked primarily with borrowers who were having difficulty paying and in default prevention, as well as in special investigations regarding borrowers who had died. He primarily processed ED loans but also handled some private loans. He handled inbound calls only while other teams handled outbound calls. When asked what the procedure was when a borrower called up and said they were having a hard time paying, CW1 replied: "Do you want to know what *I* did or what *they* told us to? Because it's two different things." CW1 described what he called a "hierarchy" of loan repayment options for borrowers experiencing financial difficulty. The first option staff were told to direct borrowers towards was forbearance, followed by the graduated repayment plan, then offering an extended payment plan, and finally offering IDR as a last resort. Loan specialists were also instructed that if at any point a borrower got frustrated and said they were going to sue Navient, to tell borrowers to have their legal counsel reach out, and hang up immediately

84.    CW1 said that under this "hierarchy" script, after forbearance, Navient staff was supposed to steer borrowers to the graduated repayment plan. CW1 says supervisors told to sell the graduated repayment plan by telling borrowers that they would have significantly lower, interest-only payments to start. The borrower would then be told that each year their payments would increase but they would still be able to pay off the loan in the original 10 years. Navient did not necessarily give borrowers any information on how much their payments would incrementally increase over the years or how much more they would be paying over the life of the loan. He said that Navient's management rationalized this to loan specialists that by the fifth year most people would be doing better financially and therefore able to handle the higher payments from the graduated payment plan. If a borrower did not want to go onto a graduated repayment plan, a specialist was supposed to direct them to an extended payment plan.  An extended payment plan would extend the length of the term of the loan, which would, over the life of the loan significantly increase the amount of interest a borrower pays.

85.    Only if a borrower said no to all three of those options (i.e., forbearance, graduated, extended) were specialists supposed to offer the IDR plan. CW1 said that his practices deviated from Navient's scripted practices of offering forbearance first because he would attempt to talk borrowers out of going into forbearance and instead direct them to IDR as he knew that those programs were in the better interest of the borrower. "Unless the person just does not want to save money, there was never a reason for anybody not to put into income-driven." CW1 explained that even under IDR their interest rates would drop and their interest would not compound and they would still be able to pay more or pay the loan off should they so choose. At one point CW1 said he heard a team leader explain the repayment "hierarchy" by saying that getting borrowers into graduated and extended repayment plans was a priority for the company because of compounding interest.

86.    CW1 said there was a lot of pressure and attention paid to call time at Navient. The target time for an inbound call was 4 minutes or less, which CW1 described as being insufficient for the complexity of the tasks at hand. Navient management would write up workers in the call center whose times were over the monthly average and/or above the 4-minute target. Navient management also judged on a peer-to-peer level, such that if everyone else in the call center was exceeding the 4-minute mark and completing calls in 2 minutes, then workers would be written up for that as well because management believed you could be moving calls faster if your peers were moving calls faster. "If you wanted to keep your job, you had to get callers off the phone. So, things that needed to get done didn't get done."

87.    CW1 said he could get through a forbearance call in 2 minutes, start-to-finish. Even faster, he said, if he read the script really fast because, he said, there was no requirement for borrowers to understand the disclaimers about interest compounding. He said the words just need to be on the recording in case the recording is ever played back. Getting someone onto the graduated repayment would take him about 1 and a half minutes. In contrast, IDR enrollment would take 15 minutes to enroll, CW1 said, largely just because of time it takes to explain to people how the process works. He attributed that to the frequent changes in IDR options (income-contingent repayment vs. pay-as-you-earn, etc.)

88.    CW1 said that Navient management instructed CW1 and other loan specialists not to spend time walking borrowers through the ED website. Instead, staff were told to direct borrowers to call the ED for help with navigating the website. CW1 says that the ED was paying Navient for this service that it was not providing.

89.    CW1 said he could earn as much as a $1,200 bonus per month under Navient's incentive program. He said that employees would start out the month qualified for a bonus and slowly become disqualified for it if you did not meet very specific metrics. Those metrics included staying below the 4-minute average call

time, caller survey ratings staying above a 90% satisfaction rating, number of calls resolved, and sticking to 95% adherence to the work schedule. Adherence refers to the fact that their work schedule was regulated down to the minute. If you clocked in at 8:30 a.m. and were supposed to be on break at 9:30 a.m. but a call went too long and you didn't get off the phone until 9:45 you were considered "out of adherence." Many workers would rush callers off the phone, particularly as it came close to break times or other adherence checks, so that they could stay in adherence and secure their bonuses.

90.    CW1 described a piece of management software that supervisors use to monitor their call processors. That software shows how long everybody has been on the phone. When someone has been on the phone approaching 5 minutes, their icon turns red. If it gets to 20 minutes, the icon starts flashing. CW1 said that because of this you would have team leads and supervisors sending him chat messages while he was on lengthy calls with borrowers telling him to end the call or find ways to get them off the call. CW1 said that this was particularly the case because supervisor's bonuses were based on the adherence of the employees they supervised. He described one incident that a supervisor yelled at her subordinates because she did not get a bonus due to her subordinates being too far out of adherence. In addition, CW1 said there is a separate division called "workforce management" whose sole function is to enforce adherence. Workforce management staff would also simultaneously send chat messages telling CW1 and other callers to get off of lengthy calls.

91.    CW1 said he was warned multiple times for not following that hierarchy, offering IDR to most callers that came to him, and exceeding call times. He was fired after they monitored a call on which a borrower wanted to sign up for the income-contingent repayment plan, a subcategory of IDR. CW1 instead directed

the caller to the pay-as-you-earn IDR option, believing it to be a better financial option for him.

92.     CW1 also described the problems with misapplied payments. He described them as an "ongoing problem." CW1 said that when payments were processed by phone, it was easier and more likely for special instructions to be followed. However, this ran up against the pressure that call center workers had to get borrowers off the phone as quickly as possible because the more special application instructions were followed the more time the call took. CW1 said misapplied payments always happened to people who mailed in their payments via check and gave instructions that you wanted them applied a certain way, as those instructions would always be ignored. CW1 said that payments processed on the website also would not properly apply payments when borrowers attempted to select specific loans. He would regularly get calls from borrowers complaining about this after the payments were misapplied. CW1 said that he was able to, after a customer complained, back out any interest that should not have been there if a customer's special instructions were ignored. But that was contingent on a customer catching the error, complaining, and escalating the complaint until it was resolved.

93.     CW1 also described Navient's practice of cashing and holding onto improperly addressed checks without properly applying payments to borrowers' accounts. CW1 said that borrowers were often confused about to which entity they should mail payments: Navient or the ED. For ED loans, even those processed by Navient, physical checks apparently needed to be mailed to the ED's payment processing center in Georgia. CW1 described a special screen in the Navient database software where loan specialists could view all of the checks held in this state of limbo. He said on this screen he would see millions of dollars of checks that had been cashed, but the money from which had not been applied to any loan. CW1 called this the "299 screen," after the internal code Navient used to refer to the

checks in limbo. He said that on this screen checks were organized by borrower's social security number. He said this made borrowers or parents or co-signors confused and angry because they would see that the check was cashed and money withdrawn from their accounts, but there was no corresponding decrease in balance on any loan. CW1 said this made the entire limbo process particularly "ridiculous" because loans are looked up by a borrower's social security number, so it would have been very easy to simply query all of those social security numbers to see if any of those borrowers had outstanding ED loans that the checks should have been applied to. CW1 said 99% of the checks on the 299 screen had corresponding social security numbers. He said 1% of the checks there were customers who sent in checks with no social security numbers or account information on them.

94.    CW1 gave the example of one call he received from a man who attempted to pay off his daughter's ED loan. He mailed in a $350,000 cashier's check to Navient's payment processing center in Pennsylvania. Despite the fact that his daughter's name and account number were included with and on the check, Navient held onto the check and put it in escrow. CW1 said it would have been obvious if anyone had typed in the account number on the check that they would have seen it was an ED loan and Navient could have easily forwarded the check to the ED.

95.    CW2 worked at Navient from June 2015 to June 2017 as a Student Loans Customer Service Specialist in the Spanish-speaking group based in the Wilkes-Barre, PA office, and confirmed that egregious practices continued into the class period.

