**LEVI & KORSINSKY, LLP**
Eduard Korsinsky (EK-8989)
55 Broadway, 10th Floor
New York, New York 10006
Tel.:  (212) 363-7500
Fax:  (212) 363-7171
Email: ek@zlk.com

*Attorneys for Lead Plaintiff*
*and Lead Counsel for the Class*

[Additional Counsel on Signature Page]

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| IN RE NAVIENT CORPORATION SECURITIES LITIGATION | Master File No. 17-8373 (RBK/AMD)<br><br>**SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

Lead Plaintiff Jesse Wayne Pritchard, individually and on behalf of all other persons similarly situated (hereinafter "Plaintiff"), by his undersigned attorneys, alleges in this Second Amended Class Action Complaint for Violation of the Federal Securities Laws (the "Complaint") the following upon knowledge with respect to his own acts, and upon facts obtained through an investigation conducted by his counsel, which included, *inter alia*: (a) review and analysis of relevant filings made by Navient Corporation ("Navient") with the United States Securities and Exchange

Commission (the "SEC"); (b) review and analysis of Navient's public documents, conference calls and press releases; (c) review and analysis of securities analysts' reports and advisories concerning Navient; (d) review and analysis of complaints and other documents relating to the cases against Navient; and (e) information readily obtainable on the Internet.

Plaintiff believes that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. Most of the facts supporting the allegations contained herein are known only to Defendants or are exclusively within their control.

## <u>NATURE OF THE ACTION</u>

1.      This is a federal securities class action on behalf of a class consisting of all persons who purchased or otherwise acquired Navient common stock between January 18, 2017 and November 20, 2018 at approximately 2:00 p.m. ET, inclusive (the "Class Period"), seeking to recover damages for violations of the federal securities laws under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule 10b-5 promulgated thereunder, against Navient, its Chief Executive Officer, John F. Remondi, and its Chief Financial Officers during the Class Period: Somsak Chivavibul and Christian M. Lown.

2.      Throughout the Class Period, Navient, one of the largest student loan servicers, engaged in an illegal scheme to cheat struggling student borrowers out of their rights to lower repayment plans and, therefore, profit at these students' expense. In no less than six different lawsuits, the Consumer Financial Protection Bureau ("CFPB") and State Attorneys General from Illinois, Washington, Pennsylvania, California, and Mississippi alleged that Navient routinely places borrowers into "forbearance" status in order to generate additional profit, even when forbearance is detrimental to the borrower and the borrower would have been unquestionably better off with a different repayment plan. Evidence, including discovery from the CFPB's

lawsuit as well as a federal audit of Navient conducted by the United States Department of Education (the "Department of Education"), has shown that these allegations were true.

3.     During the Class Period, Navient had an official corporate policy to actively steer borrowers into forbearance status for corporate gain at the expense of struggling students. Evidence of this corporate policy is demonstrated by a Navient script for its customer service representatives that provided the option of forbearance first and other plans, such as income-based or income-driven repayment plans ("IDR"), only as a last resort. Navient also maintained a unique employee compensation program that incentivized employees to spend as little time as possible on calls with borrowers. Importantly, the process for describing and enrolling a student in forbearance was much quicker than enrolling in an IDR plan. Thus, Navient employees were routinely rewarded for following its script and placing borrowers into forbearance even when this was not in the borrower's best interests. Navient never disclosed this to investors when discussing its loan servicing practices.

4.     Forbearance did, however, benefit Navient and its executives. First, by decreasing the length of calls with borrowers, Navient's customer service representatives were able to service more loans in shorter amounts of time. In turn, Navient was able to lower its operating expenses and increase the company's earnings-per-share ("EPS"). Second, by placing loans into forbearance, Navient was able to lower the number of loans with a "default" or "delinquent" status. EPS and loan status were large factors in determining executive bonuses. Additionally, loan status also influenced the number of loans Navient would receive for servicing from the Department of Education. Navient would receive more loans from the Department of Education if it had fewer loans in default or delinquent status. Thus,

Navient's future business in servicing educational loans was highly dependent upon having favorable metrics in these areas.

5.     Navient, however, gave a very different impression of its operations to its investors.  Its Chief Executive Officer, John F. Remondi, categorically stated that allegations that Navient pushed borrowers into "forbearance" arrangements instead of IDR plans (which allow borrowers to repay loans in accordance with their respective incomes) were "baseless," "unfounded," and "patently false." According to Remondi, Navient "help[ed] customers understand the complex array of federal loan repayment options so they can make informed choices" and, when it came to forbearance, Remondi said that Navient maintained "policies" to protect student borrowers by setting "limits on the number of forbearance months granted . . . ."

6.     Navient's categorical denial of the allegations as "unfounded" and "unsubstantiated" was false. Evidence obtained in the course of the CFPB's lawsuit against Navient provides concrete examples of borrowers that were placed into forbearance to their detriment even though another repayment plan was available and unquestionably the better alternative. The evidence also shows that that Navient did this in order to "gain[]" an "advantage because enrolling borrowers into forbearance is quicker and less expensive to administer than other repayment plans, thus decreasing Navient's operating costs." Indeed, according to testimony from Navient's Senior Vice President, Operations Support, Patricia Peterson, no paperwork was typically required from a borrower if he or she requested orally to be placed into forbearance whereas, on the other hand, a request for an IDR plan required extensive explanation and paperwork which consumed significantly more employee time and operating resources.

7.     Other evidence shows that Navient required its customer service representatives to follow "flow charts" when interacting with borrowers that were designed to maximize forbearance and minimize the use of IDR plans. At Navient's

direction, customer service representatives continuously enrolled "[h]undreds of thousands of consumers" in "forbearance for a period of two or three years, or more" for the purpose of reaping additional profits while minimizing the company's operating costs.

8.      Navient's categorical denials of wrongdoing are also false based upon evidence obtained in the course of a federal audit conducted by the Department of Education's Federal Student Aid office ("FSA"). In direct response to the CFPB's lawsuit, the FSA audited Navient's forbearance practices between March 20 and 24, 2017 (the "FSA Audit"). The FSA concluded that Navient had, in fact, been placing borrowers into forbearance without providing them with other, more beneficial options. The FSA provided its findings to Navient and, after giving Navient an opportunity to respond, the FSA finalized its conclusions in a report dated May 18, 2017.

9.      Despite the fact that the FSA's report was complete no later than May 18, 2017, Navient did not disclose it. Instead, Navient concealed that the audit had occurred, that the FSA initiated the audit in response to the CFPB's lawsuit, and that the FSA Audit found evidence in support of the CFPB's allegations. Navient should have disclosed this information not only because it was material to investors, but also because it was required to do so under Item 229.103 of Regulation S-K. Had the public known about the audit or that it confirmed the CFPB's allegations, Remondi would have lost all credibility with analysts and investors, and Navient's stock would have plummeted given the company's exponentially elevated risk of regulatory exposure.

10.      The truth started to emerge on October 5, 2017 when, after months of repeated denials by Remondi, the Pennsylvania Attorney General filed a complaint against Navient focusing in particular on Navient's scheme to place borrowers into forbearance starting in 2011 and continuing through 2017 (the "PA AG Complaint").

The PA AG Complaint alleged that, "since at least July 2011, despite publicly assuring borrowers that it [would] help them identify and enroll in an appropriate, affordable repayment plan, Defendants [had] routinely disregarded that commitment and instead steered borrowers experiencing long-term financial hardship into forbearance."

11. Investors began to question whether Navient and Remondi had been telling the truth and, in response to the news of the PA AG Complaint, began selling off their shares of Navient stock in order to avoid losses arising from Navient's regulatory exposure. Following a televised interview of the Pennsylvania Attorney General as well as numerous reports from several news outlets, Navient's stock price declined from $14.70 to $12.60 on unusually heavy volume in the span of just one day. According to Barrons.com, Navient's market capitalization fell from $4 billion to $3.5 billion during this period.

12. Yet Navient incredibly continued to deny any wrongdoing. The same day of the PA AG Complaint, Navient issued a press release again stating, "***The allegations are completely unfounded*** and the case was filed without any review of Pennsylvania residents' customer accounts." Remondi made this denial even though his company had been, and was continuing, to require its employees to use a "script" that effectively foreclosed borrowers from having any realistic shot of obtaining a suitable repayment plan. Moreover, by this point, the FSA Audit had already obtained evidence confirming the truth of the CFPB's allegations.

13. Defendants continued to mislead the public until November 20, 2018. On that day, at approximately 2:00 p.m. ET, the Associated Press provided the FSA Audit to the public in an exclusive report titled "AP Exclusive: Gov't questions unfair student loan practices." The report revealed publicly for the first time that the FSA had audited Navient in response to the CFPB's lawsuit and that the audit had uncovered evidence showing that Navient's customer service representatives

routinely did not offer borrowers any options other than forbearance. The report stated, in pertinent part, that: "The conclusions of the 2017 audit, which until now have been kept from the public and were obtained by The Associated Press, appear to **support federal and state lawsuits that accuse Navient of boosting its profits by steering some borrowers into the high-cost plans without discussing options that would have been less costly in the long run**" (emphasis added). The FSA Audit also included a written response from Navient addressing the FSA's findings, proving that Navient knew about the FSA Audit throughout the Class Period.

14.     Numerous news sources quickly reported on the FSA Audit findings, including *CNBC*, *American Banker*, *Fox Business News*, *Market Watch*, and *CBS*. Investors began selling their stock immediately now that they knew Remondi had been lying to them and, as a result, Navient's stock price plummeted in response to the news. On November 20, 2018, Navient's stock price closed at $10.73 per share on unusually heavy volume, falling $1.27, or 11% from the prior day's close of $12.00.

15.     Because Defendants deliberately concealed these illegal practices towards Navient's borrowers, its stock price was inflated throughout the Class Period. Investors were unaware that Navient's earnings were inflated as a result of its policy of pushing borrowers into forbearance and away from IDRs. When Navient's policy was exposed, its investors were harmed when its stock price declined. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of Navient's common stock, Plaintiff and the Class has suffered significant losses and damages.

### JURISDICTION AND VENUE

16.     The claims asserted herein arise under and pursuant to §§ 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

17.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

18.    Venue is proper in this District pursuant to § 27 of the Exchange Act and 28 U.S.C. §1391(b), as Defendant maintains offices in this District and a significant portion of Defendants' business, actions, and the subsequent damages, took place within this District.

19.    In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## **PARTIES**

20.    Plaintiff Jesse Wayne Pritchard purchased Navient common stock at artificially inflated prices during the Class Period and was damaged upon the revelation of the defendants' fraud. Plaintiff filed his certification evidencing his transactions previously with the Court in connection with his motion for appointment as Lead Plaintiff. Plaintiff's certification is incorporated herein by reference.

21.    Defendant Navient provides asset management and business processing services to education, health care, and government clients at the federal, state, and local levels in the United States.  Navient is incorporated in Delaware and maintains an office in Moorestown, New Jersey. Navient's common stock was traded on the Nasdaq Global Select Market ("NASDAQ") under the ticker symbol "NAVI" and, as of September 30, 2017, there were 263,012,203 shares of Navient common stock outstanding

22.    Defendant John F. Remondi ("Remondi") has been Navient's Chief Executive Officer throughout the Class Period.

23.     Defendant Somsak Chivavibul ("Chivavibul") has been Navient's Chief Financial Officer from April 2014 until March 26, 2017.

24.     Defendant Christian M. Lown ("Lown") has been Navient's Chief Financial Officer since March 27, 2017.

25.     Defendants Remondi, Chivavibul, and Lown are sometimes referred to herein as the "Individual Defendants."

26.     Each of the Individual Defendants:

a.     directly participated in the management of Navient;

b.     was directly involved in the day-to-day operations of Navient at the highest levels;

c.     was privy to confidential proprietary information concerning Navient and its business and operations;

d.     was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the materially false and misleading statements and information alleged herein;

e.     was directly or indirectly involved in the oversight or implementation of Navient's internal controls;

f.     was aware of or recklessly disregarded the fact that the materially misleading false and misleading statements were being issued concerning Navient; and/or

g.     approved or ratified these statements in violation of the federal securities laws.

27.     Navient is liable for the acts of the Individual Defendants and its other employees under the doctrine of respondeat superior and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

28.     The scienter of the Individual Defendants and other employees and agents of Navient is similarly imputed to Navient under respondeat superior and common law agency principles.

29.     Navient and the Individual Defendants are referred to herein, collectively, as the "Defendants."

30.     The Individual Defendants, because of their positions with Navient, possessed the power and authority to control the contents of Navient's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. Each Individual Defendant was provided with copies of Navient's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein.

## SUBSTANTIVE ALLEGATIONS

**A.    Background.**

31.     Navient engages in servicing of federal and private student loans for more than 12 million borrowers, including originating federal and private loans, marketing student loans and loan packages to schools and students, and servicing and collecting loans, under one corporate structure.

32.     Navient services federal loans pursuant to a contract with the Department of Education that was signed by its predecessors, SLM Corporation and Sallie Mae, Inc., in 2009.

33.     Navient operates in a heavily regulated industry, rendering compliance with applicable laws and regulations critical to Navient's business. Navient was subject to, *inter alia*, the Consumer Financial Protection Act and the Fair Credit Reporting Act and other federal and state consumer protection and privacy laws.

34.     Navient is one of the ten major loan servicers that have contracts with the Department of Education and one of four larger servicers awarded Title IV Additional Servicer (TIVAS) contracts. Title IV financial aid is federally funded aid such as Federal Pell Grant, Federal Supplemental Educational Opportunity Grant (SEOG), Federal Perkins Loan, and Federal Subsidized and Unsubsidized Direct Loans. TIVAS contractors service these loans and grants.

35.     On August 27, 2014, the Department of Education extended its TIVAS contract with Navient to service federal loans for five more years. As Navient outlined in its Form 10-K annual report for 2016 (the "2016 10-K"), under the terms of the contract extension, the allocation of additional volume will be determined twice each year based on the relative performance of the servicers utilizing five performance metrics: borrowers in current repayment status (30 percent), borrowers more than 90 but less than 271 days delinquent (15 percent), borrowers 271 days or more but less than 360 days delinquent (15 percent), a survey of borrowers (35 percent), and a survey of Department of Education personnel (5 percent). Quarterly scores in each metric are to be averaged together twice each year to calculate the final result for each metric.

36.     As of December 31, 2016, Navient serviced approximately 6.2 million accounts or $197.0 billion in loans and recorded $840 million in education related revenue. The education related revenue accounted for 82.8% of Navient's revenue in 2016. Navient earned $151 million of revenue under the contract for the year ended December 31, 2016. The $151 million from Department of Education service contracts accounted for 17.9% of Navient's education related revenue in 2016.

Intercompany loan servicing, including FFELP Loans owned by Navient, accounted for $389 million while other education related revenues, such as revenue from private education loans, accounted for $300 million. Navient noted in its 2016 10-K Risk Factors section, "If Navient is unable to improve its performance and increase its relative standing compared to the three other servicing companies with whom it competes, its ability to maintain or increase its servicing business with Department of Education may be materially adversely affected."

37.     Department of Education revenue was critical to Navient's overall operations. Because of its importance to Navient, the Individual Defendants actively monitored Navient's Department of Education operations, including Navient's servicing practices.

**B.     Federal Student Loan Repayment Options.**

38.     Federal Student loans are loans funded or guaranteed by the federal government. Federal Student loans are also unique in that they are: 1) primarily need-based and made to borrowers regardless of credit history, with automatic approval if the student meets program requirements; 2) the interest rate is capped by the federal government; and 3) have a variety of repayment options available to borrowers, including repayment based on the borrower's income.

39.     Borrowers typically access federal loans before private loans because federal student loans have lower interest rates and better repayment options.

40.     A student borrower enters repayment after completing school (or after ceasing to be a student for a certain period of time). Upon entering repayment, a federal student loan borrower is assigned to or selects a specific repayment plan. That borrower has the right to change his/her repayment plan assignment or selection at any time, including if the borrower is experiencing financial hardship or distress.

41.     The Department of Education offers numerous repayment plans to eligible borrowers with federal student loans, which are designed to help borrowers

manage their student loan debt and make monthly repayment of these loans more affordable. These repayment plans include several IDR plans, such as Income-Based Repayment ("IBR") and Pay As You Earn Repayment ("PAYE"). Most federal student loans are eligible for at least one IDR plan.

42.   The monthly amount that the borrower will pay under the IDR plans is set at an amount that is intended to be more affordable based on the borrower's income and family size, and may be as low as $0 per month.

43.   In addition to providing a more affordable monthly payment, most IDR plans offer several other benefits for federal student loan borrowers, especially borrowers experiencing long-term financial hardship. For borrowers with subsidized loans whose monthly payment amount does not fully cover accrued interest, the federal government will pay any remaining unpaid interest that accrues on those loans during the first three consecutive years of enrollment in the plan.

44.   This interest subsidy can be a significant benefit to such borrowers because they generally have no obligation to ever pay the remaining unpaid interest that accrues during those three years. Furthermore, because that unpaid interest is paid in full by the federal government, it is not added to the principal balance of the loan. When interest is not paid, it can be added to the principal balance of the loan; additional interest is then charged on the increased principal balance of the loan, which could significantly increase the total amount repaid over the life of the loan. Thus, the interest subsidy available to many borrowers enrolled in IDR plans can reduce these additional harmful effects, mitigating the financial strain on those borrowers.

45.   Another benefit available to borrowers who are enrolled in an IDR plan is forgiveness of the remaining balance of their federal loan, either after making 20-25 years of qualifying payments for most IDR plans or 10 years of qualifying payments while working full time for certain public service employers.