96.    CW2 said forbearance was "supposed to be our last option" but the way the options were presented, the company's script hid the risk and made it sound attractive and penalty-free to struggling borrowers. The way Navient instructed its customer service team to describe forbearances, it made that option sound attractive to struggling borrowers. "We were told to tell them they'd have a $0 per month

payment, what we weren't telling them is their interest is adding up," CW2 said. "We weren't able to tell them."

97.    CW2 also explained that forbearance reduced the paperwork for Navient. CW2 said it did because it involved one online tool, while deferment or IDR options required more paperwork, such as documentation from a school or government agency.

98.    CW2 also said that Navient's inbound call representatives were incentivized to end calls within an established upper-range time limit of between seven minutes and ten minutes, to keep hold-time for callers under 30 seconds, and sometimes offered incentives for doing things like enrolling buyers in paperless billing. CW2 said, "I know they gave incentives depending on the situation, but mostly just for ending calls in time and we couldn't put callers on hold for more than 30 seconds." That rule was problematic because if a representative did not know the answer to a question asked by a borrower the system did not leave much room for the worker to ask their supervisor without leaving the borrower on hold for too long and being penalized.

99.    CW2 discussed this in context of the forbearance program, "We had this system, if [the caller] said, 'Hey, I want to be placed in forbearance,' I click on forbearance, then the forbearance script pops up and I tell them the rules. The thing that does suck is, because we were timed, I caught myself and others reading really quick. Most people didn't understand and just agreed." CW2 said he noticed himself speeding up about halfway through the script, as the clock ticked down. "We'd lose our bonus at the end of time," CW2 said. To complete the forbearance script without going over the mandated time CW2 stated, "We had to power talk to get through -- half the people didn't understand what we said." CW2 explained that it was important to read the entire forbearance script that appeared on their company portal.

100.   CW2 noted, "Honestly, most of the calls I got, everyone had issues." CW2 often spoke with Spanish-speaking callers who didn't know and were never told how to repay their loan. CW2 explained that the income-based repayment options were better than forbearance, but not much for those with non-subsidized loans, but Navient did not allow its representatives to tell borrowers about the major downside of each option. CW2 received about 120 calls each work day from borrowers who were in a variety of situations. He estimated that on Monday through Thursday most of the callers were in trouble, and on Fridays, most people who called in wanted to make payments. Some borrowers called in to make their payments because they had little confidence in paying by mail or through the website, CW2 said. Checks and money orders could be mailed to Navient, but the process was confusing, CW2 recalled.

## I.     Despite Its Ongoing Consumer Violations, Navient Represented Itself as a Compliant, Trusted Source for Borrowers to Turn to for Assistance with Student Loans.

101.   Despite the three lawsuits against Navient for its egregious loan servicing practices filed on January 18, 2017, Navient denied any culpability and continued to hold itself out as an industry leader in student loan servicing, with compliant, 'customer-centric,' 'data-driven' loan servicing practices with the capacity to competently expand its student loan servicing base.

102.   Defendants repeatedly assured investors during the Class Period that forbearances were meant to afford temporary (not long-term) relief to borrowers, and that Navient engaged in a careful, borrower-specific evaluation of whether to grant forbearances. Defendants also repeatedly assured investors that Navient was diligent in complying with applicable laws and regulations. While compliance would naturally be of great concern to investors in a loan-servicer, it was even more important to Navient investors in light of the scrutiny the Company faced from the

CFPB and other agencies relating to the loan-servicing and collection practices of Navient's wholly-owned subsidiaries

### *Navient's Website*

103.   Navient, as a servicer of federal loans, has repeatedly and continually encouraged borrowers experiencing financial hardship to contact Navient for assistance in evaluating the various alternative repayment options. For example, from January 18, 2017 through April 4, 2018, Navient's website has included the following statements inviting borrowers to contact Navient for guidance in finding long-term repayment solutions:

> • "[I]f you're having trouble, there are options for assistance, including income-driven repayment plans, deferment, forbearance, and solutions to help you avoid delinquency and prevent default …. We can work with you to help you get back on track, and are sometimes able to offer new or temporarily reduced payment schedules. Contact us at 800- 722-1300 and *let us help you make the right decision for your situation.*"

> • "If you're experiencing problems making your loans payments, please contact us. *Our representatives can help you by identifying options and solutions, so you can make the right decision for your situation*."

> • "*Navient is here to help*. We've found that, 9 times out of 10, when we can talk to a struggling federal loan customer we can help him or her get on an affordable payment plan and avoid default. If you're worried about missing your payments or want to learn about other payment plans, engage with your servicer." (emphasis added).

104.   Defendants' website has stated since at least January 18, 2016 that forbearance is appropriate for borrowers who "***have a problem making on-time payments due to a temporary financial difficulty***." (emphasis added).

105.   The statements identified above in emphasis were materially misleading because they created the false impression that Navient was customer-oriented and conducted itself in a manner that was compliant with consumer

regulations. In reality, Navient did not. Navient instead placed borrowers into forbearance arrangements when IDR plans would have been more suitable. Additionally, these statements implied that forbearance was only used for temporary problems, when in reality, Navient often pushed troubled borrowers into forbearance when the borrowers had long-term difficulties. In fact, Navient would place borrowers into repeated forbearances.

*Press Release – January 18, 2017*

106.   On January 18, 2017, in response to the PA AG Complaint, Navient denied any wrongdoing and issued a press release, stating, in part, "Navient has a well-established, superior track-record of helping student loan borrowers succeed in repayment. 49 percent of loan balances serviced by Navient for the federal government are enrolled in income-driven repayment plans. ***Assertions that we do not educate borrowers about IDR plans ignore the facts***." (emphasis added).

107.   The statements identified above in emphasis were materially misleading because they created the false impression that Navient was customer-oriented and conducted itself in a manner that was compliant with consumer regulations, which included educating borrowers about IDR plans. Navient was referring to the 'ignored' facts that indicate that Navient places more borrowers into IDR plans than other servicers. In reality, Navient's practices incentivized employees to keep calls as short as possible using a script with a 'hierarchy' in which IDR was only discussed as a last resort, if at all.

*Conference Call – January 25, 2017*

108.   In the January 25, 2017 Navient Fourth Quarter 2016 earnings call. Jack Remondi, Navient's CEO, reinforced Navient's commitment to borrower success, stating "Our focus in the near term here is going to ***continue to communicate and demonstrate how we deliver borrower success. This means helping borrowers manage their payments***, as I have mentioned a few times, in terms of some of our

32

statistics, ***our customers are less likely to be delinquent, they're more likely to be enrolled in income driven repayment programs, and they are substantially less likely to default***." (emphasis added).

109.   The statements identified above in emphasis were materially misleading because they created the false impression that Navient was customer-oriented and was helping borrowers to be put in the best program to avoid default. This statement also falsely portrayed that their customers are less likely to be delinquent. In reality, Navient was using forbearance as a tool to artificially deflate delinquency and default rates. Additionally, Navient's time limits on calls and scripting practices steered borrowers into forbearance and virtually precluded Navient employees from even having the opportunity to discuss IDR options with borrowers.

<u>*Investor Presentation – February 7, 2017*</u>

110.   At the February 7, 2017 Credit Suisse Financial Services Forum, Remondi emphasized Navient's commitment to customers and the company's compliance when he stated:

> At Navient what we do, we use a data-driven approach in the way we run our operations and how we help our customers that goes above and beyond what is required by our contracts with the Department Of Education as well as what's required by the regulatory framework. ***For our 12 million loan customers they are less likely to be delinquent, they're more likely to be enrolled in income driven repayment programs or alternative payment programs and they are 31% less likely to default.*** In fact, if all servicers met our default prevention activities last year, 300,000 fewer borrowers would have defaulted.
> . . .
> Our data driven approach consistently deliver superior performance for our clients and we see that year in and year out in terms of the loan performance of lower delinquency and substantially lower default rates and ***we have a long history of a customer-first compliance-driven***

*operating environment*. So the federal student loan programs have long been heavily regulated more for purposes of ensuring the government guarantee in the account, but *we have built up over the years a very strong compliance and operating control structure.* (emphasis added)

111. The statements identified above in emphasis were materially misleading because they created the false impression that Navient was compliant, customer-oriented, and was helping borrowers to be put in the best program to avoid default. This statement also falsely portrayed that their customers are less likely to be delinquent. In reality, Navient was using forbearance as a tool to artificially deflate delinquency and default rates. Additionally, Navient's time limits on calls and scripting practices steered borrowers into forbearance and virtually precluded Navient employees from even having the opportunity to discuss IDR options with borrowers. Finally, Navient's loan payment applications were not compliant, and instead, were frequently being misapplied.