46.     Federal student loans are generally also eligible for forbearance, which is a short-term, temporary postponement of payment. With forbearance, a borrower experiencing financial hardship or illness may be able to stop making payments or reduce his or her monthly payment for a defined period of time.

47.     Forbearance is typically not suitable for borrowers experiencing financial hardship or distress that is not temporary or short-term. Borrowers who enroll in forbearance face significant costs, which generally increase the longer the borrower is in forbearance. These include the accumulation of unpaid interest and the addition of that unpaid interest to the principal balance of the loan. In addition, in some cases, following a forbearance, a loan may be reamortized, where the monthly payments may be recalculated, which can lead to an increase in the borrower's monthly payment amount. As a result of these costs, long-term enrollment in forbearance can dramatically increase the total amount due each month after the forbearance period ends and over the repayment term for a borrower's federal loans.

48.     *U.S. News and World Reports* discussed the dangers of forbearance, "The problem with forbearance is that interest still accrues on all loans, even subsidized Stafford loans, and if you do not pay the interest, it is capitalized – or added – on to the principal balance at the end of the forbearance period. This means that borrowers who use forbearance end up paying interest on top of interest, which isn't good. The capitalizing interest can also cause your monthly payment to increase because of the larger balance, depending on your payment plan. So if you can't afford your student loan payments today, you may have an even harder time affording them once the forbearance has concluded."

49.     Because IDR plans enable borrowers to avoid or reduce these costs associated with forbearance, for borrowers whose financial hardship is not

temporary and short-term, enrolling in an IDR plan is usually a significantly better option than forbearance.

50.     Because of the number and complexity of repayment options available for federal loans, a conversation about alternative repayment plans and the borrower's financial situation is usually time-consuming.

51.     Moreover, since to enroll in an IDR plan, a borrower is required to submit a paper or online application, and include certain income tax documentation with that application, the process of enrolling a borrower in such plans sometimes requires multiple, lengthy conversations with the borrower.

52.     In addition to the paperwork required to enroll a borrower in an IDR plan, a borrower in such a plan must also complete a recertification form each year to document his/her current income and family size, which is then used to adjust the borrower's payment amount. Processing this renewal paperwork further increases the employee time that Navient must devote to borrowers who enroll in an IDR plan.

53.     This affordable payment amount applies for a period of twelve months. At the end of this twelve-month period, the affordable payment amount will expire unless the borrower renews his/her enrollment in the plan before the expiration date. To do so, the borrower must "recertify" his/her income and family size by submitting updated information, including documentation of income each year.

54.     If the twelve-month period expires because the borrower has not timely recertified income and family size, several negative consequences are likely to occur. First, the borrower's monthly payment amount may immediately increase from a low affordable amount to one that is typically in the hundreds or even thousands of dollars.

55.     Other significant consequences that will occur when the twelve-month period expires without a timely recertification include (1) the addition of any unpaid, accrued interest to the principal balance of the loan; (2) for subsidized loans in the

first three years of enrollment in an IDR plan, the loss of an interest subsidy from the federal government for each month until the borrower renews his/her enrollment; and (3) for some borrowers who enroll in forbearance when the twelve-month period expires, delayed progress towards loan forgiveness because the borrower is no longer making qualifying payments that count towards loan forgiveness. These consequences are all irreversible, thus it is extremely important that loan servicers give borrowers clear and timely notice of the process and timeline for renewal.

56. In contrast, enrollment in forbearance can often be completed over the phone, in a matter of minutes, and generally without the submission of any paperwork.

57. Putting a borrower into forbearance is less labor-intensive both in terms of call-length and paperwork, thus it is more cost efficient for Navient to put borrowers into forbearance rather than expend the time and labor necessary to discuss and then enroll a borrower into an IDR plan.

58. The Department of Education has publicly encouraged borrowers to consult their federal student loan servicer to determine the best repayment option or alternative for that individual borrower. In several places on its website, the Department of Education has advised borrowers to contact their student loan servicer before applying for any alternative repayment plan or forbearance, with statements such as the following: "Work with your loan servicer to choose a federal student loan repayment plan that's best for you"; "Before you apply for an income-driven repayment plan, contact your loan servicer if you have any questions. Your loan servicer will help you decide whether one of these plans is right for you"; and "Always contact your loan servicer immediately if you are having trouble making your student loan payment."

**C.    The Complaints filed by the Consumer Financial Protection Bureau and State Attorneys General in Illinois and Washington Put Defendants on Notice of Violations.**

59.    On January 18, 2017, the CFPB and State Attorneys General from Washington and Illinois filed lawsuits against Navient claiming multiple violations relating to predatory lending practices, including failures to disclose all loan payment options resulting in the funneling borrowers into forbearance versus IDR.

60.    The complaints alleged that, despite Navient's representations that they would help borrowers experiencing financial difficulties find solutions that were in the best interest of the borrowers, Navient instead steered borrowers into forbearance as opposed to IDR plans that were usually a significantly better option for borrowers than forbearance. This practice was in spite of statements on Navient's website that state that forbearance is appropriate for borrowers who "have a problem making on-time payments due to a temporary financial difficulty."

61.    The complaints alleged that due to Navient's incentive compensation plan, which compensated employees, in part, based on having a short average call time, it was financially detrimental for employees to engage in the lengthy conversations needed to appropriately determine and discuss the right solution for each borrower. This problem was compounded by the fact that conversations about IDR and the amount of paper work required to initially enroll borrowers in IDR plans, and then later renew IDR plans, was vastly more time-consuming than the time needed to put a borrower into a forbearance plan.

**D.    Navient's Response to the State Attorneys General and CFPB's Allegations.**

62.    Navient responded to the law suits immediately, denying that the allegations had any factual basis. Navient's press release on January 18, 2017 stated:

The allegations of the Consumer Financial Protection Bureau are unfounded, and the timing of this lawsuit—midnight action filed on the eve of a new administration—reflects their political motivations.

. . .

Navient has a well-established, superior track-record of helping student loan borrowers succeed in repayment. 49 percent of loan balances serviced by Navient for the federal government are enrolled in income-driven repayment plans. Assertions that we do not educate borrowers about IDR plans ignore the facts.

. . .

Navient has a responsibility to its customers, shareholders, and employees to defend itself—publicly and in court—against this unsubstantiated, unjustified and politically driven action. We cannot and will not accept agenda-driven ultimatums designed to get headlines rather than help for student borrowers. We will vigorously defend against these false allegations and continue to help our customers achieve financial success.

63.     Instead of addressing the problems or making efforts to fix non-compliant and misleading behaviors, Navient instead called them "unsubstantiated" and "unjustified" and continued with their deceptive, misleading, manipulative, and non-compliant practices.

64.     Analysts accepted Navient's denials entirely. Credit Suisse, for example, in its report dated January 18, 2017 emphasized that Navient's regarded the CFPB's lawsuit "as unfounded" and even recited Navient's claim that the lawsuit was politically motivated and prompted by an impending "change in the leadership of the CFPB" by the incoming administration. Based on Navient's response to the CFPB lawsuit, Credit Suisse maintained its neutral rating for Navient.

65.     Investors, in turn, relied on Navient's statements in response to these complaints, and believed that Navient was acting in accordance with its

representations about its servicing practices and overall commitment to the financial health of its borrowers. Therefore, investors believed that Navient did not have a corporate policy of forcing borrowers into forbearance instead of IDRs against their best interest and did not incentivize its employees to implement this policy.

66.    Unbeknownst to the public, Navient's corporate policy of illegally steering borrowers into forbearance was one of the company's core strategies. Navient gained an advantage by enrolling borrowers into forbearance because forbearance was quicker and less expensive to administer than other repayment plans, thus decreasing Navient's operating costs. Because of the number and complexity of repayment options available for federal loans, a conversation about alternative repayment plans and the borrower's financial situation was usually time-consuming. As a result, Navient slotted borrowers into forbearance even when alternative payment plans were unquestionably the better alternative. As a result, Navient's stock price was artificially inflated.

**E.    Navient Continued Its Illicit Servicing Practices into 2017 Despite the States' Attorneys General Complaints and Regulator Charges.**

67.    Testimony from an investigational hearing conducted by the CFPB on April 28, 2015 confirms that enrolling a borrower into forbearance was straightforward and could be completed over the telephone without additional paperwork while this was not true for enrolling in an IDR. Patricia Peterson, Navient's Senior Vice President, Operations Support, testified as follows:

> Q.    And so after a borrower makes an oral request for forbearance for federal student loans, is there any paperwork that they're required to submit?
>
> A.    Not typically.
>
> Q.    So during the phone conversation with a customer service agent, during that conversation could the customer service agent

> complete the enrollment of that borrower into a hardship forbearance program?

A.   Yes….

Q.   Can a request for income-based repayment be made orally?

A.   Not in the same way that a forbearance can be done.

68.   In order to increase forbearance and avoid the operating costs associated with IDR plans, Navient instructed customer service representatives to use "flow charts" when interacting with borrowers. These flow charts prioritized forbearance even when other options were more appropriate, requiring Navient employees to offer *only* the options of deferment or forbearance to borrowers who indicate that they cannot afford to make any payment even though forbearance was only suitable for borrowers experiencing a short term or temporary situation.

69.   Between January 1, 2010 and March 31, 2015, Navient enrolled over 1.5 million borrowers in two or more consecutive forbearances totaling twelve months or longer. More than 470,000 of those borrowers were enrolled in three consecutive forbearances, and more than 520,000 of them were enrolled in four or more consecutive forbearances. For borrowers enrolled in three or more consecutive forbearances, each forbearance period lasted, on average, six months. Hundreds of thousands of consumers were continuously enrolled in forbearance for a period of two or three years, or more.

70.   The CFPB as well as the State Attorneys General and other civil plaintiffs have identified specific instances in which Navient's borrowers were "steered" into forbearance. The following examples show that Navient maintained and enforced the forbearance scheme at issue herein and, contrary to Remondi's categorical and unequivocal denials, had been doing so for years:

> a.   Navient's communications with "Borrower 1" regarding repayment options in or about 2012, resulted in Navient placing

the borrower's loan in forbearance. At that time, the borrower requested other repayment options and Navient did not offer any alternatives. (CFPB Interview, January 25, 2017)

b.      Navient's communications with "Borrower 2" regarding repayment options in or about 2015, including a call in which the borrower asked Navient if an income-based repayment option was available to her and Navient indicated it was not. In subsequent communications between Navient and the borrower, Navient offered the consumer a forbearance option only. (CFPB Interview, January 27, 2017)

c.      Navient's communications with "Borrower 3" regarding repayment options in or about 2011 and 2012, including communications regarding potential repayment options for her federal loans. At that time, Navient offered the borrower only forbearance as an option. (CFPB Interview, February 2, 2017)

d.      Navient's communications with "Borrower 4" regarding repayment options in or about 2013, including communications in which Navient informed the borrower that her only option was forbearance and did not provide information regarding other repayment options. (CFPB Interviews, July 19, 2016 and February 13, 2017)

e.      Navient's communications with "Borrower 5" regarding repayment options in or after 2010, including communications in which Navient advised the borrower to consider forbearance and deferment. Later, upon the borrower's own research, the borrower applied for an income-based repayment plan. (CFPB Interview, March 21, 2017)

f.      Navient's communications with "Borrower 6" regarding repayment options, including the borrower's request for reasonable repayment plans after the borrower's deferment options were exhausted. At that time, the only option offered by Navient to the borrower was forbearance. (CFPB Interview, March 10, 2017)

g.      Navient's communications with "Borrower 7" regarding repayment options beginning in or about 2016, including the borrower's request for a lower monthly payment on the

borrower's Parent PLUS loans. At that time, the only option offered by Navient to the borrower was forbearance. In 2017, Navient again offered the borrower a forbearance option. (CFPB Interview, March 3, 2017)

h.    Navient's communications with "Borrower 8" regarding repayment options beginning in or about 2006 or 2007. When the borrower called Navient to discuss repayment plans, Navient indicated that forbearance was the only option. The borrower's loans were enrolled in multiple forbearances. (CFPB Interview, February 27, 2017)

i.    Navient's communications with "Borrower 9" regarding repayment options in or about 2016 resulted in Navient advising the borrower that forbearance was her only repayment option for one of her loans. The borrower discovered income-driven repayment options on her own. (CFPB Interview, March 22, 2017)

j.    Navient's communications with "Borrower 10" regarding repayment options in or about 2016 involved the borrower calling Navient to discuss repayment plans and Navient indicating that forbearance was the only option. The borrower's loans were enrolled in forbearance. The borrower subsequently learned from a third party about income-drive repayment options, and he proceeded to apply for an income-based repayment plan. (CFPB Interview, May 8, 2017)

k.    Navient's communications with "Borrower 11" regarding repayment options in or about 2016. When the borrower called Navient, she indicated that she was unemployed and that her payments were too high. Navient indicated that her only option was forbearance and did not discuss income-driven repayment plans. (CFPB Interview, July 11, 2017)

l.    Navient's communications with "Borrower 12" regarding repayment options, including certain communications with the borrower regarding repayment options on Parent Plus loans. At that time, Navient did not offer any repayment options other than forbearance. The borrower's loans were in forbearance from time to time beginning in or about 2007. (CFPB Interview, March 6, 2017)

m.   Navient's communications with "Borrower 13" regarding repayment options in or about 2017, including a call with the borrower regarding an unpaid balance on his Stafford loans. At that time, the borrower requested repayment options and Navient indicated that there were no options available. (CFPB Interview, January 25, 2017)

n.   Navient's communications with "Borrower 14" regarding repayment options, including communications regarding adjusting her federal loan payments. At the time of such communication, Navient informed the borrower that her only option was forbearance. (CFPB Interview, February 2, 2017)

o.   Navient's communications with "Borrower 15" regarding repayment options, including communications in which Navient offered the borrower only the forbearance option for her federal loans. Thereafter, when the borrower's forbearance options were exhausted, Navient offered to enroll her in an income-driven repayment plan. (CFPB Interview, February 13, 2017)

p.   Navient's communications with "Borrower 16 regarding repayment options, including communications in which Navient informed the consumer that the only options available to the consumer to repay her loans were forbearance or deferment. (CFPB Interview, February 14, 2017)

71.   Navient's use of forbearance was intentional and motivated by greed at the expense of struggling borrowers. Indeed, in September 2015, Navient responded to the CFPB in the course of a Notice and Opportunity to Respond and Advise proceeding. Navient's response acknowledged the differences between placing borrowers into forbearance versus IDR plans, and admitted the benefits Navient could enjoy if it placed borrowers into forbearance instead of IDR plans.

72.   Specifically, in its September 2015 response to the CFPB, Navient conceded that: as the volume of income-driven repayment plan applications and renewals received by Navient increased, it has had to increase the size of its staff to review and process those forms, thereby increasing operating costs. Navient's

response provided the following examples of increased operating costs relating to IDR plans: "The Company has been so concerned about getting information to borrowers that in 2014 it created a specialized customer service team, which is comprised of 70 dedicated employees to assist borrowers with their recertification questions"; and "[I]n its back-office operations, the Company in 2014 created a new department, called Repayment Options, to process IDR-related paperwork and other repayment paperwork. This department has grown to more than 100 employees during peak season."

73.    In June 2016, Navient told the CFPB in response to a Request for Information that: "the IDR application requires the borrower to use a separate government website or to complete a 12-page paper application form. With either option, enrollment is not immediate and oftentimes requires time to gather required income documentation"; that "[o]ur experience has shown that a borrower's intent to enroll in an IDR is not always enough. Because the IDR process must be completed away from the servicer's website and where our customer service agents are not allowed to co-browse (where the representative can see the borrower's application entries) with the customer, we have found that borrowers require reminders and encouragement to complete the required forms"; and that "[m]any of those who ultimately fell delinquent or even defaulted had discussed enrolling and also received information indicating they were eligible for the plans but did not take the necessary follow-up action to enroll. The majority of these borrower's [sic] simply never followed though [sic] towards IDR enrollment despite our reminders including follow-up calls and written correspondence."

74.    Navient, instead of making any changes or reforms, continued business as usual in 2017. In Navient's 2017 4th Quarter Investor Deck, Navient reported the following forbearance rates: 12.9% in 2016 and 11.2% in 2017 for FFELP Loans Segment "Core Earnings" Basis and 3.4% in 2016 and 3.8% in 2017 for Private

Education Loans Segment "Core Earnings" Basis. Within the Private Education Loan Segment, forbearance rates were 5.7% in 2016 and 6.8% in 2017 for Troubled Debt Restructurings ("TDR") loans and 1.6% for both 2016 and 2017 for non-TDR loans. These statistics show that there was little, if any, change in Navient's practices from 2016 through 2017.

75.    Information obtained from former Navient employees confirms that Navient did not change its practices during 2017, but instead maintained its predatory servicing practices.

76.    CW1, a Navient employee from March 23, 2015 to Nov 11, 2016 as a loan specialist based in the Muncie, Indiana office, verified many of the egregious practices alleged in the CFPB and State Attorneys General complaints. CW1 worked primarily with borrowers who were having difficulty paying and in default prevention, as well as in special investigations regarding borrowers who had died. He primarily processed Department of Education loans but also handled some private loans. He handled inbound calls only while other teams handled outbound calls.