### *Annual Report – February 24, 2017*

112.  In public statements, including annual report (Form 10-K) filings with the U.S. Securities and Exchange Commission signed by Defendants Remondi and Chivavibul, Navient Corporation (including its predecessor SLM Corporation) has boasted about its capabilities with respect to large-scale student loan servicing and collection, including helping consumers navigate the path to financial success and select the appropriate payment plan for their circumstances in an efficient, compliant manner. For instance, Navient Corporation's 2016 10-K, filed February 24, 2017, include the following statements:

- Navient holds the largest portfolio of education loans insured or federally guaranteed under the Federal Family Education Loan Program ("FFELP"). We also hold the largest portfolio of Private Education Loans. Navient services its own portfolio of education loans, as well as education loans owned by the United States Department of Education ("ED"), financial institutions and nonprofit education lenders. Navient is one of the largest servicers

34

to ED under its Direct Student Loan Program ("DSLP"). ***Our data-driven insight, service and innovation support customers on the path to successful education loan repayment.***

- For all our clients, we aim to improve their financial performance, optimize their operations, and ***maintain compassionate, compliant service for their customers and constituents***.

- ***We continually make enhancements designed to help our customers, drawing from a variety of inputs including customer surveys, analysis of customer inquiries and complaint data***, regulator commentary and website activity. . . ***We are committed to working with customers and appreciate customer comments, which***, combined with our own customer communication channels, ***help us improve the ways we assist our customers***.

- Navient believes the credit risk of the Private Education Loans it owns is well managed through the rigorous underwriting practices and risk-based pricing applied when the loans were originated, the continued high levels of qualified cosigners, our internal servicing and risk mitigation practices, and ***our careful use of forbearance and loan modification programs***.  (emphasis added).

113.   Other statements in the 2016 annual report related directly to Navient's supposed efforts to enroll troubled borrowers in into the payment plan that is in the borrowers' best interests. For example:

- ***Commitment to compliance and customer centricity. Navient fosters a robust compliance culture driven by a "customer first" approach.*** We invest in rigorous training programs, internal and external auditing, escalated service tracking and analysis, and customer research to enhance our compliance and customer service.

- ***Navient's Approach Helps Education Loan Borrowers Achieve Success***. Navient services loans for more than 12 million DSLP Loan, FFELP Loan, and Private Education Loan customers, including 6.2 million customers whose accounts are serviced under Navient's contract with ED. ***We help our customers navigate the path to financial success through proactive outreach and innovative, data-driven approaches***.

- ***With customer success and default prevention as our top priorities***, we apply data-driven outreach that draws from our more than 40 years of experience . . . ***By tailoring our approach to each borrower's unique situation — e.g., recent graduates, students re-entering school, those experiencing hardships or those with student debt but no degree — we help ensure industry-leading outcomes***, as evidenced by a default rate that is 31 percent lower than other servicers.

- ***Getting borrowers into the right payment plans: We help customers understand the complex array of federal loan repayment options so they can make informed choices about the plans that are aligned with their financial circumstances and goals. We promote awareness of federal repayment plan options, including Income-Driven Repayment ("IDR")*** . . . ***We also help borrowers understand that options lengthening their repayment term may increase the total cost of their loans, while reminding them that they may pay extra or switch repayment plans at any time.***

- Forbearance involves granting the customer ***a temporary cessation of payments (or temporary acceptance of smaller than scheduled payments) for a specified period of time***. . . . Our forbearance ***policies include limits on the number of forbearance months granted consecutively and the total number of forbearance months granted over the life of the loan***. . . Forbearance as a recovery tool is used most effectively ***when applied based on a customer's unique situation***, including historical information and judgments. (emphasis added).

114.  The statements identified above in emphasis were materially misleading because they created the false impression that Navient was compliant, customer-oriented, and was helping borrowers to be put in the best program to avoid default. Additionally, this statement was materially misleading because it stated that it would help borrowers find repayment plans that are best for their unique situation. This statement also falsely portrayed that Navient's customers are less likely to be delinquent and that forbearance was only granted very selectively. In reality, Navient was using forbearance as a tool to artificially deflate delinquency and default rates,

with forbearance granted liberally and repeatedly. Additionally, Navient's time limits on calls and scripting practices steered borrowers, en masse, into forbearance and virtually precluded Navient employees from even having the opportunity to discuss IDR options with borrowers or learning of the borrowers' unique circumstance in order to find the best plan for them.

*Conference Call – April 19, 2017*

115. During Navient's April 19, 2017 First Quarter conference call, Remondi promoted Navient's ability to service loans on a large scale while also keeping the best interest of the borrower in mind. Referring to Navient's agreement to purchase JPMorgan Chase's approximately $6.9 billion education loan portfolio, Remondi said, "The agreement to purchase $6.9 billion in federal and private loans represents our unique capabilities to execute large, complex transactions. It's also a strong recognition of our ability to convert hundreds of thousands of borrowers to our servicing platform, ***using a highly regarded, well-tested and customer-centric conversion approach.***" (emphasis added).

116. The statements identified above in emphasis were materially misleading because they created the false impression that Navient was compliant, customer-oriented, with resources for large-scale loan servicing. In reality, Navient's efforts to cut overhead led to time limits on calls and scripting practices that steered borrowers into forbearance, which was not a 'customer-centric' approach, but instead a cost-cutting approach.

*Quarterly Report – April 27, 2017*

117. Navient, again, boasted about its capabilities with respect to large-scale student loan servicing and collection, including helping consumers navigate the path to financial success and select the appropriate payment plan for their circumstances in an efficient, compliant manner in its 10-Q for quarter ending March 31, 2017,

filed on April 27, 2017. These filings, signed by Defendants Remondi and Lown, stated:

- Navient holds the largest portfolio of education loans insured or federally guaranteed under the Federal Family Education Loan Program ("FFELP"). We also hold the largest portfolio of Private Education Loans. Navient services its own portfolio of education loans, as well as education loans owned by the United States Department of Education ("ED"), financial institutions and nonprofit education lenders. Navient is one of the largest servicers to ED under its Direct Student Loan Program ("DSLP"). *Our data-driven insight, service and innovation support customers on the path to successful education loan repayment.*

- For all our clients, we aim to improve their financial performance, optimize their operations, and *maintain compassionate, compliant service for their customers and constituents*.

- *We continually make enhancements designed to help our customers, drawing from a variety of inputs including customer surveys, analysis of customer inquiries and complaint data*, regulator commentary and website activity. . . *We are committed to working with customers and appreciate customer comments, which*, combined with our own customer communication channels, *help us improve the ways we assist our customers*.      (emphasis added).

118.   Other statements in the 10-Q for quarter ending March 31, 2017, filed on April 27, 2017 related directly to Navient's supposed efforts to enroll troubled borrowers in into the payment plan that is in the borrowers' best interests. For example:

- *Commitment to compliance and customer centricity. Navient fosters a robust compliance culture driven by a "customer first" approach. We invest in* rigorous training programs, internal and external auditing, *escalated service tracking and analysis, and customer research to enhance our compliance and customer service.*

- ***Navient's Approach Helps Education Loan Borrowers Achieve Success***. Navient services loans for more than 12 million DSLP Loan, FFELP Loan, and Private Education Loan customers, including 6.2 million customers whose accounts are serviced under Navient's contract with ED. ***We help our customers navigate the path to financial success through proactive outreach and innovative, data-driven approaches***.

- ***With customer success and default prevention as our top priorities***, we apply data-driven outreach that draws from our more than 40 years of experience . . . ***By tailoring our approach to each borrower's unique situation — e.g., recent graduates, students re-entering school, those experiencing hardships or those with student debt but no degree — we help ensure industry-leading outcomes***, as evidenced by a default rate that is 31 percent lower than other servicers.