77.    When asked what the procedure was when a borrower called up and said they were having a hard time paying, CW1 replied: "Do you want to know what *I* did or what *they* told us to? Because it's two different things." CW1 described what he called a "hierarchy" of loan repayment options for borrowers experiencing financial difficulty. The first option staff were told to direct borrowers towards was forbearance, followed by the graduated repayment plan, then offering an extended payment plan, and finally offering IDR as a last resort. Loan specialists were also instructed that if at any point a borrower got frustrated and said they were going to sue Navient, to tell borrowers to have their legal counsel reach out, and hang up immediately

78.    CW1 said that under this "hierarchy" script, after forbearance, Navient staff was supposed to steer borrowers to the graduated repayment plan. CW1 says supervisors told him to sell the graduated repayment plan by telling borrowers that they would have significantly lower, interest-only payments to start. The borrower would then be told that each year their payments would increase but they would still be able to pay off the loan in the original 10 years. Navient did not necessarily give borrowers any information on how much their payments would incrementally increase over the years or how much more they would be paying over the life of the loan. He said that Navient's management rationalized this to loan specialists that by the fifth year most people would be doing better financially and therefore able to handle the higher payments from the graduated payment plan. If a borrower did not want to go onto a graduated repayment plan, a specialist was supposed to direct them to an extended payment plan.  An extended payment plan would extend the length of the term of the loan, which would, over the life of the loan significantly increase the amount of interest a borrower pays.

79.    Only if a borrower said no to all three of those options (*i.e.*, forbearance, graduated, extended) were specialists supposed to offer the IDR plan. CW1 said that his practices deviated from Navient's scripted practices of offering forbearance first because he would attempt to talk borrowers out of going into forbearance and instead direct them to IDR as he knew that those programs were in the better interest of the borrower. "Unless the person just does not want to save money, there was never a reason for anybody not to put into income-driven." CW1 explained that even under IDR their interest rates would drop and their interest would not compound and they would still be able to pay more or pay the loan off should they so choose. At one point CW1 said he heard a team leader explain the repayment "hierarchy" by saying that getting borrowers into graduated and extended repayment plans was a priority for Navient because of compounding interest.

26

80.     CW1 said there was a lot of pressure and attention paid to call time at Navient. The target time for an inbound call was 4 minutes or less, which CW1 described as being insufficient for the complexity of the tasks at hand. Navient management would write up workers in the call center whose times were over the monthly average and/or above the 4-minute target. Navient management also judged employees relative to one another on a peer-to-peer level, such that employees would be reprimanded or receive poor marks if they completed calls slower than their coworkers (regardless of whether the call was completed in less than four minutes. According to CW1, management believed you could be moving calls faster if your peers were moving calls faster. "If you wanted to keep your job, you had to get callers off the phone. So, things that needed to get done didn't get done."

81.     CW1 said he could get through a forbearance call in 2 minutes, start-to- finish. Even faster, he said, if he read the script really fast because, he said, there was no requirement for borrowers to understand the disclaimers about interest compounding. He said the words just need to be on the recording in case the recording is ever played back. Getting someone onto the graduated repayment would take him about 1 and a half minutes. In contrast, IDR enrollment would take 15 minutes to enroll, CW1 said, largely just because of time it takes to explain to people how the process works. He attributed that to the frequent changes in IDR options (income-contingent repayment vs. pay-as-you-earn, etc.)

82.     CW1 said that Navient management instructed CW1 and other loan specialists not to spend time walking borrowers through the Department of Education website. Instead, staff were told to direct borrowers to call the Department of Education for help with navigating the website. CW1 says that the Department of Education was paying Navient for this service that it was not providing.

83.     CW1 said he could earn as much as a $1,200 bonus per month under Navient's incentive program. He said that employees would start out the month

27

qualified for a bonus and slowly become disqualified for it if you did not meet very specific metrics. Those metrics included staying below the 4-minute average call time, caller survey ratings staying above a 90% satisfaction rating, number of calls resolved, and sticking to 95% adherence to the work schedule. Adherence refers to the fact that their work schedule was regulated down to the minute. If you clocked in at 8:30 a.m. and were supposed to be on break at 9:30 a.m. but a call went too long and you didn't get off the phone until 9:45 you were considered "out of adherence." Many workers would rush callers off the phone, particularly as it came close to break times or other adherence checks, so that they could stay in adherence and secure their bonuses.

84.     CW1 described a piece of management software that supervisors use to monitor their call processors. That software shows how long everybody has been on the phone. When someone has been on the phone approaching 5 minutes, their icon turns red. If it gets to 20 minutes, the icon starts flashing. CW1 said that because of this you would have team leads and supervisors sending him chat messages while he was on lengthy calls with borrowers telling him to end the call or find ways to get them off the call. CW1 said that this was particularly the case because supervisor bonuses were based on the adherence of the employees they supervised. He described one incident that a supervisor yelled at her subordinates because she did not get a bonus due to her subordinates being too far out of adherence. In addition, CW1 said there is a separate division called "workforce management" whose sole function is to enforce adherence. Workforce management staff would also simultaneously send chat messages telling CW1 and other callers to get off of lengthy calls.

85.     CW1 said he was warned multiple times for not following that hierarchy, offering IDR to most callers that came to him, and exceeding call times. He was fired after they monitored a call on which a borrower wanted to sign up for

the income-contingent repayment plan, a subcategory of IDR. CW1 instead directed the caller to the pay-as-you-earn IDR option, believing it to be a better financial option for him.

86.    CW2 worked at Navient from June 2015 to June 2017 as a Student Loans Customer Service Specialist in the Spanish-speaking group based in the Wilkes-Barre, PA office, and confirmed that egregious practices continued into the class period.

87.    CW2 said forbearance was "supposed to be our last option" but the way the options were presented, Navient's script hid the risk and made it sound attractive and penalty-free to struggling borrowers. The way Navient instructed its customer service team to describe forbearances, it made that option sound attractive to struggling borrowers. "We were told to tell them they'd have a $0 per month payment, what we weren't telling them is their interest is adding up," CW2 said. "We weren't able to tell them."

88.    CW2 also explained that forbearance reduced the paperwork for Navient. CW2 said it did because it involved one online tool, while deferment or IDR options required more paperwork, such as documentation from a school or government agency.

89.    CW2 also said that Navient's inbound call representatives were incentivized to end calls within an established upper-range time limit of between seven minutes and ten minutes, to keep hold-time for callers under 30 seconds, and sometimes offered incentives for doing things like enrolling buyers in paperless billing. CW2 said, "I know they gave incentives depending on the situation, but mostly just for ending calls in time and we couldn't put callers on hold for more than 30 seconds." That rule was problematic because if a representative did not know the answer to a question asked by a borrower the system did not leave much room for

the worker to ask their supervisor without leaving the borrower on hold for too long and being penalized.

90.     CW2 discussed this in context of the forbearance program, "We had this system, if [the caller] said, 'Hey, I want to be placed in forbearance,' I click on forbearance, then the forbearance script pops up and I tell them the rules. The thing that does suck is, because we were timed, I caught myself and others reading really quick. Most people didn't understand and just agreed." CW2 said he noticed himself speeding up about halfway through the script, as the clock ticked down. "We'd lose our bonus at the end of time," CW2 said. To complete the forbearance script without going over the mandated time CW2 stated, "We had to power talk to get through -- half the people didn't understand what we said." CW2 explained that it was important to read the entire forbearance script that appeared on their company portal.

91.     CW2 noted, "Honestly, most of the calls I got, everyone had issues." CW2 often spoke with Spanish-speaking callers who didn't know and were never told how to repay their loan. CW2 explained that the income-based repayment options were better than forbearance, but not much for those with non-subsidized loans. Navient, however, did not allow its representatives to tell borrowers about the major downside of each option. CW2 received about 120 calls each work day from borrowers who were in a variety of situations. He estimated that on Monday through Thursday most of the callers were in trouble, and on Fridays, most people who called in wanted to make payments. Some borrowers called in to make their payments because they had little confidence in paying by mail or through the website, CW2 said. Checks and money orders could be mailed to Navient, but the process was confusing, CW2 recalled.

92.     These confidential witness accounts are corroborated by the findings of the FSA Audit. According to Liz Hill, a Department of Education spokeswoman, the FSA decided to do a review of Navient's forbearance practices after the CFPB filed

its lawsuit against Navient in January 2017 to see if there were any compliance issues. In a report dated May 18, 2017, the FSA described the results of its findings which included an on-site review at Navient between March 20 and 24, 2017.

93.     According to the FSA Audit report:

> [T]he objective of the site visit was to assess whether the use of forbearance by the Navient CSRs met the standards outlined in federal regulations, contractual requirements, and implemented Change Requests. More specifically, the review team evaluated whether or not the Navient agents offered all the applicable options before placing a borrower in forbearance.

94.     As part of FSA Audit, auditors listened to approximately 2,400 randomly selected calls to borrowers from 2014 to 2017 out of a batch of 219,000. The findings included that, in almost one out of ten calls, Navient offered borrowers the option of forbearance as the ***only*** option.

95.     In several instances where only forbearance was offered, "this occurred after the borrower made a promise to pay within a short time of the call – usually within a time frame that would cause no additional detriment to the borrower. . . . [T]hese borrowers were not given the opportunity to decide if another option (like one of the Income Driven plans or a deferment) would have been more favorable. And in some instances, interest was capitalized when another option may have prevented it." The FSA Audit also included a review of servicing histories by examining borrower files stored in Navient's CLASS system. The FSA Audit showed that Navient offered borrowers ***only*** forbearance in 20% of the samples. Navient's response to the FSA Audit, which was included in the FSA Audit report under the section "Servicer Response," conceded that some calls were improperly handled due to, among other things, "in some limited instances agents offered forbearance when probing for IDR would have been a better approach . . . ."

96.    On March 26, 2017, two days after the FSA completed its audit, Chivavibul resigned from his position as CFO at Navient.

**F.    Despite Its Ongoing Consumer Violations, Navient Categorically Denied the Forbearance Scheme and Concealed the FSA Audit.**

97.    During the Class Period, Navient denied any culpability and continued to conceal the imminent regulatory risk it faced as a result of its illicit loan servicing practices.

<u>*Press Release – January 18, 2017*</u>

98.    On January 18, 2017, Navient issued three press releases in response to the CFPB complaint and Illinois and Washington State Attorneys General complaints. The first press release, titled "Navient says politically driven lawsuit from Illinois Attorney General is unfounded," stated in pertinent part as follows:

> WILMINGTON, Del., Jan. 18, 2017 (GLOBE NEWSWIRE) -- Navient, the nation's leading loan management, servicing and asset recovery company, today issued the following statement on legal action filed against it today:
>
> ***The allegations of the Illinois Attorney General and Consumer Financial Protection Bureau are unfounded***, and the timing of these lawsuits—midnight action filed on the eve of a new administration—reflects their political motivations. Navient welcomes clear and well-designed guidelines that all parties can follow, and we had hoped our extensive engagement with the regulators would achieve this objective. Instead, the suits improperly seek to impose penalties on Navient based on new servicing standards applied retroactively and applied only against one servicer. The regulator-asserted standards are inconsistent with Department of Education regulations, and will harm student loan borrowers, including through higher defaults.
>
> Navient has a well-established, superior track-record of helping student loan borrowers succeed in repayment.

- 49 percent of loan balances serviced by Navient for the federal government are enrolled in income-driven repayment plans. ***Assertions that we do not educate borrowers about IDR plans ignore the facts***.

- Navient is a leader in advancing policy recommendations to streamline enrollment and reenrollment in income-driven plans—reforms which we believe would make a meaningful difference for millions of Americans with student loans.

- Federal borrowers serviced by Navient are 31 percent less likely to default than their peers at other servicers. Private loan delinquencies and defaults are at among historic lows.

- In 2009, Navient pioneered the first private education loan modification program. The program was designed to help customers stay current on their loans and, unlike federal program solutions, make progress on repaying their principal balance. Today, more than $2 billion in loan balances are enrolled in these programs.

Navient has a responsibility to its customers, shareholders, and employees to defend itself—publicly and in court—***against this unsubstantiated, unjustified and politically driven action***. We cannot and will not accept agenda-driven ultimatums designed to get headlines rather than help for student borrowers. We will vigorously defend against these false allegations and continue to help our customers achieve financial success.

99.     The press release in response to the CFPB Complaint, titled "Navient rejects the CFPB ultimatum to settle by Inauguration Day or be sued," was substantially similar. In pertinent part, the press release stated as follows:

WILMINGTON, Del., Jan. 18, 2017 (GLOBE NEWSWIRE) -- Navient, the nation's leading loan management, servicing and asset recovery company, today issued the following statement on legal action filed against it today:

***The allegations of the Consumer Financial Protection Bureau are unfounded***, and the timing of this lawsuit—midnight action filed on the eve of a new administration—reflects their political motivations.

Navient welcomes clear and well-designed guidelines that all parties can follow, and we had hoped our extensive engagement with the regulators would achieve this objective. Instead, the suit improperly seeks to impose penalties on Navient based on new servicing standards applied retroactively and applied only against one servicer. The regulator-asserted standards are inconsistent with Department of Education regulations, and will harm student loan borrowers, including through higher defaults.

Navient has a well-established, superior track-record of helping student loan borrowers succeed in repayment.

- 49 percent of loan balances serviced by Navient for the federal government are enrolled in income-driven repayment plans. *Assertions that we do not educate borrowers about IDR plans ignore the facts*.

- Navient is a leader in advancing policy recommendations to streamline enrollment and reenrollment in income-driven plans—reforms which we believe would make a meaningful difference for millions of Americans with student loans.

- Federal borrowers serviced by Navient are 31 percent less likely to default than their peers at other servicers. Private loan delinquencies and defaults are at among historic lows.

- In 2009, Navient pioneered the first private education loan modification program. The program was designed to help customers stay current on their loans and, unlike federal program solutions, make progress on repaying their principal balance. Today, more than $2 billion in loan balances are enrolled in these programs.

Navient has a responsibility to its customers, shareholders, and employees to defend itself—publicly and in court—against *this unsubstantiated, unjustified and politically driven action*. We cannot and will not accept agenda-driven ultimatums designed to get headlines rather than help for student borrowers. We will vigorously defend against these false allegations and continue to help our customers achieve financial success.

100.    The third press release, titled "Navient says lawsuit from Washington Attorney General is unfounded," stated in pertinent part as follows:

WILMINGTON, Del., Jan. 18, 2017 (GLOBE NEWSWIRE) -- Navient, the nation's leading loan management, servicing and asset recovery company, today issued the following statement on legal action filed against it today:

***The allegations of the Washington Attorney General, Illinois Attorney General and Consumer Financial Protection Bureau are unfounded***, and the timing of these lawsuits—midnight action filed on the eve of a new administration—reflects their political motivations. Navient welcomes clear and well-designed guidelines that all parties can follow, and we had hoped our extensive engagement with the regulators would achieve this objective. Instead, the suits improperly seek to impose penalties on Navient based on new servicing standards applied retroactively and applied only against one servicer. The regulator-asserted standards are inconsistent with Department of Education regulations, and will harm student loan borrowers, including through higher defaults.

Navient has a well-established, superior track-record of helping student loan borrowers succeed in repayment.

- 49 percent of loan balances serviced by Navient for the federal government are enrolled in income-driven repayment plans. ***Assertions that we do not educate borrowers about IDR plans ignore the facts***.

- Navient is a leader in advancing policy recommendations to streamline enrollment and reenrollment in income-driven plans—reforms which we believe would make a meaningful difference for millions of Americans with student loans.

- Federal borrowers serviced by Navient are <u>31 percent less likely to default</u> than their peers at other servicers. Private loan delinquencies and defaults are at among historic lows.

- In 2009, Navient pioneered the first private education loan modification program. The program was designed to help customers

35

stay current on their loans and, unlike federal program solutions, make progress on repaying their principal balance. Today, more than $2 billion in loan balances are enrolled in these programs.

Navient has a responsibility to its customers, shareholders, and employees to defend itself—publicly and in court—against ***this unsubstantiated, unjustified and politically driven action***. We cannot and will not accept agenda-driven ultimatums designed to get headlines rather than help for student borrowers. We will vigorously defend against these false allegations and continue to help our customers achieve financial success.

101. The statements identified above in emphasis in each of the press releases in paragraphs 98 to 100 were false and materially misleading. Contrary to Navient's statement that the allegations were categorically "unfounded" and "false," Navient was in fact engaging in a scheme whereby it was placing borrowers into forbearance to their detriment. Evidence since disclosed from the CFPB's lawsuit, including interviews with borrowers, testimony from Navient employees, and "flow charts" used by customer service representatives, show that Navient was intentionally steering borrowers away from IDR plans and into forbearance for years in order to minimize operating costs. In addition, as CW1 described, Navient loan specialists only offered an IDR plan if a borrower had first declined forbearance, a graduated payment plan, or an extended payment plan, which resulted in Navient ***not*** "educating borrowers about IDR plans." The results of the FSA Audit show that in 220 of 2,388 randomly selected phone calls to borrowers from 2014 through 2017, Navient offered forbearance as the ***only*** option. These facts show that the allegations in the CFPB and States AG Complaints were not "unfounded" or "false" without exception and, therefore, demonstrate that the statements in Navient's press releases were false and materially misleading.

*Washington Post Article – January 23, 2017*

102.   On January 23, 2017, in response to the CFPB and States AG Complaints, Remondi participated in an interview with Danielle Douglas-Gabriel of *The Washington Post*. His statements were published in an article entitled, "Navient CEO Jack Remondi: CFPB is more interested in filing lawsuits than fixing student loan servicing." During the interview, Remondi again categorically denied the allegations in the complaints. In pertinent part, Remondi stated:

> ***They make the claim that somehow we are economically better off by having borrowers default, by having borrowers in forbearance, it is completely false***. The highest revenue we get from the Department of Education under our contract is a borrower who is current, which is more likely to happen for a struggling borrower if they are in an income-driven repayment plan. It's 180 percent higher revenue if the borrower is current than if the borrower is in forbearance. It's just false narrative, and really doesn't show a lot of appreciation for how a servicing operation works.