- ***Getting borrowers into the right payment plans: We help customers understand the complex array of federal loan repayment options so they can make informed choices about the plans that are aligned with their financial circumstances and goals. We promote awareness of federal repayment plan options, including Income-Driven Repayment ("IDR")*** . . . ***We also help borrowers understand that options lengthening their repayment term may increase the total cost of their loans, while reminding them that they may pay extra or switch repayment plans at any time.***

- Forbearance involves granting the customer ***a temporary cessation of payments (or temporary acceptance of smaller than scheduled payments) for a specified period of time***. . . . Our forbearance ***policies include limits on the number of forbearance months granted consecutively and the total number of forbearance months granted over the life of the loan***. . . Forbearance as a recovery tool is used most effectively ***when applied based on a customer's unique situation***, including historical information and judgments. (emphasis added).

119.  On April 28, 2017, in Navient's 2017 1First Quarter Investor Deck, Navient's slide titled, "In Its Role As Student Loan Servicer, ***Navient Helps***

***Borrowers Successfully Repay Their Loans***" described Navient's role as follows: ***Navient works with borrowers to help them assess multiple repayment options and successfully repay loans***. (emphasis added).

120.   The statements identified above in emphasis were materially misleading because they created the false impression that Navient was compliant, customer-oriented, and was helping borrowers to be put in the best program to avoid default. Additionally, this statement was materially misleading because it stated that it would help borrowers find repayment plans that are best for their unique situation. This statement also falsely portrayed that their customers are less likely to be delinquent and that forbearance was only granted very selectively. In reality, Navient was using forbearance as a tool to artificially deflate delinquency and default rates, with forbearance granted liberally and repeatedly. Additionally, Navient's time limits on calls and scripting practices steered borrowers, en masse, into forbearance and virtually precluded Navient employees from even having the opportunity to discuss IDR options with borrowers or learning of the borrowers' unique circumstance in order to find the best plan for them.

*Investor Presentation – May 16, 2017*

121.   On May 16, 2017, at the Barclays Americas Select Conference, Remondi discussed Navient's processing solutions and rebutted the claims made in the CFPB, IL AG, and WA AG complaints when he stated:

> ***In business processing solutions, we have developed a very strong competency in managing large volumes of very complicated transactions and applying data analytics to those practices and routines to improve performance. And we do so in a very highly compliant manner***.

> …

*One of the claims in the suit is that we steer borrowers into non-income-driven repayment solutions, things like forbearance that are temporary repayment deferment solutions.* Yet loans serviced by Navient are more likely to be enrolled in income-driven repayment programs than other servicers. I told you that our default rate is 31% lower than all other servicers, and our customers are less likely to be delinquent. One of the statistics that we find most telling in this space is that 9 times out of 10, *when we can connect with a delinquent borrower, we're able to resolve that delinquency and keep the borrower out of default.* And by contrast, 90% of the federal loan customers we service that do default each year ignore all of the outreach efforts that we make to assist them. So there's some clear opportunities for improvement, but we think the facts are going to stand on -- are going to show the right answer, and the courts will get to the right conclusions here.   (emphasis added).

122. The statements identified above in emphasis were materially misleading because they created the false impression that Navient able to handle large-volume loan servicing in a compliant, customer-oriented manner that was helping borrowers to be put in the best program to avoid default. Additionally, this statement was materially misleading it outright denied that Navient was steering borrowers into forbearance plans. In reality, Navient was using forbearance as a tool to artificially deflate delinquency and default rates, with forbearance granted liberally and repeatedly. Additionally, Navient's time limits on calls and scripting practices steered borrowers, en masse, into forbearance and virtually precluded Navient employees from even having the opportunity to discuss IDR options with borrowers or learning of the borrowers' unique circumstance in order to find the best plan for them. Additionally, Navient's ability to service large volumes of loans was not due to resources or efficiency, but, instead, because of the practices of limiting call durations, which were ultimately detrimental to the borrower.

*Second Quarter Earnings Call – July 19, 2017*

123. Remondi again promoted Navient's loan-processing abilities with focus on compliance and customer-oriented policies at the July 19, 2017 Second Quarter Earnings Call, when he stated, in reference to the proposal for the "recompete" of the federal student loan servicing contract:

> One of the largest opportunities is the recompete of the federal student loan servicing contract. The process has seen some delays, but final bids were submitted earlier this month. We believe our proposal meets or exceeds the deliverables set out in the RFP. Our strengths include our proven track record of ***high-quality, customer-centric account conversions, systems integrity, positive customer experience and of course, exceptional default prevention skills***. Further, we would bring our superior track record of innovation and ***leveraging data analytics to drive customer success***.
>
> . . .
>
> The things that we believe standout in terms of our proposal is our long and very, ***very successful track record of converting substantial numbers of accounts on to our platform in a very customer-friendly way.*** We have a very detailed process that we follow there that involves how we communicate with the customer, educate them about the changes that are coming, and then complete that conversion process. We run today in our call centers a distributed call center function today, so this would be exactly what we do. ***And then the big value add that we bring to the equation is we've got this very extensive kind of data analytics or data-driven strategies that we built over time that allow us to deliver substantially better performance***. (emphasis added).

124. The statements identified above in emphasis were materially misleading because they created the false impression that Navient able to handle large-volume loan servicing in a compliant, customer-oriented manner that would result in customer success. In reality, Navient's ability to service large volumes of loans was not due to resources or efficiency, but, instead, because of the practices of limiting call durations, which were ultimately detrimental to the borrower. These

durational limits on calls and scripting practices steered borrowers, en masse, into forbearance and was not a practice that would "drive customer success."

*Quarterly Report – August 1, 2017*

125.   Navient promoted its capabilities with respect to large-scale student loan servicing and collection, including helping consumers navigate the path to financial success and select the appropriate payment plan for their circumstances in an efficient, compliant manner in its 10-Q for quarter ending June 30, 2017 filed on August 1, 2017. These filings, signed by Defendants Remondi and Lown, stated:

- Navient holds the largest portfolio of education loans insured or federally guaranteed under the Federal Family Education Loan Program ("FFELP"). We also hold the largest portfolio of Private Education Loans. Navient services its own portfolio of education loans, as well as education loans owned by the United States Department of Education ("ED"), financial institutions and nonprofit education lenders. Navient is one of the largest servicers to ED under its Direct Student Loan Program ("DSLP"). ***Our data-driven insight, service and innovation support customers on the path to successful education loan repayment.***

- For all our clients, we aim to improve their financial performance, optimize their operations, and ***maintain compassionate, compliant service for their customers and constituents***.

- ***We continually make enhancements designed to help our customers, drawing from a variety of inputs including customer surveys, analysis of customer inquiries and complaint data***, regulator commentary and website activity. . . ***We are committed to working with customers and appreciate customer comments, which***, combined with our own customer communication channels, ***help us improve the ways we assist our customers***. (emphasis added).

126.   Other statements in the 10-Q for quarter ending June 30, 2017, filed on August 1, 2017 related directly to Navient's supposed efforts to enroll troubled

borrowers in into the payment plan that is in the borrowers' best interests. For example:

- ***Commitment to compliance and customer centricity. Navient fosters a robust compliance culture driven by a "customer first" approach. We invest in*** rigorous training programs, internal and external auditing, ***escalated service tracking and analysis, and customer research to enhance our compliance and customer service.***

- ***Navient's Approach Helps Education Loan Borrowers Achieve Success.*** Navient services loans for more than 12 million DSLP Loan, FFELP Loan, and Private Education Loan customers, including 6.2 million customers whose accounts are serviced under Navient's contract with ED. ***We help our customers navigate the path to financial success through proactive outreach and innovative, data-driven approaches.***

- ***With customer success and default prevention as our top priorities***, we apply data-driven outreach that draws from our more than 40 years of experience . . . ***By tailoring our approach to each borrower's unique situation — e.g., recent graduates, students re-entering school, those experiencing hardships or those with student debt but no degree — we help ensure industry-leading outcomes***, as evidenced by a default rate that is 31 percent lower than other servicers.