103.   The statements identified in paragraph 102 above in emphasis were false and materially misleading. Contrary to Navient's statement about placing "borrowers in forbearance" were "completely false," Navient was in fact doing just that. Evidence since disclosed from the CFPB's lawsuit, including interviews with borrowers, testimony from Navient employees, and "flow charts" used by customer service representatives, show that Navient was intentionally steering borrowers away from IDR plans and into forbearance for years in order to minimize operating costs. In addition, as CW1 described, Navient loan specialists only offered an IDR plan if a borrower had first declined forbearance, a graduated payment plan, or an extended payment plan. The results of the FSA Audit show that in 220 of 2,388 randomly selected phone calls to borrowers from 2014 through 2017, Navient offered forbearance as the ***only*** option. These facts show that the forbearance scheme allegations against Navient were not "completely false" without exception and,

therefore, demonstrate that Remondi's statements were false and materially misleading.

*Annual Report – February 24, 2017*

104.   On February 24, 2017, Navient issued its 2016 10-K. Remondi and Chivavibul signed the 2016 10-K.

105.   In the 2016 10-K, Defendants Navient, Remondi, and Chivavibul discussed the company's loan servicing practices and, in particular, the company's practices regarding forbearance in a materially misleading manner. In pertinent part, the 2016 10-K stated as follows:

- ***Getting borrowers into the right payment plans: We help customers understand the complex array of federal loan repayment options so they can make informed choices about the plans that are aligned with their financial circumstances and goals. We promote awareness of federal repayment plan options, including Income-Driven Repayment ("IDR")* . . . *We also help borrowers understand that options lengthening their repayment term may increase the total cost of their loans, while reminding them that they may pay extra or switch repayment plans at any time.***

- Forbearance involves granting the customer a temporary cessation of payments (or temporary acceptance of smaller than scheduled payments) for a specified period of time. . . . ***Our forbearance policies include limits on the number of forbearance months granted consecutively and the total number of forbearance months granted over the life of the loan*** . . . ***Forbearance as a recovery tool is used most effectively when applied based on a customer's unique situation***, including historical information and judgments.

106.   The statements identified in paragraph 105 above in emphasis were materially false and misleading because they falsely stated that Navient was helping borrowers to be put in the best program to avoid default, that was based on the customer's unique situation, with limited use of forbearance. In reality, Navient was

using forbearance as a tool to conceal delinquency and default rates, with forbearance granted liberally and repeatedly to the detriment of many borrowers. Evidence from the CFPB's lawsuit, including interviews with borrowers, testimony from Navient employees, and "flow charts" used by customer service representatives, show that Navient was intentionally steering borrowers away from IDR plans and into forbearance for years in order to minimize operating costs. Numerous borrowers (identified above in paragraph 70) were placed into forbearance indiscriminately and for the longest possible periods without regard to the borrower's unique "financial circumstances and goals." To the contrary, Navient's strict time limits on calls and scripting practices steered borrowers into forbearance by precluding Navient employees from even having the opportunity to discuss IDR options with borrowers or learning of the borrowers' unique circumstance in order to find the best plan for them. Both CW1 and CW2 indicated that Navient used forbearance liberally and repeatedly, and generally as the only option for borrowers. For these reasons, the 2016 10-K affirmatively misstated Navient's policies and practices towards forbearance.

*Navient Response Statement to Bloomberg Article – April 4, 2017*

107. On April 3, 2017, *Bloomberg.com* published an article entitled "Student Debt Giant Navient to Borrowers: You're on Your Own" by Shahien Nasiripour, which, among other things, noted that, "Jack Remondi, chief executive of student loan giant Navient Corp., has gone out of his way to tout the company's devotion to helping Americans cope with student debt. He's mentioned it in meetings with investors, on calls with Wall Street analysts, in testimony before Congress, and even on his Medium blog."

108. The article contrasted Navient's public image with the allegations of the CFPB Complaint, stating that Remondi "sang a different tune in court filings." The article stated that, "[b]orrowers can't reasonably rely on America's largest

student loan servicer to counsel them about their many options, Navient said on March 24 in a motion to dismiss the case, because its primary role is, after all, to collect their payments. 'There is no expectation that the servicer will act in the interest of the consumer,' Navient said in response to the litigation filed Jan. 18 by the U.S. Consumer Financial Protection Bureau."

109.   In response, Navient released a statement on its website, stating, in relevant part, "Readers of an April 3 *Bloomberg* story on Navient received a distorted, inaccurate picture of Navient's legal arguments and performance. Picking a single phrase out of a technical legal brief may make for sensational headlines but ignoring the results we deliver is a disservice to borrowers and the public . . . ***Statements that Navient does not inform borrowers of their array of repayment options are patently false.***"

110.   The statements identified in paragraph 109 above in emphasis were false and materially misleading because they unequivocally and categorically denied the existence of the forbearance scheme. In reality, it was true that Navient did not inform borrowers of their array of repayment options and, instead, maintained and enforced a practice of placing borrowers into forbearance arrangements, when IDR plans would have been more suitable, for the benefit of Navient. Evidence from the CFPB's lawsuit, including interviews with borrowers, testimony from Navient employees, and "flow charts" used by customer service representatives, show that Navient was intentionally steering borrowers away from IDR plans and into forbearance for years in order to minimize operating costs. As CW1 described, Navient loan specialists were instructed by management to only offer an IDR plan if a borrower had first declined forbearance, a graduated payment plan, or an extended payment plan. Moreover, the results of the FSA Audit show that in 220 of 2,388 randomly selected phone calls to borrowers from 2014 through 2017, borrowers were offered forbearance as the ***only*** option. These facts show that

40

Navient materially misled the public by categorically denying accusations concerning the company's forbearance practices, as it did here by referring to them as "patently false."

*Quarterly Report – April 27, 2017*

111.   On April 27, 2017, Navient issued its quarterly report for the first quarter of 2017 on Form 10-Q (the "1Q17 10-Q"). Defendant Lown signed the 1Q17 10-Q.

112.   In the 1Q17 10-Q, Defendants Navient, Remondi, and Lown discussed the company's loan servicing practices and, in particular, the company's practices regarding forbearance, in a materially misleading manner. In pertinent part, the 1Q17 10-Q stated as follows:

- ***Getting borrowers into the right payment plans: We help customers understand the complex array of federal loan repayment options so they can make informed choices about the plans that are aligned with their financial circumstances and goals. We promote awareness of federal repayment plan options, including Income-Driven Repayment ("IDR")*** . . . ***We also help borrowers understand that options lengthening their repayment term may increase the total cost of their loans, while reminding them that they may pay extra or switch repayment plans at any time.***

- Forbearance involves granting the customer ***a temporary cessation of payments (or temporary acceptance of smaller than scheduled payments) for a specified period of time***. . . . Our forbearance ***policies include limits on the number of forbearance months granted consecutively and the total number of forbearance months granted over the life of the loan***. . . Forbearance as a recovery tool is used most effectively ***when applied based on a customer's unique situation***, including historical information and judgments.

113.   The statements identified in paragraph 112 above in emphasis were materially false and misleading because they falsely stated that Navient was helping borrowers to be put in the best program to avoid default, that was based on the

customer's unique situation, with limited use of forbearance. In reality, Navient was using forbearance as a tool to conceal delinquency and default rates, with forbearance granted liberally and repeatedly to the detriment of many borrowers. Evidence from the CFPB's lawsuit, including interviews with borrowers, testimony from Navient employees, and "flow charts" used by customer service representatives, show that Navient was intentionally steering borrowers away from IDR plans and into forbearance for years in order to minimize operating costs. Numerous borrowers (identified above in paragraph 70) were placed into forbearance indiscriminately and for the longest possible periods without regard to the borrower's unique "financial circumstances and goals." To the contrary, Navient's strict time limits on calls and scripting practices steered borrowers into forbearance by precluding Navient employees from even having the opportunity to discuss IDR options with borrowers or learning of the borrowers' unique circumstance in order to find the best plan for them. Both CW1 and CW2 indicated that Navient used forbearance liberally and repeatedly, and generally as the only option for borrowers. For these reasons, the 1Q17 10-Q affirmatively misstated Navient's policies and practices towards forbearance.

114.   The 1Q17 10-Q was also false and materially misleading because it concealed the fact that Navient had just been audited by the FSA in response to the CFPB's allegations concerning the company's forbearance practices. Item 103 of Regulation S-K required Navient to disclose "material pending legal proceedings" and to provide "a description of the factual basis" underlying the proceeding. Instead of disclosing the FSA Audit, Navient disclosed the following in the 1Q17 10-Q:

> In addition, Navient and its subsidiaries are subject to examination or regulation by the SEC, CFPB, FDIC, [Department of Education] and various state agencies as part of its ordinary course of business. Items or matters similar to or different from those described above may arise during the course of those examinations. We also routinely receive

> inquiries or requests from various regulatory entities or bodies or government agencies concerning our business or our assets. The Company endeavors to cooperate with each such inquiry or request.

115.   The FSA Audit qualified as a material pending legal proceeding that was not of a routine nature and that should have been disclosed to the public. The FSA Audit was material given that it was initiated in response to the CFPB Complaint. Defendants publicly categorically denied any factual basis for the allegations in the CFPB Complaint. Had Defendants disclosed the FSA Audit, investors would have been less likely to believe their categorical denials and better able to assess the regulatory risk associated with their investments in Navient. For these reasons, the 1Q17 10-Q was misleading because it did not disclose the FSA Audit.

### *Quarterly Report – August 1, 2017*

116.   On August 1, 2017, Navient issued its quarterly report for the second quarter of 2017 on Form 10-Q (the "2Q17 10-Q"). Remondi and Lown signed the 2Q17 10-Q.

117.   In the 2Q17 10-Q, Navient, Remondi, and Lown discussed the company's loan servicing practices and, in particular, the company's practices regarding forbearance, in a materially misleading manner. In pertinent part, the 2Q17 10-Q stated as follows:

> - ***Getting borrowers into the right payment plans: We help customers understand the complex array of federal loan repayment options so they can make informed choices about the plans that are aligned with their financial circumstances and goals. We promote awareness of federal repayment plan options, including Income-Driven Repayment ("IDR") . . . We also help borrowers understand that options lengthening their repayment term may increase the total cost of their loans, while reminding them that they may pay extra or switch repayment plans at any time.***

43

- Forbearance involves granting the customer *a temporary cessation of payments (or temporary acceptance of smaller than scheduled payments) for a specified period of time*. . . . Our forbearance *policies include limits on the number of forbearance months granted consecutively and the total number of forbearance months granted over the life of the loan*. . . Forbearance as a recovery tool is used most effectively *when applied based on a customer's unique situation*, including historical information and judgments.

118.   The statements identified in paragraph 117 above in emphasis were materially false and misleading because they falsely stated that Navient was helping borrowers to be put in the best program to avoid default, that was based on the customer's unique situation, with limited use of forbearance. In reality, Navient was using forbearance as a tool to conceal delinquency and default rates, with forbearance granted liberally and repeatedly to the detriment of many borrowers. Evidence from the CFPB's lawsuit, including interviews with borrowers, testimony from Navient employees, and "flow charts" used by customer service representatives, show that Navient was intentionally steering borrowers away from IDR plans and into forbearance for years in order to minimize operating costs. Numerous borrowers (identified above in paragraph 70) were placed into forbearance indiscriminately and for the longest possible periods without regard to the borrower's unique "financial circumstances and goals." To the contrary, Navient's strict time limits on calls and scripting practices steered borrowers into forbearance by precluding Navient employees from even having the opportunity to discuss IDR options with borrowers or learning of the borrowers' unique circumstance in order to find the best plan for them. On May 18, 2017, Navient had received the FSA audit report which verified that in almost one out of ten calls, Navient offered borrowers the option of forbearance as the *only* option. In several instances where only forbearance was offered, "this occurred after the borrower made a promise to pay within a short time of the call – usually within a time frame

that would cause no additional detriment to the borrower. . . . [T]hese borrowers were not given the opportunity to decide if another option (like one of the Income Driven plans or a deferment) would have been more favorable. And in some instances, interest was capitalized when another option may have prevented it." The FSA Audit also included a review of servicing histories by examining borrower files stored in Navient's CLASS system. The FSA Audit showed that Navient offered borrowers ***only*** forbearance in 20% of the samples. Further, both CW1 and CW2 indicated that Navient used forbearance liberally and repeatedly, and generally as the only option for borrowers. For these reasons, the 2Q17 10-Q affirmatively misstated Navient's policies and practices towards forbearance.

119.   The 2Q17 10-Q was also false and materially misleading because it concealed the fact that Navient had been audited by the FSA in March 2017 in response to the CFPB's allegations concerning the company's forbearance practices. Item 103 of Regulation S-K required Navient to disclose "material pending legal proceedings" and to provide "a description of the factual basis" underlying the proceeding. Instead of disclosing the FSA Audit, Navient disclosed the following in the 2Q17 10-Q:

> In addition, Navient and its subsidiaries are subject to examination or regulation by the SEC, CFPB, FDIC, [Department of Education] and various state agencies as part of its ordinary course of business. Items or matters similar to or different from those described above may arise during the course of those examinations. We also routinely receive inquiries or requests from various regulatory entities or bodies or government agencies concerning our business or our assets. The Company endeavors to cooperate with each such inquiry or request.

120.   The FSA Audit qualified as a material pending legal proceeding that was not of a routine nature and that should have been disclosed to the public. The FSA Audit was material given that it was initiated in response to the CFPB

Complaint. Defendants publicly categorically denied any factual basis for the allegations in the CFPB Complaint. Had Defendants disclosed the FSA Audit, investors would have been less likely to believe their categorical denials and better able to assess the regulatory risk associated with their investments in Navient. For these reasons, the 2Q17 10-Q was misleading because it did not disclose the FSA Audit.

*PA AG Complaint – October 5, 2017*

121.   On October 5, 2017, PA AG Josh Shapiro announced the filing of a lawsuit in United States District Court for the Middle District of Pennsylvania against Navient and one of its subsidiaries for engaging in unfair and deceptive lending and failed to offer proper prepayment plans to student. The lawsuit was styled as *Commonwealth of Pennsylvania*, By *Attorney General Josh Shapiro v. Navient Corporation and Navient Solutions, LLC*, Case No. 3:17-cv-01814.

122.   The PA AG Complaint alleged that Navient violated state and federal law by failing to inform borrowers who were experiencing long-term financial hardship of more favorable loan payment options available under an IDR plan and instead pushed borrowers into forbearance in an effort to cut costs and maximize profit which caused, or was likely to cause, substantial financial harm to the borrower.

123.   Unlike the CFPB Complaints and the States AG Complaints which focused on Navient's servicing practices prior to the Class Period, the PA AG Complaint addressed conduct by NAVI as recent as early-2017. Specifically, the PA AG Complaint alleges that:

> 109. Nevertheless, since at least July 2011, despite publicly assuring borrowers that it will help them identify and enroll in an appropriate, affordable repayment plan, Defendants have routinely disregarded that commitment and instead steered borrowers experiencing long-term financial hardship into forbearance.

180. As described above, while engaging in trade or commerce within the Commonwealth through steering borrowers suffering long-term financial hardship into forbearance, Defendants:

  a. Misrepresented, either expressly or by implication, the suitability of certain federal loan repayment options for borrowers struggling with their payments;

  b. In phone calls, failed to meaningfully disclose to borrowers struggling to make their payments that the federal government offers IDR plans to help borrowers avoid default;

  c. Misrepresented that Defendants would "work with" borrowers struggling to pay their loans, "help [borrowers] make the right decision for [their] situation"; and "help [borrowers] by identifying options and solutions, so [borrowers] can make the right decision for [their] situation" when, in fact, Defendants in many instances did not do so; and

  d. Continuously offered forbearances to borrowers who demonstrated a long-term inability to repay, when in fact forbearance is intended for a temporary hardship.

124. In connection with filing the case, on October 5, 2017, PA AG Josh Shapiro released a statement stating, "Navient's deceptive practices and predatory conduct harmed student borrowers and put their own profits ahead of the interests of millions of families across our country who are struggling to repay student loans." PA AG Shapiro also appeared on CNBC's "Power Lunch" program on October 5, 2017, to give an in-depth interview concerning the allegations being leveled against Navient. "Power Lunch" is a daily, two hour-long television program that focuses exclusively on issues related to the stock market. It often features interviews with chief executive officers and other high-level executives as well as stock market analysts and investment bankers. The program, on average, is viewed by tens of thousands of viewers each day.

125.   PA AG Shapiro emphasized the harm being done by Navient to student borrowers. During the interview, PA AG Shapiro said:

> I could care less about their [Navient's] stock prices, I care about student loan holders in the Commonwealth of Pennsylvania and across the United States who have been victimized by widespread abuse from Navient, the largest student loan lender across our country with a big presence here in Pennsylvania. But one where we have seen students preyed upon, *we have seen schemes from Navient that have cost billions of dollars that have been taken out of the pockets of students* . . . the facts will clearly show that their widespread abuse has had an1 effect, a negative effect, on student loan holders across this country…
>
> . . .
>
> We want to change corporate behavior, we want to make sure the scales are tipped in favor of students, in favor of those who hold the loans.
>
>  . . .
>
> There are so many abuses, but here is one that is particularly horrible when it comes to these student loan holders. Navient had a program where you could actually repay your student loan based on your earnings, right? *And instead of steering these student loan holders towards that, they instead put them in a risky scheme where they jacked up the interest rates, and ultimately that scheme costs student loan holders four billion dollars. That is four billion dollars that they should never have had to pay in the first place, but because of this marketing practice – because they directed people that way- these student loan holders were left paying four billion dollars more than they needed to. There are so many abusive practices- there's widespread abuse- that one is particularly egregious.*

126.   Numerous local and international media outlets reported on the PA AG Complaint on October 5, 2017, including Philadelphia's *The Inquirer*, *The Philadelphia Business Journal*, *U.S. News & World Report*, *ABC News, The*

*Washington Post*, *Nasdaq.com*, and *Bloomberg*. In each instance, reports focused squarely on Navient's widespread abuses in the student loan servicing business.