- ***Getting borrowers into the right payment plans: We help customers understand the complex array of federal loan repayment options so they can make informed choices about the plans that are aligned with their financial circumstances and goals. We promote awareness of federal repayment plan options, including Income-Driven Repayment ("IDR")*** . . . ***We also help borrowers understand that options lengthening their repayment term may increase the total cost of their loans, while reminding them that they may pay extra or switch repayment plans at any time.***

- Forbearance involves granting the customer ***a temporary cessation of payments (or temporary acceptance of smaller than scheduled payments) for a specified period of time***. . . . Our forbearance

*policies include limits on the number of forbearance months granted consecutively and the total number of forbearance months granted over the life of the loan*. . . Forbearance as a recovery tool is used most effectively *when applied based on a customer's unique situation*, including historical information and judgments. (emphasis added).

127.   On August 2, 2017, in Navient's 2017 Second Quarter Investor Deck, Navient's slide titled, "In Its Role As Student Loan Servicer, *Navient Helps Borrowers Successfully Repay Their Loans*" described Navient's role as follows: *Navient works with borrowers to help them assess multiple repayment options and successfully repay loans*. (emphasis added).

128.   The statements identified above in emphasis were materially misleading because they created the false impression that Navient was compliant, customer-oriented, and was helping borrowers to be put in the best program to avoid default. Additionally, this statement was materially misleading because it stated that it would help borrowers find repayment plans that are best for their unique situation. This statement also falsely portrayed that their customers are less likely to be delinquent and that forbearance was only granted very selectively. In reality, Navient was using forbearance as a tool to artificially deflate delinquency and default rates, with forbearance granted liberally and repeatedly. Additionally, Navient's time limits on calls and scripting practices steered borrowers, en masse, into forbearance and virtually precluded Navient employees from even having the opportunity to discuss IDR options with borrowers or learning of the borrowers' unique circumstance in order to find the best plan for them.

\*          \*          \*

129.   The statements in this subsection of the Complaint (identified above in emphasis) were false and/or materially misleading. Each statement created the false impression that Navient was a compliant, efficient, 'customer-centric' loan servicer

with resources to provide borrowers with competent advice and loan servicing that was in the best interest of the borrower on a large-scale basis. These also statements led investors to believe that use of forbearance was limited and for short-term use only.

130. In reality, Navient actively steered borrowers into forbearance regardless of whether it was in the best interest of the borrower and, in fact, often omitted to even mention the more beneficial IDR options with borrowers. Navient indiscriminately and, often repeatedly, pushed borrowers experiencing long-term difficulties into forbearance which was severely damaging to borrowers because of the interest that would continue to accrue while the loan remained in forbearance.

131. As discussed below, the PA AG Lawsuit alleged that Navient had on-going, non-compliant, and misleading loan servicing practices throughout the class-period. As discussed above, CW1 and CW2 verify the PA AG Lawsuit's allegations that Navient's non-compliant and misleading loan servicing practices were on-going, and occurred both prior to and continued through the class period.

132. CW1 and CW2 described an employee incentive program that pressured employees to minimize call-length while also following a script in which forbearance was emphasized above all other options (while IDR was only offered as a last-resort when borrowers refused other options). CW1 described what he called a "hierarchy" of loan repayment options for borrowers experiencing financial difficulty. Navient systematically directed borrowers into forbearance programs, followed by the graduated repayment plan, then offering an extended payment plan, and finally offering income-driven repayment as a last resort. CW2 noted that some loan servicers were not even allowed to mention some of the negative consequences of forbearance.

133. CW1 described the Navient bonus structure. CW1 said that he could earn as much as a $1,200 bonus per month. There were no incentive bonuses like on

a sales commission, but rather you would start out your month qualified for a bonus and slowly become disqualified for it if you did not meet very specific metrics. Those metrics included: staying below the 4-minute and average call time; caller survey ratings staying above a 90% satisfaction rating; number of calls resolved; and sticking to 95% adherence to the work schedule.

134.   Adherence refers to the fact that their work schedule was regulated down to the minute. If an employee clocked in at 8:30 a.m. and was schedule to be on break at 9:30 a.m., but a call went too long and the employee did not get off the phone until 9:45, they were considered "out of adherence." Many workers would rush callers off the phone, particularly as it came close to break times or other adherence checks, so that they could stay in adherence and secure their bonuses.

135.   CW1 said there was a lot of pressure and attention paid to call time at Navient. The target time for an inbound call was 4 minutes or less. CW1 described that time as being insufficient for the complexity of the tasks at hand. Management would write up workers in the call center whose times were over the monthly average and/or above the 4-minute target. Management also judged on a peer-to-peer level, such that if everyone else in the call center was exceeding the 4-minute mark and completing calls in 2 minutes, then workers would be written up for that as well — because management believed you could be moving calls faster if your peers were moving calls faster.

136.   CW1 also noted that Management instructed loan specialists not to spend time walking borrowers through the Department of Education website. Instead, staff were told to direct borrowers to call the Department of Education for help with navigating the website.

137.   CW1 also described a piece of management software that supervisors use to monitor their call processors. That software shows how long everybody has been on the phone. When someone has been on the phone approaching 5 minutes,

their icon turns red. If it gets to 20 minutes, the icon starts flashing. CW1 said that because of this you would have team leads and supervisors sending him chat messages while he was on lengthy calls with borrowers telling him to end the call or find ways to get them off the call. CW1 said that this was particularly the case because supervisor's bonuses were based on the adherence of the employees they supervised. He described one incident that a supervisor yelled at her subordinates because she did not get a bonus due to her subordinates being too far out of adherence.

138.   In addition, CW1 said there is a separate division called "workforce management" whose sole function is to enforce adherence. Workforce management staff would also simultaneously send chat messages telling CW1 and other callers to get off of lengthy calls.

139.   CW2 spoke of similar where inbound call representatives were given incentives to keep call times short and to encourage borrowers to opt in to paperless communications. He said that Navient there was an upper time limit for calls with borrowers of "seven-to-10 minutes." He said Navient also sometimes offered incentives to representatives for doing things like enrolling buyers in paperless billing.

140.   CW2 said "I know they gave incentives depending on the situation, but mostly just for ending calls in time and we couldn't put callers on hold for more than 30 seconds." That rule was problematic because if a representative did not know the answer to a question asked by a borrower the system did not leave much room for the worker to ask their supervisor without leaving the borrower on hold for too long and being penalized.

141.   CW2 also noted that even when putting borrowers into a forbearance agreement, he was often pressed for time. "The thing that does suck is, because we were timed, I caught myself and others reading really quick. Most people didn't

understand and just agreed," CW2 said. CW2 said he noticed himself speeding up about halfway through the script, as the clock ticked down because "We'd lose our bonus at the end of time." To complete the forbearance script without going over the mandated time CW2 said, "We had to power talk to get through -- half the people didn't understand what we said."

142.   As the CWs note, because Navient representatives were so closely monitored for compliance and because their compensation was so closely tied to call-length, representatives were more concerned with staying in compliance to meet the financial incentives than in helping borrowers find the best repayment plan. Borrowers went to Navient looking for help, often at the instruction of the ED website, which encourages borrowers to contact their respective servicers for help, yet Navient's cost-cutting and deceptive practices effectively deprived borrowers of any legitimate chance of loan repayment counseling.

143.   Further, Defendants knew that there were problems with their loan payment process, caused by Defendants' practices and limited staffing resources. In fact, Defendants even maintained a database of payments that had been processed by Navient but not yet applied to any loans. In addition, Defendants knew of or intentionally disregarded the numerous calls from borrowers complaining about payments not being applied properly, or at all to loans. Despite maintaining this database as well as fielding calls from disgruntled borrowers whose payments had been misapplied or not applied at all, Navient still claimed to be compliant, highly efficient, 'data-driven,' and 'customer-centric.' The contradiction between Defendants' statements and actual policies and practices is strong evidence that Defendants either intended to mislead investors or intentionally disregarded the risk of doing so.

144. The truth concerning Navient's servicing practices was extremely important to investors and, had it been known, would have altered the total mix of information available to the public.

145. Investor concern for compliance was heightened for investors in Navient, because, as company in an area of heavy regulation, had increased scrutiny due to recent allegations of non-compliant and misleading practices by the CFPB and two States' Attorneys General.