127.   The PA AG Complaint led investors to question whether and to what extent Remondi had been telling the truth when denying the CFPB and States AG Complaints' allegations regarding Navient's forbearance practices. In addition to addressing Navient's more recent servicing practices, the PA AG Complaint contained additional detail about Navient's forbearance practices. Indeed, CFRA Equity Analyst Scott Kessler wrote in his October 11, 2017 report of Navient, "We also note an October 2017 lawsuit filed by the Pennsylvania Attorney General with what we see as ***more expansive*** accusations" (emphasis added).

128.   In response to the announcements about the PA AG Complaint, on October 5, 2017, Navient's stock price closed at $12.60 per share on unusually heavy volume, down $2.10 or 14% from the October 4, 2017 close of $14.70. Barrons.com reported after market close on October 5, 2017 that Navient's market capitalization fell to $3.5 billion from $4 billion the prior day. The significant decline in Navient's stock price was caused directly by the introduction of company-specific news about Navient's servicing practices into the market place which corrected, in part, its categorical denials of wrongdoing.

### *Navient's Response to the PA AG Complaint – October 5, 2017*

129.   On October 5, 2017, in response to the PA AG Complaint, Navient attempted to minimize the harm done by the disclosure of the PA AG Complaint by repeating its misleading statements that the allegations were unfounded and issuing the following statement in the *Globe Newswire*:

> ***The allegations are completely unfounded*** and the case was filed without any review of Pennsylvania residents' customer accounts. We comply with the rules that govern the student loan program as set by Congress and the U.S. Department of Education, and there are no allegations that we have violated these rules. Navient is a leader in

helping student loan borrowers succeed; in fact, 49 percent of balances serviced by Navient for the government are enrolled in income-driven repayment plans and Navient-serviced borrowers are 37 percent less likely to default than those serviced by others. We will vigorously defend our record in court, and are confident we will prevail following an impartial review of the facts. In the meantime, we will continue to provide industry-leading service to our customers.

130.   The statements identified in paragraph 129 above in emphasis were false and materially misleading because they categorically denied the factual basis of the PA AG Complaint and absolutely assured investors that there was no forbearance scheme. By stating that the allegations were "unfounded," Navient represented that it was not placing borrowers into forbearance against their interest. This was not true. In reality, Navient maintained and enforced a practice of placing borrowers into forbearance arrangements, when IDR plans would have been more suitable, for the benefit of Navient. Evidence from the CFPB's lawsuit, including interviews with borrowers, testimony from Navient employees, and "flow charts" used by customer service representatives, show that Navient was intentionally steering borrowers away from IDR plans and into forbearance for years in order to minimize operating costs. As CW1 described, Navient loan specialists were instructed by management to only offer an IDR plan if a borrower had first declined forbearance, a graduated payment plan, or an extended payment plan. Moreover, the results of the FSA Audit show that in 220 of 2,388 randomly selected phone calls to borrowers from 2014 through 2017, borrowers were offered forbearance as the ***only*** option. Navient, who had already responded to the FSA Audit by this point, had even admitted to the FSA that had improperly handled a number of calls by placing borrowers into forbearance. These facts show that Navient materially misled the public by categorically denying accusations concerning the company's forbearance practices, as it did here by referring to them as "completely unfounded."

*Third Quarter Earnings Call – October 18, 2017*

131.   Remondi again falsely denied the allegations of illicit servicing without exception on October 18, 2017. During an investor conference call, Remondi discussed the company's third quarter earnings for 2017. Remondi also addressed the recently-filed PA AG Complaint:

> Earlier this month, the Department of Education released the results of the 2014 3-year cohort default rate. While the national rate increased, the rate for Navient-serviced loans declined. Navient-serviced borrowers were 37% less likely to default than borrowers serviced by other organizations. We also continue to be a leader in enrolling federal student loan borrowers in alternative payment programs like income-based repayment. In fact, 53% of the loan balances serviced by Navient for the Department of Education are enrolled in income-driven repayment programs, more than any other servicer.

> This is all good news. Yet, ***despite our consistent industry-leading performance in assisting federal student loan borrowers, the baseless, politically-driven accusations have continued***. I'd like to take a few moments to discuss one such example, the recent lawsuit brought by the Pennsylvania Attorney General. The Attorney General asserts that he brought charges after an extensive investigation, but no one from his office has ever stepped foot in one of our centers or requested information on Pennsylvania borrower accounts. Instead, they simply copied the lawsuit filed by another state.

> He claims to have received thousands of complaints from Pennsylvania residents when, in fact, 53 Navient-serviced borrowers requested assistance from his office in the last year, and 49 of them reflected disagreement with federal policy or a term of the loan, not a concern regarding our servicing. He claims we steered borrowers into schemes where we "jacked up their interest rates." Yet, federal student loan interest rates are set by Congress and are fixed and are never changed by the servicer. And once again, there is no claim that we violated the terms of the Higher Education Act or our servicing contract. ***We've done a cursory review which showed that there is a stark chasm between reality and these unfounded claims, and of course, our***

*industry-leading performance statistics stand as a factual contradiction to these accusations.*

Perpetuating baseless allegations for political gain does nothing to assist borrowers towards successful repayment. In fact, it's more likely to harm borrowers by directing attention away from the true issues that are causing student loan defaults: a lack of adequate upfront education, an overly complex repayment system and the serious financial consequences of dropping out before graduating or not responding to servicer outreach. We should be focusing on addressing these issues.

The federal loan programs are complex, too complex. Ironically, the solution promoted by many would increase this complexity. Struggling borrowers have difficulty navigating today's complex set of rules and need help to understand their options so they can make the best choice given their circumstances. Year after year, we demonstrate that when we speak with a struggling federal loan borrower, over 9s and 10, we help them select a solution that keeps them out of default. This is what we do, and it's why our customers default at a 37% lower rate. In the meantime, our repeated request that regulators encourage struggling borrowers to contact their servicer goes unanswered.

It may be -- it may appear to be politically beneficial to make claims of widespread abuse, but the facts will rise to the surface and I'm confident that the facts will be heard and the extraordinary results delivered by Team Navient will defeat this politically-driven campaign.

132.   The statements identified in paragraph 131 above in emphasis were false and materially misleading because they stated that the allegations against Navient were "baseless," "unfounded," and merely "politically-driven accusations." Contrary to Defendants' categorical and absolute denials, Navient was placing borrowers into forbearance arrangements when IDR plans would have been more suitable. Navient maintained and enforced a practice of placing borrowers into forbearance arrangements, when IDR plans would have been more suitable, for the benefit of Navient. Evidence from the CFPB's lawsuit, including interviews with borrowers, testimony from Navient employees, and "flow charts" used by customer

service representatives, show that Navient was intentionally steering borrowers away from IDR plans and into forbearance for years in order to minimize operating costs. As CW1 described, Navient loan specialists were instructed by management to only offer an IDR plan if a borrower had first declined forbearance, a graduated payment plan, or an extended payment plan. Moreover, the results of the FSA Audit show that in 220 of 2,388 randomly selected phone calls to borrowers from 2014 through 2017, borrowers were offered forbearance as the *only* option. Navient, who had already responded to the FSA Audit by this point, had even admitted to the FSA that had improperly handled a number of calls by placing borrowers into forbearance. These facts show that Navient materially misled the public by categorically denying accusations concerning the company's forbearance practices, as it did here by referring to them as "baseless" and "unfounded."

*Quarterly Report – October 27, 2017*

133.   On October 27, 2017, Navient issued its quarterly report for the third quarter of 2017 on Form 10-Q (the "3Q17 10-Q"). Remondi and Lown signed the 3Q17 10-Q.

134.   In the 3Q17 10-Q, Navient, Remondi, and Lown discussed the company's loan servicing practices and, in particular, the company's practices regarding forbearance, in a materially misleading manner. In pertinent part, the 3Q17 10-Q stated as follows:

- *Getting borrowers into the right payment plans: We help customers understand the complex array of federal loan repayment options so they can make informed choices about the plans that are aligned with their financial circumstances and goals. We promote awareness of federal repayment plan options, including Income-Driven Repayment ("IDR") . . . We also help borrowers understand that options lengthening their repayment term may increase the total cost of their loans, while reminding them that they may pay extra or switch repayment plans at any time.*

- Forbearance involves granting the customer *a temporary cessation of payments (or temporary acceptance of smaller than scheduled payments) for a specified period of time*. . . . Our forbearance *policies include limits on the number of forbearance months granted consecutively and the total number of forbearance months granted over the life of the loan*. . . Forbearance as a recovery tool is used most effectively *when applied based on a customer's unique situation*, including historical information and judgments.

135.   The statements identified in paragraph 134 above in emphasis were materially false and misleading because they falsely stated that Navient was helping borrowers to be put in the best program to avoid default, that was based on the customer's unique situation, with limited use of forbearance. In reality, Navient was using forbearance as a tool to conceal delinquency and default rates, with forbearance granted liberally and repeatedly to the detriment of many borrowers. Evidence from the CFPB's lawsuit, including interviews with borrowers, testimony from Navient employees, and "flow charts" used by customer service representatives, show that Navient was intentionally steering borrowers away from IDR plans and into forbearance for years in order to minimize operating costs. Numerous borrowers (identified above in paragraph 70) were placed into forbearance indiscriminately and for the longest possible periods without regard to the borrower's unique "financial circumstances and goals." To the contrary, Navient's strict time limits on calls and scripting practices steered borrowers into forbearance by precluding Navient employees from even having the opportunity to discuss IDR options with borrowers or learning of the borrowers' unique circumstance in order to find the best plan for them. Moreover, the results of the FSA Audit show that in 220 of 2,388 randomly selected phone calls to borrowers from 2014 through 2017, borrowers were offered forbearance as the *only* option. Navient, who had already responded to the FSA Audit by this point, had even admitted to the FSA that had improperly handled a number of calls by placing

borrowers into forbearance. Both CW1 and CW2 indicated that Navient used forbearance liberally and repeatedly, and generally as the only option for borrowers. For these reasons, the 3Q17 10-Q affirmatively misstated Navient's policies and practices towards forbearance.

136.   The 3Q17 10-Q was also false and materially misleading because it concealed the fact that Navient had been audited by the FSA in March 2017 in response to the CFPB's allegations concerning the company's forbearance practices. Item 103 of Regulation S-K required Navient to disclose "material pending legal proceedings" and to provide "a description of the factual basis" underlying the proceeding. Instead of disclosing the FSA Audit, Navient disclosed the following in the 3Q17 10-Q:

> In addition, Navient and its subsidiaries are subject to examination or regulation by the SEC, CFPB, FDIC, [Department of Education] and various state agencies as part of its ordinary course of business. Items or matters similar to or different from those described above may arise during the course of those examinations. We also routinely receive inquiries or requests from various regulatory entities or bodies or government agencies concerning our business or our assets. The Company endeavors to cooperate with each such inquiry or request.

137.   The FSA Audit qualified as a material pending legal proceeding that was not of a routine nature and that should have been disclosed to the public. The FSA Audit was material given that it was initiated in response to the CFPB Complaint. Defendants categorically denied any factual basis for the allegations in the CFPB Complaint. Had Defendants disclosed the FSA Audit, investors would have been less likely to believe their categorical denials and better able to assess the regulatory risk associated with their investments in Navient. For these reasons, the 3Q17 10-Q was misleading because it did not disclose the FSA Audit.

*Fourth Quarter Earnings Call – January 24, 2018*

138.   Remondi hosted an investor conference all on behalf of Naveint on January 24, 2018. The purpose of the call was to discuss Navient's fourth quarter and year end results for 2017. During the call, Remondi addressed CFPB and States AG Complaints, once again providing categorical denials of any wrongdoing concerning Navient's forbearance practices:

> While 2017 started with the challenge of the CFPB and Attorney General lawsuits, I'm particularly proud that our team did not let these ***unsubstantiated claims*** distract us from executing our business plan. For example, in 2017, we continued to deliver exceptional service to our student loan clients, customers, outperforming the industry and student loan delinquency and default rates, in fact, 37% better; delivering high levels of income-driven repayment enrollment with more than half of loan balances serviced for the government enrolled in IDR; and we piloted numerous initiatives to improve customer outcomes by making it easier for borrowers to navigate the complexity of the federal student loan programs.

139.   The statements identified in paragraph 138 above in emphasis were false and materially misleading because they stated that the allegations against Navient were "unsubstantiated." Contrary to Defendants' categorical and absolute denials, Navient was placing borrowers into forbearance arrangements when IDR plans would have been more suitable. Navient maintained and enforced a practice of placing borrowers into forbearance arrangements, when IDR plans would have been more suitable, for the benefit of Navient. Evidence from the CFPB's lawsuit, including interviews with borrowers, testimony from Navient employees, and "flow charts" used by customer service representatives, show that Navient was intentionally steering borrowers away from IDR plans and into forbearance for years in order to minimize operating costs. As CW1 described, Navient loan specialists were instructed by management to only offer an IDR plan if a borrower had first declined forbearance, a graduated payment plan, or an extended payment plan.

Moreover, the results of the FSA Audit show that in 220 of 2,388 randomly selected phone calls to borrowers from 2014 through 2017, borrowers were offered forbearance as the *only* option. Navient, who had already responded to the FSA Audit by this point, had even admitted to the FSA that had improperly handled a number of calls by placing borrowers into forbearance. These facts show that Navient materially misled the public by categorically denying accusations concerning the company's forbearance practices, as it did here by referring to them as "unsubstantiated."

*Annual Report – February 26, 2018*

140.   On February 26, 2018, Navient issued its annual report for 2017 on Form 10-K (the "2017 10-K"). Remondi and Lown signed the 2017 Form 10-K.

141.   In the 2017 10-K, Navient, Remondi, and Lown discussed the company's loan servicing practices and, in particular, the company's practices regarding forbearance, in a materially misleading manner. In pertinent part, the 2017 10-K stated as follows:

> ***Getting borrowers into the right payment plans: We help customers understand the complex array of federal loan repayment options so they can make informed choices about the plans that are aligned with their financial circumstances and goals. We promote awareness of federal repayment plan options, including Income-Driven Repayment ("IDR")*** . . . ***We also help borrowers understand that options lengthening their repayment term may increase the total cost of their loans, while reminding them that they may pay extra or switch repayment plans at any time.***

> Forbearance involves granting the customer ***a temporary cessation of payments (or temporary acceptance of smaller than scheduled payments) for a specified period of time***. . . . Our forbearance ***policies include limits on the number of forbearance months granted consecutively and the total number of forbearance months granted over the life of the loan***. . . Forbearance as a recovery tool is used most

effectively *when applied based on a customer's unique situation*, including historical information and judgments.

142.   The statements identified above in paragraph 141 above in emphasis were materially false and misleading because they falsely stated that Navient was helping borrowers to be put in the best program to avoid default, that was based on the customer's unique situation, with limited use of forbearance. In reality, Navient was using forbearance as a tool to conceal delinquency and default rates, with forbearance granted liberally and repeatedly to the detriment of many borrowers. Evidence from the CFPB's lawsuit, including interviews with borrowers, testimony from Navient employees, and "flow charts" used by customer service representatives, show that Navient was intentionally steering borrowers away from IDR plans and into forbearance for years in order to minimize operating costs. Numerous borrowers (identified above in paragraph 70) were placed into forbearance indiscriminately and for the longest possible periods without regard to the borrower's unique "financial circumstances and goals." To the contrary, Navient's strict time limits on calls and scripting practices steered borrowers into forbearance by precluding Navient employees from even having the opportunity to discuss IDR options with borrowers or learning of the borrowers' unique circumstance in order to find the best plan for them. Moreover, the results of the FSA Audit show that in 220 of 2,388 randomly selected phone calls to borrowers from 2014 through 2017, borrowers were offered forbearance as the *only* option. Navient, who had already responded to the FSA Audit by this point, had even admitted to the FSA that had improperly handled a number of calls by placing borrowers into forbearance. Both CW1 and CW2 indicated that Navient used forbearance liberally and repeatedly, and generally as the only option for borrowers.

For these reasons, the 2017 10-K affirmatively misstated Navient's policies and practices towards forbearance.

143.   The 2017 10-K was also false and materially misleading because it concealed the fact that Navient had been audited by the FSA in March 2017 in response to the CFPB's allegations concerning the company's forbearance practices. Item 103 of Regulation S-K required Navient to disclose "material pending legal proceedings" and to provide "a description of the factual basis" underlying the proceeding. Instead of disclosing the FSA Audit, Navient disclosed the following in the 2017 10-K:

> In addition, Navient and its subsidiaries are subject to examination or regulation by the SEC, CFPB, FFIEC, [Department of Education] and various state agencies as part of its ordinary course of business. Items or matters similar to or different from those described above may arise during the course of those examinations. We also routinely receive inquiries or requests from various regulatory entities or bodies or government agencies concerning our business or our assets. Generally, the Company endeavors to cooperate with each such inquiry or request.

144.   The FSA Audit qualified as a material pending legal proceeding that was not of a routine nature and that should have been disclosed to the public. The FSA Audit was material given that it was initiated in response to the CFPB Complaint. Defendants publicly categorically denied any factual basis for the allegations in the CFPB Complaint. Had Defendants disclosed the FSA Audit, investors would have been less likely to believe their categorical denials and better able to assess the regulatory risk associated with their investments in Navient. For these reasons, the 2017 10-K was misleading because it did not disclose the FSA Audit.