146. Additionally, Navient's aggressive use of forbearances would have been material to investors because an increased number of forbearances allowed Navient to artificially decrease the number of defaults, delinquencies, and charge-offs on its loan portfolios as borrowers in forbearance were still considered "current" on their accounts. This, in turn, made Navient look like a less risky investment. It also allowed Navient to artificially understate its provisions for loan losses. And because loan loss provisions were recorded as an expense on Navient's income statement, artificially depressing them allowed Navient to report artificially inflated net income and EPS. An artificially inflated net income and EPS would have been important to investors as those are key metrics that investors often use in evaluating a company.

147. Further, Navient's capacity to compliantly service loans was important to investors given the high level of regulation in the industry, the numerous ED contracts available at that time, as well as allocation of additional volume under the current ED contracts. For example, Compass Point Research & Trading, LLC notes in the Risks section of their analyst reports on Navient that, "The student lending industry faces significant regulation by states, the FDIC, the Department of Education, and the Consumer Financial Protection Bureau (CFPB)." Under the terms of the ED TIVAS contract extension, the allocation of additional volume will be determined twice each year based on the relative performance of the servicers

utilizing five performance metrics: borrowers in current repayment status (30 percent), borrowers more than 90 but less than 271 days delinquent (15 percent), borrowers 271 days or more but less than 360 days delinquent (15 percent), a survey of borrowers (35 percent), and a survey of ED personnel (5 percent). As borrowers put in forbearance were considered to be in current repayment status, the misrepresentations of their practices would have been important to investors as it manipulated the data upon which future loan allocation, and correspondingly, future business, was based.

## J.    Pennsylvania Attorney General Files Consumer Protection Complaint Revealing the Truth and Investors Sustain Significant Damages

148.   Investors did not discover the truth about Navient's servicing practices until October 5, 2017, when PA AG Josh Shapiro announced the filing of a lawsuit in United States District Court for the Middle District of Pennsylvania against Navient and one of its subsidiaries for engaging in unfair and deceptive lending and failed to offer proper prepayment plans to student.[1]

149.   The PA AG Lawsuit alleges that Navient violated state and federal law by failed to inform borrowers who were experiencing long-term financial hardship of more favorable loan payment options under an IDR plan and instead pushed borrowers into forbearance in an effort to cut costs and maximize profit which caused, or was likely to cause, substantial financial harm to the borrower. Specifically, the PA AG Lawsuit alleges that:

> 109. Nevertheless, since at least July 2011, despite publicly assuring borrowers that it will help them identify and enroll in an appropriate, affordable repayment plan, Defendants have routinely disregarded that commitment and instead steered borrowers experiencing long-term financial hardship into forbearance.

---

[1] Styled as *Commonwealth of Pennsylvania*, By *Attorney General Josh Shapiro v. Navient Corporation and Navient Solutions, LLC*, Case No. 3:17-cv-01814.

180. As described above, while engaging in trade or commerce within the Commonwealth through steering borrowers suffering long-term financial hardship into forbearance, Defendants:

   a. Misrepresented, either expressly or by implication, the suitability of certain federal loan repayment options for borrowers struggling with their payments;

   b. In phone calls, failed to meaningfully disclose to borrowers struggling to make their payments that the federal government offers IDR plans to help borrowers avoid default;

   c. Misrepresented that Defendants would "work with" borrowers struggling to pay their loans, "help [borrowers] make the right decision for [their] situation"; and "help [borrowers] by identifying options and solutions, so [borrowers] can make the right decision for [their] situation" when, in fact, Defendants in many instances did not do so; and

   d. Continuously offered forbearances to borrowers who demonstrated a long-term inability to repay, when in fact forbearance is intended for a temporary hardship.

150.   The PA AG Lawsuit alleges that Navient as violated state and federal law through repeated payment processing errors which caused substantial injury to consumer in the form of late fees, interest accrual, and negative credit reporting. Specifically, the PA AG Lawsuit alleges that:

200. As described above, while engaging in trade or commerce within the Commonwealth through processing payments by borrowers and/or co-signors toward their student loans, Defendants:

   a. Unfairly made errors, sometimes month after month, in misallocating and misapplying payments made by borrowers;

   b. failed to implement adequate processes and procedures to prevent the same errors from recurring; and

   c.   misapplied and misallocated borrower payments.

   151.   In connection with filing the case, on October 5, 2017, PA AG Josh Shapiro released a statement stating, "Navient's deceptive practices and predatory conduct harmed student borrowers and put their own profits ahead of the interests of millions of families across our country who are struggling to repay student loans."

   152.   PA AG Shapiro also appeared on CNBC's "Power Lunch" program on October 5, 2017, to give an in-depth interview concerning the allegations being leveled against Navient. "Power Lunch" is a daily, two hour-long television program that focuses exclusively on issues related to the stock market. It often features interviews with chief executive officers and other high-level executives as well as stock market analysts and investment bankers. The program, on average, is viewed by tens of thousands of viewers each day. During the interview, PA AG Shapiro said:

> I could care less about their [Navient's] stock prices, I care about student loan holders in the Commonwealth of Pennsylvania and across the United States who have been victimized by widespread abuse from Navient, the largest student loan lender across our country with a big presence here in Pennsylvania. But one where we have seen students preyed upon, ***we have seen schemes from Navient that have cost billions of dollars that have been taken out of the pockets of students*** . . . the facts will clearly show that their widespread abuse has had an1 effect, a negative effect, on student loan holders across this country…
>
> . . .
>
> We want to change corporate behavior, we want to make sure the scales are tipped in favor of students, in favor of those who hold the loans.
>
>  . . .
>
> There are so many abuses, but here is one that is particularly horrible when it comes to these student loan holders. Navient had a program

where you could actually repay your student loan based on your earnings, right? ***And instead of steering these student loan holders towards that, they instead put them in a risky scheme where they jacked up the interest rates, and ultimately that scheme costs student loan holders four billion dollars. That is four billion dollars that they should never have had to pay in the first place, but because of this marketing practice – because they directed people that way- these student loan holders were left paying four billion dollars more than they needed to. There are so many abusive practices- there's widespread abuse- that one is particularly egregious.***
(emphasis added)

153.    Numerous local and international media outlets reported on the PA AG Lawsuit on October 5, 2017, including Philadelphia's The Inquirer, The Philadelphia Business Journal, U.S. News & World Report, ABC News, The Washington Post, Nasdaq.com, and Bloomberg. In each instance, reports focused squarely on widespread abuses in the student loan servicing business.

**K.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.**

154.    During the Class Period, as detailed herein, Navient and the defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Navient's securities and operated as a fraud or deceit on Class Period purchasers of Navient's securities by materially misleading the investing public. Later, when Defendants' prior misrepresentations and fraudulent conduct became apparent to the market, the price of Navient's securities materially declined, as the prior artificial inflation came out of the price over time. As a result of their purchases of Navient's securities during the Class Period, Plaintiffs and other members of the Class suffered economic loss, *i.e.*, damages under federal securities laws.

155.   Specifically, on October 4, 2017, Navient's stock price closed at $14.70. On October 5, 2017, Navient's stock price closed at $12.60 per share on unusually heavy volume. Between October 4, 2017 and October 5, 2017, Navient's stock price fell $2.10 per share, a drop of approximately 14%, on the news of the Pennsylvania AG's complaint. Barrons.com reported after market close on October 5, 2017 that Navient's market capitalization fell to $3.5 billion to from $4 billion the prior day. The significant decline in Navient's stock price was caused directly by the Company's continued misrepresentations about their practices which artificially inflated the stock price followed by yet another Attorney General filing another complaint alleging deceptive and misleading loan servicing practices in violation of Pennsylvania State and Federal Laws.

156.   CFRA Equity Analyst Scott Kessler wrote in his October 11, 2017 report of Navient, "We also note an October 2017 lawsuit filed by the Pennsylvania Attorney General with what we see as more expansive accusations." He also wrote in his research notes for October 5, 2017, "NAVI is down significantly today, as Pennsylvania's Attorney General sues the company, alleging "widespread abuses" in its student loan origination and servicing businesses, including "deceptive practices and predatory conduct [that] harmed student borrowers." Although similar suits have been filed by the Consumer Financial Protection Bureau (CFPB), in Washington and Illinois, we note Pennsylvania is home to considerable student loan activity. Interestingly, NAVI also announces what we think is a smart proposed purchase of digital student loan company Earnest for $155 million."