*Quarterly Report – May 3, 2018*

145.   On May 3, 2018, Navient issued its quarterly report for the first quarter of 2018 on Form 10-Q (the "1Q18 10-Q"). Remondi and Lown signed the 1Q18 10-Q.

146.   In the 1Q18 10-Q, Navient, Remondi, and Lown discussed the company's loan servicing practices and, in particular, the company's practices regarding forbearance, in a materially misleading manner. In pertinent part, the 1Q18 10-Q stated as follows:

> ***Getting borrowers into the right payment plans: We help customers understand the complex array of federal loan repayment options so they can make informed choices about the plans that are aligned with their financial circumstances and goals. We promote awareness of federal repayment plan options, including Income-Driven Repayment ("IDR")*** . . . ***We also help borrowers understand that options lengthening their repayment term may increase the total cost of their loans, while reminding them that they may pay extra or switch repayment plans at any time.***

> Forbearance involves granting the customer ***a temporary cessation of payments (or temporary acceptance of smaller than scheduled payments) for a specified period of time***. . . . Our forbearance ***policies include limits on the number of forbearance months granted consecutively and the total number of forbearance months granted over the life of the loan***. . . Forbearance as a recovery tool is used most effectively ***when applied based on a customer's unique situation***, including historical information and judgments.

147.   The statements identified in paragraph 146 in emphasis were materially false and misleading because they falsely stated that Navient was helping borrowers to be put in the best program to avoid default, that was based on the customer's unique situation, with limited use of forbearance. In reality, Navient was using forbearance as a tool to conceal delinquency and default rates, with forbearance

granted liberally and repeatedly to the detriment of many borrowers. Evidence from the CFPB's lawsuit, including interviews with borrowers, testimony from Navient employees, and "flow charts" used by customer service representatives, show that Navient was intentionally steering borrowers away from IDR plans and into forbearance for years in order to minimize operating costs. Numerous borrowers (identified above in paragraph 70) were placed into forbearance indiscriminately and for the longest possible periods without regard to the borrower's unique "financial circumstances and goals." To the contrary, Navient's strict time limits on calls and scripting practices steered borrowers into forbearance by precluding Navient employees from even having the opportunity to discuss IDR options with borrowers or learning of the borrowers' unique circumstance in order to find the best plan for them. Moreover, the results of the FSA Audit show that in 220 of 2,388 randomly selected phone calls to borrowers from 2014 through 2017, borrowers were offered forbearance as the *only* option. Navient, who had already responded to the FSA Audit by this point, had even admitted to the FSA that had improperly handled a number of calls by placing borrowers into forbearance. Both CW1 and CW2 indicated that Navient used forbearance liberally and repeatedly, and generally as the only option for borrowers. For these reasons, the 1Q18 10-Q affirmatively misstated Navient's policies and practices towards forbearance.

148.   The 1Q18 10-Q was also false and materially misleading because it concealed the fact that Navient had been audited by the FSA in March 2017 in response to the CFPB's allegations concerning the company's forbearance practices. Item 103 of Regulation S-K required Navient to disclose "material pending legal proceedings" and to provide "a description of the factual basis" underlying the proceeding. Instead of disclosing the FSA Audit, Navient disclosed the following in the 1Q18 10-Q:

> In addition, Navient and its subsidiaries are subject to examination or regulation by the SEC, CFPB, FFIEC, [Department of Education] and various state agencies as part of its ordinary course of business. Items or matters similar to or different from those described above may arise during the course of those examinations. We also routinely receive inquiries or requests from various regulatory entities or bodies or government agencies concerning our business or our assets. Generally, the Company endeavors to cooperate with each such inquiry or request.

149.   The FSA Audit qualified as a material pending legal proceeding that was not of a routine nature and that should have been disclosed to the public. The FSA Audit was material given that it was initiated in response to the CFPB Complaint. Defendants publicly categorically denied any factual basis for the allegations in the CFPB Complaint. Had Defendants disclosed the FSA Audit, investors would have been less likely to believe their categorical denials and better able to assess the regulatory risk associated with their investments in Navient. For these reasons, the 1Q18 10-Q was misleading because it did not disclose the FSA Audit.

*Press Release – June 28, 2018*

150.   On June 28, 2018, the California State Attorney General filed a complaint against Navient with allegations similar to those of the State Attorneys General from Pennsylvania, Illinois, and Washington, including allegations that Navient violated California's Unfair Competition and False Advertising Laws by steering vulnerable borrowers toward more expensive repayment plans and failing to adequately disclose how students could attain income-driven repayment recertification, with some violations dating back to as far as 2010, and many on-going. In connection with the complaint, California's Attorney General, Xavier Becerra, said that "Navient's loan servicing abuses have compounded the misery of parents and students who sacrificed to pay for college."

151.   Remondi replied to AG Becerra and the complaint in a June 28, 2018 press release stating, "***The allegations are unfounded,*** and the lawsuit is another attempt to blame a single servicer for the failures of the higher education system and the federal student loan program to deliver desired outcomes . . . ***The need to blame someone has driven these lawsuits***."

152.   The statements identified in paragraph 151 above in emphasis were false and materially misleading because they stated that the allegations against Navient were "unfounded." Contrary to Defendants' categorical and absolute denials, Navient was placing borrowers into forbearance arrangements when IDR plans would have been more suitable. Navient maintained and enforced a practice of placing borrowers into forbearance arrangements, when IDR plans would have been more suitable, for the benefit of Navient. Evidence from the CFPB's lawsuit, including interviews with borrowers, testimony from Navient employees, and "flow charts" used by customer service representatives, show that Navient was intentionally steering borrowers away from IDR plans and into forbearance for years in order to minimize operating costs. As CW1 described, Navient loan specialists were instructed by management to only offer an IDR plan if a borrower had first declined forbearance, a graduated payment plan, or an extended payment plan. Moreover, the results of the FSA Audit show that in 220 of 2,388 randomly selected phone calls to borrowers from 2014 through 2017, borrowers were offered forbearance as the ***only*** option. Navient, who had already responded to the FSA Audit by this point, had even admitted to the FSA that had improperly handled a number of calls by placing borrowers into forbearance. These facts show that Navient materially misled the public by categorically denying accusations concerning the company's forbearance practices, as it did here by referring to them as "unfounded."

*Second Quarter Earnings Call – July 25, 2018*

153.    On July 25, 2018, Remondi hosted an investor conference call on behalf of Navient to discuss the company's earnings for the second quarter of 2018. Remondi began the call by addressing the CFPB Complaint, stating in relevant part:

> Before I provide my comments on this quarter's positive results, I'd like to provide an update on the regulatory political issues. We are approaching the fifth anniversary since the CFPB served its first civil investigative demand on the company. This process has been backwards from the start. It began with the conclusion that the problems student loan borrowers were experiencing were caused by improper servicing, then they looked for examples. However, ***the ongoing search for evidence to support this claim continues to come up empty-handed.*** The bureau is now requesting yet another extension to continue its search. 5 years and no evidence, it's time for this case to be dismissed.
>
> These regulatory cases do not address the real issues facing federal student loan borrowers. High cost, lack of financial planning resources, program complexity and low graduation rates are the issues that need to be addressed. We have long advocated for changes to address these issues, and today, we've published a letter that lays out the issues and advances 5 recommendations that would improve outcomes for borrowers.

154.    In response to Wedbush Securities Inc. Analyst Henry Joseph Coffey's question about the CFPB case, Defendant Remondi continued to attempt to mitigate the market impact of the disclosure of the actions accusing Navient of misconduct when he replied:

> I can't speak to how the CFPB will manage the caseload and the issues that are in front of them. I can speak to our particular case as it relates to the court process. As I said, this has been somewhat of a backwards process. They issued the conclusion before they began their research. And since that conclusion 5 years ago, they've been in search of evidence to support what they believe to be true. They have found

nothing. ***There is no evidence to date to support their case.*** I mean, these are in the court filings. They have not presented any customer accounts that are consistent with their claims. The big frustration for us is that in a civil legal matter like this, we do not have a right to a speedy trial. So here we are 2 years into the legal process, and we probably won't see the inside of a courtroom if this thing goes to trial for another 2 years. And so our arguments here are, you've had 5 years to look for your evidence, you found none, it's time to move on.

155.   The statements identified in paragraphs 153 and 154 above in emphasis were false and materially misleading because they represented that the allegations against Navient were without evidence or any factual basis. Contrary to Defendants' categorical and absolute denials, Navient was placing borrowers into forbearance arrangements when IDR plans would have been more suitable. Navient maintained and enforced a practice of placing borrowers into forbearance arrangements, when IDR plans would have been more suitable, for the benefit of Navient. Evidence from the CFPB's lawsuit, including interviews with borrowers, testimony from Navient employees, and "flow charts" used by customer service representatives, show that Navient was intentionally steering borrowers away from IDR plans and into forbearance for years in order to minimize operating costs. As CW1 described, Navient loan specialists were instructed by management to only offer an IDR plan if a borrower had first declined forbearance, a graduated payment plan, or an extended payment plan. Moreover, the results of the FSA Audit show that in 220 of 2,388 randomly selected phone calls to borrowers from 2014 through 2017, borrowers were offered forbearance as the ***only*** option. These facts show that Navient materially misled the public by referring to the accusations as completely and absolutely lacking any foundational basis in fact.

*Quarterly Report – August 3, 2018*

156.   On August 3, 2018, Navient issued its quarterly report for the second quarter of 2018 on Form 10-Q (the "2Q18 10-Q"). Remondi and Lown signed the 2Q18 10-Q.

157.   In the 2Q18 10-Q, Navient, Remondi, and Lown discussed the company's loan servicing practices and, in particular, the company's practices regarding forbearance, in a materially misleading manner. In pertinent part, the 2Q18 10-Q stated as follows:

> ***Getting borrowers into the right payment plans: We help customers understand the complex array of federal loan repayment options so they can make informed choices about the plans that are aligned with their financial circumstances and goals. We promote awareness of federal repayment plan options, including Income-Driven Repayment ("IDR")*** . . . ***We also help borrowers understand that options lengthening their repayment term may increase the total cost of their loans, while reminding them that they may pay extra or switch repayment plans at any time.***

> Forbearance involves granting the customer ***a temporary cessation of payments (or temporary acceptance of smaller than scheduled payments) for a specified period of time***. . . . Our forbearance ***policies include limits on the number of forbearance months granted consecutively and the total number of forbearance months granted over the life of the loan***. . . Forbearance as a recovery tool is used most effectively ***when applied based on a customer's unique situation***, including historical information and judgments.

158.   The statements identified in paragraph 157 above in emphasis were materially false and misleading because they falsely stated that Navient was helping borrowers to be put in the best program to avoid default, that was based on the customer's unique situation, with limited use of forbearance. In reality, Navient was using forbearance as a tool to conceal delinquency and default rates, with

forbearance granted liberally and repeatedly to the detriment of many borrowers. Evidence from the CFPB's lawsuit, including interviews with borrowers, testimony from Navient employees, and "flow charts" used by customer service representatives, show that Navient was intentionally steering borrowers away from IDR plans and into forbearance for years in order to minimize operating costs. Numerous borrowers (identified above in paragraph 70) were placed into forbearance indiscriminately and for the longest possible periods without regard to the borrower's unique "financial circumstances and goals." To the contrary, Navient's strict time limits on calls and scripting practices steered borrowers into forbearance by precluding Navient employees from even having the opportunity to discuss IDR options with borrowers or learning of the borrowers' unique circumstance in order to find the best plan for them. Moreover, the results of the FSA Audit show that in 220 of 2,388 randomly selected phone calls to borrowers from 2014 through 2017, borrowers were offered forbearance as the **_only_** option. Navient, who had already responded to the FSA Audit by this point, had even admitted to the FSA that had improperly handled a number of calls by placing borrowers into forbearance. Both CW1 and CW2 indicated that Navient used forbearance liberally and repeatedly, and generally as the only option for borrowers. For these reasons, the 2Q18 10-Q affirmatively misstated Navient's policies and practices towards forbearance.

159.   The 2Q18 10-Q was also false and materially misleading because it concealed the fact that Navient had been audited by the FSA in March 2017 in response to the CFPB's allegations concerning the company's forbearance practices. Item 103 of Regulation S-K required Navient to disclose "material pending legal proceedings" and to provide "a description of the factual basis" underlying the proceeding. Instead of disclosing the FSA Audit, Navient disclosed the following in the 2Q18 10-Q:

> In addition, Navient and its subsidiaries are subject to examination or regulation by the SEC, CFPB, FFIEC, [Department of Education] and various state agencies as part of its ordinary course of business. Items or matters similar to or different from those described above may arise during the course of those examinations. We also routinely receive inquiries or requests from various regulatory entities or bodies or government agencies concerning our business or our assets. Generally, the Company endeavors to cooperate with each such inquiry or request.

160.   The FSA Audit qualified as a material pending legal proceeding that was not of a routine nature and that should have been disclosed to the public. The FSA Audit was material given that it was initiated in response to the CFPB Complaint. Defendants publicly categorically denied any factual basis for the allegations in the CFPB Complaint. Had Defendants disclosed the FSA Audit, investors would have been less likely to believe their categorical denials and better able to assess the regulatory risk associated with their investments in Navient. For these reasons, the 2Q18 10-Q was misleading because it did not disclose the FSA Audit.

### *Barclays Global Financial Services Conference – September 13, 2018*

161.   Remondi, on behalf of Navient, participated in an analyst conference sponsored by Barclays on September 13, 2018. During the conference, Barclays Bank Analyst Mark DeVries interviewed Remondi. Mr. DeVries asked Remondi, among other things, where Navient stands with CFPB case. Remondi replied:

> So the CFPB process, as I've said before, is we're now in year 5 of our -- of this lengthy -- a lengthy process. And unfortunately, our -- this is certainly my view of this, but they started with a conclusion, and the conclusion was then -- and then went in search of evidence to support that conclusion through numerous CIDs, which are civil investigative demands. They were able to -- they requested data, we responded to it, provided it to them, about why borrowers move through different statuses in the repayment process. The -- then they moved into the legal side of the equation. We've been fact discovery through the court

process at this stage. We have been responsive. We've been providing them the information that they've been asking for in this process. In some instances, we had some debates as to how broad that process can be where the request is so broad that it becomes difficult to use and process and work with them on that side. But at the end of the day, here we are 5 years in and *we still don't have any examples of borrower accounts that support their accusations*. And so our view here is that I want us to get to court. I'd love it to get to trial, prove our case, because I'm highly confident that we'll prevail. This is a complicated process and the -- and so I tell folks I've learned my -- I had to relearn my civics lessons from high school. You don't have a right to a speedy trial in a civil case, and so we're probably not going to see the inside of a courtroom for 2 years, unfortunately. So we are working to get the facts out there and make sure that people understand that *there is no evidence to support the claims* and get this resolved as quickly as possible.

162.   The statements identified in paragraph 161 above in emphasis were false and materially misleading because they represented that the allegations against Navient were without evidence or any factual basis. Contrary to Defendants' categorical and absolute denials, Navient was placing borrowers into forbearance arrangements when IDR plans would have been more suitable. Navient maintained and enforced a practice of placing borrowers into forbearance arrangements, when IDR plans would have been more suitable, for the benefit of Navient. Evidence from the CFPB's lawsuit, including interviews with borrowers, testimony from Navient employees, and "flow charts" used by customer service representatives, show that Navient was intentionally steering borrowers away from IDR plans and into forbearance for years in order to minimize operating costs. As CW1 described, Navient loan specialists were instructed by management to only offer an IDR plan if a borrower had first declined forbearance, a graduated payment plan, or an extended payment plan. Moreover, the results of the FSA Audit show that in 220 of 2,388 randomly selected phone calls to borrowers from 2014 through 2017, borrowers were offered forbearance as the *only* option. These facts show that

Navient materially misled the public by referring to the accusations as completely and absolutely lacking any foundational basis in fact.

*Quarterly Report – November 2, 2018*

163.   On November 2, 2018, Navient issued its quarterly report for the third quarter of 2018 on Form 10-Q (the "3Q18 10-Q"). Remondi and Lown signed the 3Q18 10-Q.

164.   In the 3Q18 10-Q, Navient, Remondi, and Lown discussed the company's loan servicing practices and, in particular, the company's practices regarding forbearance, in a materially misleading manner. In pertinent part, the 3Q18 10-Q stated as follows:

> **Getting borrowers into the right payment plans: We help customers understand the complex array of federal loan repayment options so they can make informed choices about the plans that are aligned with their financial circumstances and goals. We promote awareness of federal repayment plan options, including Income-Driven Repayment ("IDR")** . . .   **We also help borrowers understand that options lengthening their repayment term may increase the total cost of their loans, while reminding them that they may pay extra or switch repayment plans at any time.**

> Forbearance involves granting the customer *a temporary cessation of payments (or temporary acceptance of smaller than scheduled payments) for a specified period of time*. . . . Our forbearance *policies include limits on the number of forbearance months granted consecutively and the total number of forbearance months granted over the life of the loan*. . . Forbearance as a recovery tool is used most effectively **when applied based on a customer's unique situation**, including historical information and judgments.