157.   The decline in Navient's stock price was caused by the PA AG Lawsuit and related publicity. Investors discovered the true nature of Navient's servicing practices (which had been previously concealed) and reacted sharply by selling the stock immediately. This resulted in damages to Navient investors.

**L.     Defendants Acted with Scienter**

*Knowledge of Falsity*

158.  Defendants provided investors with material information concerning the Company's loan servicing practices and capabilities, holding themselves out to be a compliant loan servicer with low default rates due to their highly efficient, 'data-driven,' 'customer-centric' practices while at the same time knowing that their practices were not highly efficient, 'data-driven,' or 'customer-centric,' and the reason for the low default rates were due to Navient's practice of driving borrowers into forbearance. Three key facts support the conclusion that Defendants knew Navient was engaging in the improper, illicit servicing conduct described above:

159.  <u>First</u>, Navient was the subject of several lawsuits prior to the start of the class period. These lawsuits focused on the 'forbearance scheme' as well as various problems with loan servicing, thus defendants were on notice of their conduct and that their public statements were materially misleading.

160.  The egregiousness, pervasiveness, and duration of Navient's undisclosed forbearance practices which began long before the class period strongly indicate senior management knew of and approved those practices, or could only have disregarded them by consciously turning a blind eye to them. Moreover, Defendants rejected the notion of any wrongdoing in response to the CFPB, IL AG, and WA AG complaints, meaning that they were on notice of the wrongdoing. The PA AG Lawsuit similarly describes the pervasiveness and systematic nature of Navient's forbearance practices.

161.  <u>Second</u>, Navient implemented and maintained compensation plans that steered borrowers into forbearance plans while also minimizing call time in which customers might be serviced. These compensation plans and practices for handling calls were in accordance with Navient policies and, therefore, would not have existed without the individual defendants' approval.

162. Additionally, as detailed in the various CFPB, IL AG, WA AG, and PA AG complaints, these improper loan servicing practices were not the sporadic actions of rogue employees, but rather highly systematized, including through the use of scripts. Such a streamlined process for dealing with borrowers could not have been implemented without the knowledge and approval of senior management.

163. In fact, Navient's employee compensation plans incentivized against the exact practices that Navient boasted as merits. The contradiction between Defendants' statements and actual policies and practices is strong evidence that Defendants knew that Navient's public statements were false and either intended to mislead investors or recklessly disregarded the risk of doing so.

164. Third, the forbearance scheme and loan servicing practice (often resulting misapplication or non-application of payments) impacted Navient's bottom line in a material manner, so much so that the forbearance scheme amounted to an integral part of the company's core operations. These practices allowed Defendants to minimize costs by paying fewer workers to process more calls and payments while also manipulating financials such that more loans would be listed as current, thus allowing for a higher EPS as well as appearing less risky to investors. This also allowed Defendants to be able to report better metrics to ED to allow for increased allocations of Federal Loans. The Individual Defendants oversaw all material aspects of Navient's day-to-day operations and, therefore, would have been aware of the forbearance scheme and its material effect on Navient's financials.

165. Navient maintained incentive policies that encouraged the improper forbearance practices. Senior executives would have known about such widespread practices spawned by Company policies that were implemented by management. There was nothing more critical to Navient's financial results and prospects for future ED contracts than Navient's financial results and servicing data. Navient's

pervasive practice of placing borrowers into forbearance materially impacted the Company's financial results and thus went to the Company's core operations.

166.   As noted above, misusing forbearances allowed Navient to artificially understate the levels of delinquencies, defaults, and charge-offs in its loan portfolios, as borrowers in forbearance were still considered "current" on their accounts. Understating delinquencies, defaults, and charge-offs allowed Navient in turn to artificially understate its provisions for loan losses. And because loan loss provisions were recorded as an expense on Navient's income statement, artificially depressing them allowed Navient to report artificially inflated net income and EPS. That manipulation of core financial information would have required the knowledge (or reckless disregard) of Navient's senior executives.

167.   Defendants acted with scienter when making their representations concerning Navient's servicing practices. Given the pervasiveness of improper loan-servicing activities at Navient, it is inconceivable that the Company's senior executives, were unaware of them. Particularly so given that, as with forbearances and related issues, legal compliance was at the core of Navient's operations. Indeed, it was necessary to the Company's very survival, given the particular significance of legal compliance to a heavily regulated entity like Navient.

### *Motive and Opportunity*

168.   On January 18, 2017, in response to three complaints filed by the IL and WA Attorneys General and the CFPB, Navient denied any wrong-doing and began a ten-month charade to mislead both investors and the Department of Education into believing that Navient was a compliant loan servicer with low default rates due to their highly efficient, 'data-driven,' 'customer-centric' practices. By driving students into forbearance as opposed to taking the time to explain loan options, Navient was able to accomplish a number of goals.

169. Navient, through the use of an employee incentive program to limit call times and a script in which borrowers were steered into forbearance program, was able to keep labor costs down by processing more calls from borrowers in less time with fewer employees. Navient placed borrowers into forbearance in lieu of counseling and enrollment in IDR programs. As described above, the process to explain and enroll a borrower in forbearance was far less time-consuming than the process for explaining various IDR options and enrolling borrowers in the program, thus by utilizing a script that pushed forbearance over IDR, Navient was able to service more troubled borrowers in less time and with fewer employees.

170. This policy, while beneficial to the company by limiting overhead, was detrimental to borrowers and in direct conflict with Navient's practices as represented to the public and Department of Education.  Navient placed borrowers into forbearance in lieu of counseling and enrolling them in alternative repayment programs, including IDR plans. In doing so, Navient avoided (at borrowers' expenses) the higher operational costs associated with properly counseling and enrolling borrowers in such plans. That is, it would take significantly more time, and thus employee resources, to shepherd a borrower through the process of getting into an alternative repayment plan than simply to place her into forbearance. As the CFPB explained, "[a]s the volume of [IDR] plan applications and renewals received by Navient increases, Navient also has to increase the size of its staff to review and process those forms, thereby increasing operating costs." Navient thus avoided those necessary operating costs by improperly placing borrowers into forbearance. That, in turn, would necessitate hiring more personnel to meet the needs of Navient's customer base. By eschewing its stated commitment to promote borrowers' best interests, Navient artificially kept its operational costs lower than they should have been.

171.   Defendants also pushed borrowers into forbearance to avoid having to classify those borrowers as delinquent or in default, which would raise a red flag to analysts and investors that Navient's loan portfolios were exposed to higher levels of risk than Defendants disclosed, and that the Company was in turn a riskier investment than Defendants portrayed to the market. This was beneficial to Navient because it portrayed as being a less risky investment to investors.

172.   Increases in delinquencies, defaults, and charge-offs caused the Company to increase its loan loss provisions, whereas favorable delinquency and default trends correspond with lower provisions. The provision for loan losses "increases the related allowance for loan losses," i.e., the total reserve set aside to address charge-offs. Navient records those provisions as an expense on its income statement, so lower provisions allow the Company to report higher income, resulting in higher EPS. By overusing forbearances, Navient artificially kept delinquencies, defaults, and charge-offs lower than they should have been, which in turn allowed the Company to report artificially low loan loss provisions as well as correspondingly high net income and EPS.

173.   This process was additionally beneficial to Navient because by pushing borrowers into forbearance, and then, often, repeatedly enrolling borrowers in forbearance programs, Navient was able to keep borrowers out of delinquency or default while continuing to accrue and capitalize interest on the loans.

174.   Additionally, using forbearance to artificially increase EPS, Navient was able to artificially decrease delinquencies and defaults, which are key metrics that ED uses in analyzing how to allocate additional loan servicing under the TIVAS contracts.