165.   The statements identified in paragraph 164 above in emphasis were materially false and misleading because they falsely stated that Navient was helping borrowers to be put in the best program to avoid default, that was based on the

customer's unique situation, with limited use of forbearance. In reality, Navient was using forbearance as a tool to conceal delinquency and default rates, with forbearance granted liberally and repeatedly to the detriment of many borrowers. Evidence from the CFPB's lawsuit, including interviews with borrowers, testimony from Navient employees, and "flow charts" used by customer service representatives, show that Navient was intentionally steering borrowers away from IDR plans and into forbearance for years in order to minimize operating costs. Numerous borrowers (identified above in paragraph 70) were placed into forbearance indiscriminately and for the longest possible periods without regard to the borrower's unique "financial circumstances and goals." To the contrary, Navient's strict time limits on calls and scripting practices steered borrowers into forbearance by precluding Navient employees from even having the opportunity to discuss IDR options with borrowers or learning of the borrowers' unique circumstance in order to find the best plan for them. Moreover, the results of the FSA Audit show that in 220 of 2,388 randomly selected phone calls to borrowers from 2014 through 2017, borrowers were offered forbearance as the **only** option. Navient, who had already responded to the FSA Audit by this point, had even admitted to the FSA that had improperly handled a number of calls by placing borrowers into forbearance. Both CW1 and CW2 indicated that Navient used forbearance liberally and repeatedly, and generally as the only option for borrowers. For these reasons, the 3Q18 10-Q affirmatively misstated Navient's policies and practices towards forbearance.

166.   The 3Q18 10-Q was also false and materially misleading because it concealed the fact that Navient had been audited by the FSA in March 2017 in response to the CFPB's allegations concerning the company's forbearance practices. Item 103 of Regulation S-K required Navient to disclose "material pending legal proceedings" and to provide "a description of the factual basis" underlying the

proceeding. Instead of disclosing the FSA Audit, Navient disclosed the following in the 3Q18 10-Q:

> In addition, Navient and its subsidiaries are subject to examination or regulation by the SEC, CFPB, FFIEC, [Department of Education] and various state agencies as part of its ordinary course of business. Items or matters similar to or different from those described above may arise during the course of those examinations. We also routinely receive inquiries or requests from various regulatory entities or bodies or government agencies concerning our business or our assets. Generally, the Company endeavors to cooperate with each such inquiry or request.

167.   The FSA Audit qualified as a material pending legal proceeding that was not of a routine nature and that should have been disclosed to the public. The FSA Audit was material given that it was initiated in response to the CFPB Complaint. Defendants publicly categorically denied any factual basis for the allegations in the CFPB Complaint. Had Defendants disclosed the FSA Audit, investors would have been less likely to believe their categorical denials and better able to assess the regulatory risk associated with their investments in Navient. For these reasons, the 3Q18 10-Q was misleading because it did not disclose the FSA Audit.

**G.    U.S. Senator Elizabeth Warren and the Associated Press Release Hard Evidence of Navient Student Loan Malfeasance Confirming that Navient Steered Borrowers into Forbearance for Profit.**

168.   On November 13, 2018, Senator Warren wrote a letter to Remondi accusing him of misleading her in previous conversations about Navient's servicing practices. Among other things, the letter accused Remondi of withholding and concealing the FSA Audit from her office. Senator Warren published the letter and the FSA Audit report on her official website on November 20, 2018. In pertinent part, Senator Warren wrote:

*This report bolsters allegations that Navient illegally cheated struggling student borrowers out of their rights to lower repayments*. It also directly contradicts information that you provided to me personally during a June 2018 meeting in my office.

. . .

The audit I received demands an explanation. It appears that, *while the company was publicly stating that there was no truth to the allegations about Navient's misbehavior by CFPB, the company had received an official Education Department audit that revealed your company was not meeting federal standards or adequately servicing student loan borrowers. You made these same denials to me privately - compounding the problem by denying the existence of any third-party audit that identified Navient's failures.*

…

During our discussion about the CFPB's lawsuit, which alleges that Navient steered struggling student borrowers into expensive loan forbearance programs, you strongly denied the allegations, repeating the same denials you have made publicly. I then asked if you were aware of any third-party analysis of the CFPB's allegations, including the allegation that Navient steered borrowers into forbearance plans rather than income-driven repayment plans. You said 'no.' I followed-up and asked if you were aware of any Department of Education analysis of these allegations, including whether Navient steered struggling borrowers into forbearance. You responded that the Education Department conducted routine and targeted audits of all the servicers, including Navient, but that you were unaware of any audit that looked into this specific issue.

To confirm the information that you provided, and to obtain as much information as possible on the allegations against Navient, I had my staff request all routine and targeted audits of Navient conducted by the Department's Office of Federal Student Aid (FSA) from the past two years. The Department responded with all of the audits, including a May 18, 2017 audit report from FSA entitled, "Navient Use of

Forbearance Site Visit Review." According to the review methodology, which was included in the audit:

> [T]he objective of the site visit was to assess whether the use of forbearance by the Navient CSRs met the standards outlined in federal regulations, contractual requirements, and implemented Change Requests. More specifically, the review team evaluated whether or not the Navient agents offered all the applicable options before placing a borrower in forbearance.

The existence of this particular audit on the subject of forbearance surprised me, since you told me in my office that you were not aware of any such audits of Navient on this issue.

169.   Senator Warren recognized that the results of the audit as "even more disturbing" with respect to the site visit and "even more alarming" with respect to Navient's servicing system, and describing the findings as "both tragic and infuriating, and *the findings appear to validate the allegations that Navient boosted its profits by unfairly steering student borrowers into forbearance when that was often the worst financial option for them.*"

170.   Senator Warren then concluded:

> The CFPB alleged that, "[f]rom January 2010 to March 2015, [Navient] added up to $4 billion in interest charges to the principal balances of borrowers who were enrolled in multiple, consecutive forbearances." This audit report raises questions about whether a significant portion of these charges could have been avoided had Navient acted in the best interests of these borrowers. *It also gives disturbing new weight to Navient's astounding assertion in response to the CFPB' s lawsuit that, "There is no expectation that the servicer will 'act in the interest of the consumer. ""*
>
> Given *Navient's admitted disregard for the best interests of students, the troubling finding of this May 2017 FSA audit, and your own misleading answers to questions about the existence of this audit during our June 2018 meeting*, I am providing you the opportunity for

you to correct the misinformation you provided me during our meeting, and explain the appalling findings of this audit.

171.   On November 20, 2018, at approximately 2:00 p.m. ET, the Associated Press released an "exclusive" report on Senator Warren's letter to Remondi as well as the FSA Audit. According to the Associated Press's report, Department of Education spokeswoman Liz Hill said that the FSA audited Navient's forbearance practices after the CFPB filed its lawsuit against the company in January 2017 to see if there were any compliance issues.

172.   The Associated Press article made note of a number of the audit's significant findings, and specifically quoted Navient's response to the audit as well as the response of Seth Frotman, the CFPB's then-current student loan ombudsman:

> "We (are not) aware of any requirement that borrowers receive all of their repayment options … on each and every call," the company said, adding that if the Department of Education chose to require all servicers to discuss income-driven repayment plans with all borrowers, the Department of Education needs to redo its contract with Navient.

> Seth Frotman, who was the highest-ranking government official in charge of student loans until he quit in August in protest over how the Trump-controlled Department of Education and Consumer Financial Protection Bureau were handling the issue of student loans, said Navient's response was outrageous.

> "In short, Navient, when confronted with evidence of its bad practices, is telling the government, 'Pay us more money or take a hike.' And It looks like the Department of Education took a hike," Frotman said.

173.   The FSA's report was dated May 18, 2017 with on-site dates of March 20 through 24, 2017. As part of their inquiry, FSA auditors did a call center review listened in on about 2,400 randomly selected calls to borrowers from 2014 to 2017 out of a batch of 219,000. The findings were as follows:

a.   FSA listened to 2,388 phone calls, including 388 inbound and 2,000 outbound calls. Of these, FSA determined *almost 1/10 calls were only offered forbearance as an option*.

b.   In several instances where only forbearance was offered, it was after a borrower had already made a promise to pay within a short time, without being given the opportunity to decide if another option (like one of the Income Driven plans or a deferment) would have been more favorable. And in some instances, interest was capitalized when another option may have prevented it."

c.   FSA recommended in the report that "Navient ask questions so that the borrower is able to determine which option (like promise to pay) would be most beneficial to resolve the delinquency. . . . FSA does not believe a borrow should use unnecessary forbearance time that will result in interest capitalization."

d.   "[M]any CSRs did not offer alternative or beneficial options when attempt to assist borrowers with bringing their account current or managing repayment. CSRs did not ask probing questions to determine if it would be more beneficial for the borrower to enter a deferment or to change to one of the Income Driven Repayment (IDR) options."

e.   FSA recommended in the report that, "Navient provide borrowers with all options available so that the borrower may make an informed decision based on their current situation. The use of forbearance in lieu of any other options can cause more undue hardship to a borrower in the long term."

174.   FSA also reported that "it isn't always easy to determine exactly what happened on a given call with Navient's CLASS system. Of the forty accounts, the review team was able to determine that 21 of them offered the borrower an option other than forbearance. For the other nineteen accounts, FSA asked for Navient to provide the call that resulted in the notation on the account; eight of those did not offer the borrower any other option." Additional findings were as follows:

a. ***Navient offered borrowers ONLY forbearance in 20% of the samples.*** In a few of these instances, where there was a change of circumstances, Navient did not suggest a new repayment plan or an unemployment deferment. In other instances, the borrower requested a month or two of forbearance and Navient provided the forbearance without probing to see if there was a better option available to the borrower.

b. While the FSA acknowledges difference in training processes after July 1, 2015, "FSA recommends that Navient provide communication/on-going training to their agents so that borrowers consistently receive all of their options - repay, IDR, deferment and forbearance."

c. "About half of the time (21 out of 40 accounts), Navient's notes were not clear enough to determine what happened on the account. For example, entries on the same day would have a comment suggesting that the borrower both accepted and rejected the forbearance. It was unclear whether this was the same call or a different call. One reason for this is the CLASS system does not provide the timestamp to show when a transaction happened, unless the call was routed through the IVR. Another reason for this is because Navient's CARES system used to notate the account that the borrower rejected the forbearance when CSRs went to a different section of the CARES system. This issue of "rejecting forbearance" was resolved with a system upgrade in June 2016. In other examples, the phone agent clearly provided several options (repay, IDR, deferment) before ultimately giving the borrower the forbearance option. However, the note only displayed that the forbearance was processed without a discussion of the other options."

175.   As part of their inquiry, FSA auditors did a live side-by-side review at Navient. For the side-by-side reviews, the review team listened to live calls as they entered the system. FSA auditors noted that the agents were friendly and polite,

however, Navient CSRs have varying degrees of skill when navigating calls. For example, one of the agents recently finished the eleven week training course and did a good job navigating the call. However, a more seasoned agent was not able to provide the next steps for a disabled borrower wanting to apply for discharge based on a determination by the Social Security Administration. After the review team left site, Navient provided CR 3294 (SSA match for TPD) to their staff for additional education.

176.   Navient responded to the audit, which was included in the FSA Audit report in a section titled "Servicer Response." In its response, Navient conceded that some calls were improperly handled. For instance, Navient admitted the following calls were improperly handled:

    a.    Customer "advised she was going through a divorce that should be settled in a few months and asked to postpone payments. Prior to the call, the customer had temporary hold expire that was applied after we qualified her for hardship deferment and were awaiting the required documentation. The customer was also in IDR (ICR, but in the permanent standard payment) and these should have been clues to the agent to ask if payment amount was affordable after forbearance expired or other probing questions to ensure hardship was in fact temporary and not long term. Although other options were not discussed, a letter was sent to the customer after the call that did include other options, including IOR."

    b.    Customer "requested 2 months of postponement due to other obligations and advised that she would likely be able to resume payments in August or September making the relief temporary in nature. However, because [customer] was already in IDR (processed in 04/2014) the agent should have reminded the customer that she did have the option of recalculating her IDR payment if needed. In addition, the agent should have asked probing questions to determine if deferment was an option given the short term nature of the requested relief."

c.   Customer "was in IDR at the time of the call (processed on 03/25/2015) and requested postponement for 3-month due to financial issues. Since this was short term, the agent offered forbearance. Customer did not indicate there was an overall change in financial circumstance, just a temporary inability to pay but he agent could have confirmed that recalculation of current payment amount wasn't needed before offering forbearance."

d.   Customer "requested forbearance, which the agent granted based on available time. Since the customer wanted 6-months of forbearance the agent should have asked probing questions to definitively rule out other options."

177.   Numerous news sources quickly reported on the FSA's audit findings, on the Associated Press story, including *CNBC*, *American Banker*, *Fox Business News*, *Market Watch*, and *CBS*.

178.   On November 19, 2018, Navient's stock price closed at $12.00. On November 20, 2018, Navient's stock price closed at $10.73 per share on unusually heavy volume. Between November 19, 2018 and November 20, 2018, Navient's stock price fell $1.27 per share, a drop of approximately 11%, in response to the news about the FSA Audit and increased regulatory scrutiny, including scrutiny from Senator Warren.

## H.   Defendants Acted with Scienter.

*The FSA Audit establishes Defendants' knowledge about the forbearance scheme and illegal loan servicing practices.*

179.   Defendants knew of problems with Navient's student loan servicing from the FSA Audit which was specifically "to assess whether the use of forbearance by Navient CSRs met the standards outlined in federal regulations, contractual requirements, and implemented Change Request. More specially, the review team

evaluated whether or not the Navient agents offered all the applicable options before placing a borrower in forbearance."

180.   The date of the FSA Audit report was May 18, 2017. FSA auditors were on site at Navient from March 20, 2017 through March 24, 2017. Navient provided its responses to the Department of Education which were incorporated in the FSA Audit report. Navient and the Individual Defendants, therefore, were on notice that the Department of Education took issue with many of Navient's practices. The FSA Audit report showed that Navient was aware that FSA auditors did a call center review and listened in on about 2,400 randomly selected calls to borrowers from 2014 to 2017 out of a batch of 219,000. The findings were as follows:

    a.    FSA listened to 2,388 phone calls, including 388 inbound and 2,000 outbound calls. Of these, FSA determined ***almost 1/10 calls were only offered forbearance as an option***.

    b.    In several instances where only forbearance was offered, it was after a borrower had already made a promise to pay within a short time, without being given the opportunity to decide if another option (like one of the Income Driven plans or a deferment) would have been more favorable. And in some instances, interest was capitalized when another option may have prevented it."

    c.    FSA recommended in the report that "Navient ask questions so that the borrower is able to determine which option (like promise to pay) would be most beneficial to resolve the delinquency. . . . FSA does not believe a borrower should use unnecessary forbearance time that will result in interest capitalization."

    b.     "[M]any CSRs did not offer alternative or beneficial options when attempting to assist borrowers with bringing their account current or managing repayment. CSRs did not ask probing questions to determine if it would be more beneficial for the borrower to enter a deferment or to change to one of the Income Driven Repayment (IDR) options."

c.    FSA recommended in the report that, "Navient provide borrowers with all options available so that the borrower may make an informed decision based on their current situation. The use of forbearance in lieu of any other options can cause more undue hardship to a borrower in the long term."

181.   Navient and the Individual Defendants also knew that FSA reported that "it isn't always easy to determine exactly what happened on a given call with Navient's CLASS system. Of the forty accounts, the review team was able to determine that 21 of them offered the borrower an option other than forbearance. For the other nineteen accounts, FSA asked for Navient to provide the call that resulted in the notation on the account; eight of those did not offer the borrower any other option." Additional FSA findings were as follows:

a.    ***Navient offered borrowers ONLY forbearance in 20% of the samples.*** In a few of these instances, where there was a change of circumstances, Navient did not suggest a new repayment plan or an unemployment deferment. In other instances, the borrower requested a month or two of forbearance and Navient provided the forbearance without probing to see if there was a better option available to the borrower.

b.    While the FSA acknowledges difference in training processes after July 1, 2015, "FSA recommends that Navient provide communication/on-going training to their agents so that borrowers consistently receive all of their options - repay, IDR, deferment and forbearance."

c.    "About half of the time (21 out of 40 accounts), Navient's notes were not clear enough to determine what happened on the account. For example, entries on the same day would have a comment suggesting that the borrower both accepted and rejected the forbearance. It was unclear whether this was the same call or a different call. One reason for this is the CLASS system does not provide the timestamp to show when a

transaction happened, unless the call was routed through the
IVR. Another reason for this is because Navient's CARES
system used to notate the account that the borrower rejected the
forbearance when CSRs went to a different section of the
CARES system. This issue of "rejecting forbearance" was
resolved with a system upgrade in June 2016. In other examples,
the phone agent clearly provided several options (repay, IDR,
deferment) before ultimately giving the borrower the forbearance
option. However, the note only displayed that the forbearance
was processed without a discussion of the other options."

182.   Navient and the Individual Defendants also knew that as part of their
inquiry, FSA auditors did a live side-by-side review at Navient. For the side-by-side
reviews, the review team listened to live calls as they entered the system. FSA
auditors noted that the agents were friendly and polite, however, Navient CSRs have
varying degrees of skill when navigating calls. For example, one of the agents
recently finished the eleven week training course and did a good job navigating the
call. However, a more seasoned agent was not able to provide the next steps for a
disabled borrower wanting to apply for discharge based on a determination by the
Social Security Administration. After the review team left site, Navient provided CR
3294 (SSA match for TPD) to their staff for additional education.

183.   From the FSA Audit, Navient was aware that: the Department of
Education was not satisfied with Navient's practices; the Department of Education
determined Navient's systems had shortcomings for servicing loans; the Department
of Education noted the varying levels of competence and skill that Navient's agents
possessed and suggested additional education; and that the Department of Education
expected Navient to educate borrowers on repayment options beyond just deferment.

*Navient implemented and maintained formal policies and practices that steered borrowers into forbearance plans.*

184.   Navient's formal compensation plans and its practices for handling calls were formal corporate policies and, therefore, would not have existed without the Individual Defendants' approval. The compensation plans incentivized employees to minimize the call time in which customers might be serviced and accordingly encouraged employees to put customers into forbearance versus IDRs or other options.