175. Navient had Management Incentive Plan for Navient's Named Executive Officers ("NEOs") designed to drive performance metrics that aligned with Navient's business objectives. For 2016, these performance metrics included

(i) EPS on a "Core Earnings" basis, (ii) strategic debt financing proceeds, and (iii) private education loan defaults. As Navient noted in its Proxy Statement dated April 13, 2017, "Gross loan defaults is a key metric used by our investors and others to measure the performance of our loan portfolios." There was a target for each of the performance metrics, with a weight assigned to each metric, as well as a scale of "payout factors" to assess the Company's performance relative to target. These payout factors range from 50% based on a threshold level of performance, to 150% based on a maximum level of performance, with performance below threshold resulting in a payout factor of 0%. The weight-value for the Performance Metrics were broken down as follows - the Earnings Per Share on a "Core Earnings" Basis was weighted at 40%, Strategic Debt Financing Proceeds was weighted at 20%, Fee Income (generated through loan servicing, asset recovery, and other business processing activities) was weighted at 10%, Private Education Loan Gross Defaults were weighted at 15% and Revenue from Growth Business (non-federal-loan-related business) was weighted at 15%.

176. For 2016, Navient's performance resulted in above-target payments under the 2016 Management Incentive Plan. Under the 2016 Management Incentive Plan, NEO's received bonus which were 166.665% (150% times 11.1%) of their respective base salaries, in addition to their base salaries Remondi received $1,666,500 while Chivavibul received $633,270 in additional compensation on top of their respective base salaries. Remondi's base salary for 2016 was $1,000,000 while Chivavibul received $380,000. Such large performance-based compensations were strong incentives for the NEOs to manipulate EPS and loan default statistics.

177. Further, by increasing the number of trouble borrowers serviced in a compliant manner, with in shorter times, and with lower labor costs, Navient was able to make itself more attractive to the ED in that Navient could boast its capacity to service high volumes of loans at lower costs. This was particularly important

during 2017 when the Trump administration was trying make a number of changes and offering new loan servicing contracts. For instance, Wedbush noted on April 17, 2017 in its report on Navient that actions by ED Secretary Betsy DeVos to issue a memo on` her purposed single-servicer contract "is a reset that could ultimately extend to all areas of related servicing and open doors previous closed to Navi with the Department of Education."

178. Navient also continued to misrepresent that it was a compliant, highly efficient, 'data-driven' loan servicer with 'customer-centric' practices despite on-going issues with misapplication of loan payments and numerous customer complaints associated with this problem. As discussed above, Navient had a strong motive to hold itself out as being a compliant, efficient, customer-oriented loan servicer so that it could put itself in a better place to win various ED contracts.

## M.   Presumption of Reliance; Fraud-On-The-Market

179. At all relevant times, the market for Navient's common stock was an efficient market for the following reasons, among others:

    (a)    Navient's common stock met the requirements for listing and was listed and actively traded on the NASDQ Exchange, a highly efficient and automated market;

    (b)    Navient communicated with public investors via established market communication mechanisms, including disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

    (c)    Navient was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms during

the Class Period. Each of these reports was publicly available and entered the public marketplace; and

(d)     Unexpected material news about Navient was reflected in and incorporated into the Company's stock price during the Class Period.

180.   As a result of the foregoing, the market for Navient's common stock promptly digested current information regarding Navient from all publicly available sources and reflected such information in Navient's stock price. Under these circumstances, all purchasers of Navient's common stock during the Class Period suffered similar injury through their purchase of Navient's common stock at artificially inflated prices, and a presumption of reliance applies.

181.   Alternatively, reliance need not be proven in this action because the action involves omissions and deficient disclosures. Positive proof of reliance is not a prerequisite to recovery pursuant to ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security.

## N.     No Safe Harbor: Inapplicability of Bespeaks Caution Doctrine

182.   The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the material misrepresentations and omissions alleged in this Complaint.

183.   To the extent certain of the statements alleged to be misleading or inaccurate may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

63

184.   Defendants are also liable for any false or misleading "forward-looking statements" pleaded because, at the time each "forward-looking statement" was made, the speaker knew the "forward-looking statement" was false or misleading and the "forward-looking statement" was authorized and/or approved by an executive officer of Navient who knew that the "forward-looking statement" was false. Alternatively, none of the historic or present-tense statements made by the defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by the defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

**PLAINTIFFS' CLASS ACTION ALLEGATIONS**

185.   Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Navient securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosure. Excluded from the Class are defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

186.   The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Navient securities were actively traded on the NASDAQ market. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified

from records maintained by Navient or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions. As of September 30, 2017, there were 263,012,203 shares of Navient common stock outstanding. Upon information and belief, these shares are held by thousands, if not millions, of individuals located throughout the country and possibly the world. Joinder would be highly impracticable.

187.   Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

188.   Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

189.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)   whether the federal securities laws were violated by defendants' acts as alleged herein;

(b)   whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Navient;

(c)   whether the Individual Defendants caused Navient to issue false and misleading financial statements during the Class Period;

(d)   whether defendants acted knowingly or recklessly in issuing false and misleading financial statements;

(e)     whether the prices of Navient's securities during the Class Period were artificially inflated because of the defendants' conduct complained of herein; and

(f)     whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

190.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## COUNT I

### Against Defendants Navient and Individual Defendants

### for Violations of Section 10(b) and Rule 10b-5 Promulgated Thereunder

191.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

192.   This Count is asserted against defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

193.   During the Class Period, defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiffs and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud

in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Navient securities; and (iii) cause Plaintiffs and other members of the Class to purchase or otherwise acquire Navient's securities and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

194.   Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Navient's securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Navient's finances and business prospects.

195.   By virtue of their positions at Navient, defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of the Class, or, in the alternative, defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to defendants. Said acts and omissions of defendants were committed willfully or with reckless disregard for the truth. In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

196.   Information showing that defendants acted knowingly or with reckless disregard for the truth is peculiarly within defendants' knowledge and control. As the senior managers and/or directors of Navient, the Individual Defendants had knowledge of the details of Navient's internal affairs.

197.   The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Navient. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Navient's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Navient's securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Navient's business and financial condition which were concealed by defendants, Plaintiffs and the other members of the Class purchased or otherwise acquired Navient's securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by defendants, and were damaged thereby.

198.   During the Class Period, Navient's securities were traded on an active and efficient market. Plaintiffs and the other members of the Class, relying on the materially false and misleading statements described herein, which the defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Navient's securities at prices artificially inflated by defendants' wrongful conduct. Had Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at

the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiffs and the Class, the true value of Navient's securities was substantially lower than the prices paid by Plaintiffs and the other members of the Class. The market price of Navient's securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiffs and Class members.

199. By reason of the conduct alleged herein, defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

200. As a direct and proximate result of defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

**Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act**

201. Plaintiffs repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

202. During the Class Period, the Individual Defendants participated in the operation and management of Navient, and conducted and participated, directly and indirectly, in the conduct of Navient's business affairs. Because of their senior positions, they knew the adverse non-public information about Navient's misstatement of income and expenses and false financial statements.

203. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Navient's financial condition and results of operations, and to correct

promptly any public statements issued by Navient which had become materially false or misleading.

204. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Navient disseminated in the marketplace during the Class Period concerning Navient's operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Navient to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Navient within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Navient's securities.

205. Each of the Individual Defendants, therefore, acted as a controlling person of Navient. By reason of their senior management positions and/or being directors of Navient, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Navient to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of Navient and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

206. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Navient.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs demand judgment against defendants as follows:

A.      Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class representative;

B.      Requiring defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C.      Awarding Plaintiffs and the other members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.      Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury.

Dated: April 3, 2018                    **LEVI & KORSINSKY, LLP**

                                        s/ Eduard Korsinsky
                                        Eduard Korsinsky (EK-8989)
                                        30 Broad Street, 24th Floor
                                        New York, New York 10004
                                        Tel.:  (212) 363-7500
                                        Fax:  (212) 363-7171
                                        Email: ek@zlk.com

                                             -and-

                                        Nicholas I. Porritt (*pro hac vice* to be submitted)
                                        Adam M. Apton (*pro hac vice* pending)
                                        1101 30th Street NW, Suite 115
                                        Washington, DC 20007
                                        Tel: (202) 524-4290
                                        Fax: (202) 333-2121
                                        Email: nporritt@zlk.com
                                        Email: aapton@zlk.com

*Counsel for Plaintiffs and Lead Counsel for the Class*

# <u>CERTIFICATE OF SERVICE</u>

I, Eduard Korsinsky, hereby certify that on April 3, 2018, I authorized the electronic filing of the foregoing complaint with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the registered participants as identified on the Notice of Electronic Filing.

/s/ Eduard Korsinsky
Eduard Korsinsky