185.   Indeed, Navient created "flow charts" that its customer service representatives were required to use. These flow charts directed Navient employees to offer only deferment or forbearance to borrowers who indicate that they cannot afford to make any payment. Scripts were also created for customer service representatives which, as described by CW1 and CW2, prohibited employees from offering IDR plans before offering forbearance. Patricia Peterson's hearing testimony confirms that this was a company-sanctioned practice and procedure. The examples of borrower "steering" provided herein further confirm that this practice was implemented and enforced by Navient management.

186.   Additionally, as detailed in the various CFPB and State Attorneys General complaints, as well as complaints filed by Mississippi's AG and lawsuits filed by members of the American Federation of Teachers, each of which Navient and the Individual Defendants were aware and familiar with, these improper loan servicing practices were not the sporadic actions of rogue employees, but rather highly systematized, including through the use of scripts. Such a streamlined process for dealing with borrowers could not have been implemented without the knowledge and approval of senior management.

187.   In fact, Navient's employee compensation plans incentivized against the exact practices that Navient boasted as merits. The contradiction between Defendants' statements and actual policies and practices is strong evidence that Defendants knew that Navient's public statements were false and either intended to mislead investors or recklessly disregarded the risk of doing so.

*The forbearance scheme and illegal loan servicing practices were an integral part of Navient's core operations.*

188.   The forbearance scheme and loan servicing practice (often in the resulting misapplication or non-application of payments) impacted Navient's bottom line in a material manner, so much so that the forbearance scheme amounted to an integral part of the company's core operations. These practices allowed Defendants to minimize costs by paying fewer workers to process more calls and payments while also manipulating financials such that more loans would be listed as current, thus allowing for a higher EPS as well as appearing less risky to investors. This also allowed Defendants to be able to report better metrics to Department of Education to allow for increased allocations of federal loans. The Individual Defendants oversaw all material aspects of Navient's day-to-day operations and, therefore, would have been aware of the forbearance scheme and its material effect on Navient's financials.

189.   Navient maintained incentive policies that encouraged the improper forbearance practices. Senior executives would have known about such widespread practices spawned by company policies that were implemented by management. Navient's financial results and servicing data were critical to its operations and prospects for future Department of Education contracts. Navient's pervasive practice of placing borrowers into forbearance materially impacted its financial results and thus went to Navient's core operations.

190.   As noted above, misusing forbearances allowed Navient to artificially understate the levels of delinquencies, defaults, and charge-offs in its loan portfolios, as borrowers in forbearance were still considered "current" on their accounts. Understating delinquencies, defaults, and charge-offs allowed Navient in turn to artificially understate its provisions for loan losses. And because loan loss provisions were recorded as an expense on Navient's income statement, artificially depressing them allowed Navient to report artificially inflated net income and EPS. That manipulation of core financial information would have required the knowledge (or reckless disregard) of Navient's senior executives.

191.   Defendants acted with scienter when making their representations concerning Navient's servicing practices. Given the pervasiveness of improper loan-servicing activities at Navient, it is highly implausible that Navient's senior executives did not know or, in the absence of deliberate recklessness, would not have been aware of them.

*Navient intentionally orchestrated the forbearance scheme to maximize profits, increase executive bonuses, and strengthen loan servicing opportunities from the Department of Education.*

192.   On January 18, 2017, in response to three complaints filed by the IL and WA Attorneys General and the CFPB, and then on June 28, 2018, in response to the CAAG Complaint, Navient denied any wrong-doing and began a twenty-two-month charade to mislead both investors into believing that Navient was a compliant loan servicer with low default rates due to their highly efficient, 'data-driven,' 'customer-centric' practices. Navient perpetuated this scheme to mislead the market through repeated statements in SEC filings, press releases, releases on Navient's website, interviews with press, and conference calls whose seeming primary purpose to attempt to exonerate Navient by hyping Navient's alleged loan servicing practices.

By driving students into forbearance as opposed to taking the time to explain loan options, Navient was able to accomplish a number of goals.

193.   Navient, through the use of an employee incentive program to limit call times and a script in which borrowers were steered into forbearance program, was able to keep labor costs down by processing more calls from borrowers in less time with fewer employees. Navient placed borrowers into forbearance in lieu of counseling and enrollment in IDR programs. As described above, the process to explain and enroll a borrower in forbearance was far less time-consuming than the process for explaining various IDR options and enrolling borrowers in the program, thus by utilizing a script that pushed forbearance over IDR, Navient was able to service more troubled borrowers in less time and with fewer employees.

194.   This policy, while beneficial to Navient by limiting overhead, was detrimental to borrowers and in direct conflict with its policies as represented to the public and Department of Education. Navient placed borrowers into forbearance in lieu of counseling and enrolling them in alternative repayment programs, including IDR plans. In doing so, Navient avoided (at borrowers' expenses) the higher operational costs associated with properly counseling and enrolling borrowers in such plans. That is, it would take significantly more time, and thus employee resources, to shepherd a borrower through the process of getting into an alternative repayment plan than simply to place her into forbearance. As the CFPB explained, "[a]s the volume of [IDR] plan applications and renewals received by Navient increases, Navient also has to increase the size of its staff to review and process those forms, thereby increasing operating costs." Navient thus avoided those necessary operating costs by improperly placing borrowers into forbearance. That, in turn, would necessitate hiring more personnel to meet the needs of Navient's customer base. By eschewing its stated commitment to promote borrowers' best interests, Navient artificially kept its operational costs lower than they should have been.

195.   Navient also pushed borrowers into forbearance to avoid having to classify those borrowers as delinquent or in default, which would raise a red flag to analysts and investors that Navient's loan portfolios were exposed to higher levels of risk than Defendants disclosed, and that it was in turn a riskier investment than Defendants portrayed to the market. This was beneficial to Navient because it portrayed as being a less risky investment to investors.

196.   Increases in delinquencies, defaults, and charge-offs caused Navient to increase its loan loss provisions, whereas favorable delinquency and default trends correspond with lower provisions. The provision for loan losses "increases the related allowance for loan losses," *i.e.*, the total reserve set aside to address charge-offs. Navient records those provisions as an expense on its income statement, so lower provisions allow Navient to report higher income, resulting in higher EPS. By overusing forbearances, Navient artificially kept delinquencies, defaults, and charge-offs lower than they should have been, which in turn allowed Navient to report artificially low loan loss provisions as well as correspondingly high net income and EPS.

197.   This process was additionally beneficial to Navient because by pushing borrowers into forbearance, and then, often, repeatedly enrolling borrowers in forbearance programs, Navient was able to keep borrowers out of delinquency or default while continuing to accrue and capitalize interest on the loans.

198.   Additionally, using forbearance to artificially increase EPS, Navient was able to artificially decrease delinquencies and defaults, which are key metrics that Department of Education uses in analyzing how to allocate additional loan servicing under the TIVAS contracts.

199.  Navient had a Management Incentive Plan for Navient's Named Executive Officers ("NEOs") designed to drive performance metrics that aligned with Navient's business objectives. For 2016, these performance metrics included

(i) EPS on a "Core Earnings" basis, (ii) strategic debt financing proceeds, and (iii) private education loan defaults. As Navient noted in its Proxy Statement dated April 13, 2017, "Gross loan defaults is a key metric used by our investors and others to measure the performance of our loan portfolios." There was a target for each of the performance metrics, with a weight assigned to each metric, as well as a scale of "payout factors" to assess Navient's performance relative to target. These payout factors range from 50% based on a threshold level of performance, to 150% based on a maximum level of performance, with performance below threshold resulting in a payout factor of 0%. The weight-value for the Performance Metrics were broken down as follows - the Earnings Per Share on a "Core Earnings" Basis was weighted at 40%, Strategic Debt Financing Proceeds was weighted at 20%, Fee Income (generated through loan servicing, asset recovery, and other business processing activities) was weighted at 10%, Private Education Loan Gross Defaults were weighted at 15% and Revenue from Growth Business (non-federal-loan-related business) was weighted at 15%.

200. For 2016, Navient's performance resulted in above-target payments under the 2016 Management Incentive Plan. Under the 2016 Management Incentive Plan, NEO's received bonus which were 166.665% (150% times 11.1%) of their respective base salaries. In addition to their base salaries Remondi received $1,666,500 while Chivavibul received $633,270 in additional compensation on top of their respective base salaries. Remondi's base salary for 2016 was $1,000,000 while Chivavibul received $380,000. Such large performance-based compensations were strong incentives for the NEOs to manipulate EPS and loan default statistics.

201. Further, by increasing the number of trouble borrowers serviced in a compliant manner, within shorter times, and with lower labor costs, Navient was able to make itself more attractive to the Department of Education in that Navient could boast its capacity to service high volumes of loans at lower costs. This was

particularly important during 2017 when the Trump administration was trying make a number of changes and offering new loan servicing contracts. For instance, Wedbush noted on April 17, 2017 in its report on Navient that Education Secretary Betsy DeVos's proposed single-servicer contract "is a reset that could ultimately extend to all areas of related servicing and open doors previous closed to Navi with the Department of Education."

202.   Navient had a strong motive to hold itself out as being a compliant, efficient, customer-oriented loan servicer so that it could put itself in a better place to win various Department of Education contracts.

## I.   Loss Causation and Economic Harm.

203.   As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of Navient's common stock in response to company new specific news about Navient's practices, Plaintiff and the other Class members have suffered significant damages.

204.   During the Class Period, Defendants concealed from Plaintiff and other Class members that Navient faced increased regulatory risk and exposure that would arise from illicit loan servicing practices such as steering borrowers to forbearance and failing to inform them about other options such as IDRs. To the extent that information came into the market suggesting that Navient may have been engaged in such improper practices, Defendants continually denied that Navient had engaged in any such practices and insisted that Navient's practices with borrowers was appropriate at all times and conducted in the best interests of the borrowers. This, in turn, artificially inflated the price of Navient's common stock and operated as a fraud or deceit on purchasers of Navient's common stock by materially misleading the investing public. Later, when Defendants' prior misrepresentations and fraudulent conduct became apparent to the market as evidence of Navient's forbearance scheme emerged, the price of Navient's common stock materially declined as the prior

artificial inflation came out of the price over time. As a result of their purchases of Navient's common stock during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages under federal securities laws.

205.   The first stock drop was caused by the PA AG's Complaint. Specifically, on October 4, 2017, Navient's stock price closed at $14.70. On October 5, 2017, Navient's stock price closed at $12.60 per share on unusually heavy volume. Between October 4, 2017 and October 5, 2017, Navient's stock price fell $2.10 per share, a drop of approximately 14%, on the news of the PA AG's complaint. The significant decline in Navient's stock price was caused directly by Defendants' continued misrepresentations about Navient's servicing practices.

206.   The second stock drop was caused by the Associated Press's release of the FSA Audit report and Senator Warren's letter to Remondi on November 20, 2018, which revealed additional information about Navient's improper practices that had not yet been available to the market. On November 19, 2018, Navient's stock price closed at $12.00. The next day, on November 20, 2018, Navient's stock price closed at $10.73 per share on unusually heavy volume. Between November 19, 2018 and November 20, 2018, Navient's stock price fell $1.27 per share, a drop of approximately 11%.

207.   The declines in Navient's stock price was caused by the revelation to the market about the true state of loan servicing within Navient and Remondi's propensity to lie to the public, including to sitting senators. These truths revealed that Defendants had concealed from the public that Navient was subject to a heightened risk of regulatory exposure as a result of its servicing practices. As investors fully understood the risk profile and true nature of Navient's servicing practices (which Defendants had repeatedly and aggressively previously attempted to conceal), they reacted sharply by selling the stock immediately. This resulted in damages to Navient investors.

208.   Overall, from before the first partial disclosure on October 5, 2017, until the second disclosure on November 20, 2018, the Navient's stock price fell from $14.70 on October 4, 2017 to $10.73 on November 20, 2018, for a total drop of $3.97, or 27%.

209.   The decline in the price of Navient's common stock caused economic harm to Plaintiff and other Class members as the value of their investments declined due to the fraud alleged herein.

## J.   Presumption of Reliance; Fraud-On-The-Market.

210.   At all relevant times, the market for Navient's common stock was an efficient market for the following reasons, among others:

    a.   Navient's common stock met the requirements for listing and was listed and actively traded on the NASDQ Exchange, a highly efficient and automated market;

    b.   Navient communicated with public investors via established market communication mechanisms, including disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

    c.   Navient was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms during the Class Period. Each of these reports was publicly available and entered the public marketplace; and

    d.   Unexpected material news about Navient was reflected in and incorporated into its stock price during the Class Period.

211.   As a result of the foregoing, the market for Navient's common stock promptly digested current information regarding Navient from all publicly available sources and reflected such information in Navient's stock price. Under these circumstances, all purchasers of Navient's common stock during the Class Period suffered similar injury through their purchase of Navient's common stock at artificially inflated prices, and a presumption of reliance applies.

212.   Alternatively, reliance need not be proven in this action because the action involves omissions and deficient disclosures. Positive proof of reliance is not a prerequisite to recovery pursuant to ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security.

## K.   No Safe Harbor: Inapplicability of Bespeaks Caution Doctrine.

213.   The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the material misrepresentations and omissions alleged in this Complaint because they are not forward looking statement which are the only statements that can be protected by the statutory safe harbor.

214.   To the extent certain of the statements alleged to be misleading or inaccurate may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

215.   Defendants are also liable for any false or misleading "forward-looking statements" pleaded because, even if they were identified as "forward looking statements," which they were not, at the time each "forward-looking statement" was

made, the speaker knew the "forward-looking statement" was false or misleading and the "forward-looking statement" was authorized and/or approved by an executive officer of Navient who knew that the "forward-looking statement" was false. Alternatively, none of the historic or present-tense statements made by the defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by the defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

216.   Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Navient common stock during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosure. Excluded from the Class are defendants herein, the officers and directors of Navient, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

217.   The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Navient common stock was actively traded on the NASDAQ market. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Navient or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily

used in securities class actions. As of September 30, 2017, there were 263,012,203 shares of Navient common stock outstanding. Upon information and belief, these shares are held by thousands, if not millions, of individuals located throughout the country and possibly the world. Joinder would be highly impracticable.

218.   Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

219.   Plaintiff will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

220.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

      a.     whether the federal securities laws were violated by Defendants' acts as alleged herein;

      b.     whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations, practices, policies and management of Navient;

      c.     whether the Individual Defendants caused Navient to issue materially false and misleading statements during the Class Period;

      d.     whether Defendants acted knowingly or recklessly in issuing false and misleading statements;

e. whether the prices of Navient's common stock during the Class Period were artificially inflated because of Defendants' conduct complained of herein; and

f. whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

221. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## <u>COUNT I</u>

### Against Defendants for Violations of Section 10(b) and Rule 10b-5

222. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

223. This Count is asserted against defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

224. During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of common stock. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public,

including Plaintiff and the other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Navient common stock; and (iii) cause Plaintiff and the other members of the Class to purchase or otherwise acquire Navient's common stock at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

225.   Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Navient's common stock. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Navient's finances and business prospects.

226.   By virtue of their positions at Navient, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

227.   Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As

the senior managers and/or directors of Navient, the Individual Defendants had knowledge of the details of Navient's internal affairs.

228.   The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Navient. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Navient's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Navient's common stock was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Navient's business and financial condition which were concealed by defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Navient's common stock at artificially inflated prices and relied upon the price of the common stock, the integrity of the market for the common stock and/or upon statements disseminated by defendants, and were damaged thereby.

229.   During the Class Period, Navient's common stock was traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Navient's common stock at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said common stock, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the other Class members, the true value of

Navient's common stock was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of Navient's common stock declined sharply upon public disclosure of the facts alleged herein to have been misrepresented or omitted by Defendants to the injury of Plaintiff and other Class members.

230.   By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

231.   As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, of Navient's common stock during the Class Period, upon the disclosure that it had been disseminating misrepresented facts about Navient and its business, practices and policies to the investing public.

## COUNT II

### Against the Individual Defendants for Violations of Section 20(a)

232.   Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

233.   During the Class Period, the Individual Defendants participated in the operation and management of Navient, and conducted and participated, directly and indirectly, in the conduct of Navient's business affairs. Because of their senior positions, they knew the adverse non-public information about Navient's misstatement of income and expenses and false financial statements.

234.  As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Navient's financial condition and results of operations, and to correct promptly any public statements issued by Navient which had become materially false or misleading.

235.   Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Navient disseminated in the marketplace during the Class Period concerning Navient's operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Navient to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Navient within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Navient's common stock.

236.   Each of the Individual Defendants, therefore, acted as a controlling person of Navient. By reason of their senior management positions and/or being directors of Navient, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Navient to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of Navient and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

237.   By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Navient.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff demands judgment against defendants, jointly and severally, as follows:

a.   Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and

certifying Plaintiff as the Class representative and his counsel as Class Counsel;

b.    Requiring defendants to pay damages sustained by Plaintiff and the other members of the Class by reason of the acts and transactions alleged herein;

c.    Awarding Plaintiff and the other members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

d.    Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demand a trial by jury.

Dated: March 18, 2019                    **LEVI & KORSINSKY, LLP**

                                          s/ Eduard Korsinsky
                                         Eduard Korsinsky (EK-8989)
                                         55 Broadway, 10th Floor
                                         New York, New York 10006
                                         Tel.:  (212) 363-7500
                                         Fax:  (212) 363-7171
                                         Email: ek@zlk.com

                                                -and-

                                         Nicholas I. Porritt
                                         Adam M. Apton
                                         1101 30th Street NW, Suite 115
                                         Washington, DC 20007
                                         Tel: (202) 524-4290
                                         Fax: (202) 333-2121
                                         Email: nporritt@zlk.com
                                         Email: aapton@zlk.com

                                         *Attorneys for Lead Plaintiff*
                                         *and Lead Counsel for the Class*