**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**
**CAMDEN VICINAGE**

|  |  |  |
|---|---|---|
| | : | |
| | : | |
| | : | |
| | : | Civil No. 17-8373 (RBK/AMD) |
| IN RE NAVIENT CORPORATION | : | |
| SECURITIES LITIGATION | : | **OPINION** |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |

**KUGLER**, United States District Judge:

This matter comes before the Court upon the Motion (Doc. 36) of Defendants Somsak Chivavibul, Christian M. Lown, John F. Remondi, and Navient Corporation (collectively "Defendants") to dismiss Plaintiff's consolidated Complaint for failure to state a claim under Fed. R. Civ. P. 12(b)(6). For the reasons expressed herein, Defendants' Motion is hereby DENIED.

## I.    BACKGROUND[1]

### a.  Factual Background

Plaintiff brings this federal securities class action on behalf of all persons, excluding Defendants, who purchased or otherwise acquired the publicly-traded securities of Navient Corporation ("Navient") during the period from January 18, 2017 through November 20, 2018.

Navient, a publicly-traded corporation, is "one of the ten major loan servicers that have contracts with the Department of Education." (Doc. 33, ("Compl.") ¶34.) Defendants include

---

[1] On this motion to dismiss, the Court accepts as true the well-pleaded facts in the operative Complaint (Doc. 33) and construes them in the light most favorable to Plaintiff. *See Phillips v. Cty. of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008).

Navient, its Chief Executive Officer John F. Remondi, and its Chief Financial Officers during the class period, Somsak Chivavibul and Christian M. Lown.

Plaintiff brings this action under sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b–5, seeking to recover compensable damages caused by Defendants' alleged violations of federal securities laws. The consolidated Complaint (Doc. 33) alleges that, during the class period, Defendants made materially false and misleading statements regarding Navient's business, causing losses and damages among the holders of Navient securities.[2]

Plaintiff's claims arise from Defendants' response to lawsuits brought against Navient by the Consumer Financial Protection Bureau ("CFPB") and State Attorneys General from Illinois, Washington, Pennsylvania, California, and Mississippi. In these lawsuits, Navient was sued for allegedly running a "forbearance scheme," which Plaintiff describes as an "illegal scheme to cheat struggling student borrowers out of their rights to lower repayment plans" by improperly steering borrowers into forbearance status, rather than offering more financially sensible income-driven repayment (IDR) plans. (Compl. ¶2.)

Plaintiff claims that Navient could operate more efficiently and cost-effectively by steering borrowers into forbearance, whether or not it was financially appropriate for the borrower. Knowing this, Navient allegedly instructed its customer service representatives to "actively steer borrowers into forbearance" during phone conversations, rather than discuss IDR plans, which would necessitate a much lengthier conversation and reduce the number of customers each Navient employee could service. (Compl. ¶¶3–4.) This instruction to staff allowed Navient to decrease call length per borrower and thus "service more loans in shorter amounts of time." (*Id*. ¶¶3–4.) Additionally, forbearance-steering was profitable for Navient because staff could enroll a borrower

---

[2] This Court's February 2, 2018 Opinion and Order (Docs. 10, 11) consolidated cases and appointed Navient Investor Group as Lead Plaintiff.

in forbearance over the phone, whereas IDR required borrowers to fill out and submit paperwork on their own and recertify their IDR application each year. (*Id*. ¶50-54.) There was no guarantee that borrowers would complete IDR steps on their own, potentially resulting in loans being placed into default or delinquent status. (*Id*.) In contrast, enrolling borrowers in forbearance over the phone guaranteed that loans would not reflect a default or delinquent status. (*Id*.) Plaintiff emphasizes that the status of loans affected executive bonuses, as well as influenced "the number of loans Navient would receive for servicing from the Department of Education." (*Id*. ¶4.) Forbearance also generated more income for Navient: interest that accrued during the forbearance period capitalized at the end of the forbearance period, potentially increasing monthly payments and overall repayment amount. (*Id*. ¶48.)

### *Lawsuits against Navient*

On January 18, 2017, the start date of the class period, the CFPB and State Attorneys General ("AG") from Washington and Illinois filed the first set of lawsuits against Navient. (Compl. ¶59.) These suits alleged "multiple violations relating to predatory lending practices," including allegations relating to the forbearance scheme detailed above. (*Id*.)

That same day, Navient put out three press releases responding to the lawsuits. (*Id*. ¶¶62, 98.) Navient's press releases called the lawsuits politically motivated, stated that the allegations were unsubstantiated and false, denied the lawsuits' claim that Navient did not educate borrowers about IDR, and went on to highlight successful aspects of Navient's loan repayment system. (*Id*. ¶¶62, 98–100.) Based on Navient's response, analysts such as Credit Suisse did not downgrade Navient's rating. (*Id*. ¶64.) Plaintiff claims that Navient's denial—which Plaintiff alleges contained "false and materially misleading" statements—misled investors and artificially inflated stock prices. (*Id*. ¶¶66, 101.)

Plaintiff details several additional times where Defendants deny the substance of the CFPB and Washington and Illinois AG lawsuits. On January 23, 2017, Defendant Remondi commented on the lawsuits in an interview with *The Washington Post*. (Compl. ¶102.) In the interview, Remondi "categorically denied" the allegations contained in the government lawsuits, and stated that Navient would not be made economically better off by steering borrowers into forbearance. (*Id.*) On Feburary 24, 2017, Navient issued its annual report, the 2016 10-K, which stated that Navient promotes awareness of IDR plans and limits grants of forbearance, tailoring forbearance to each customer's "unique situation." (*Id.* ¶104–105.) This 10-K was signed by Defendants Remondi and Chivavibul. (*Id.*) In April 2017, Navient responded to a *Bloomberg* article which covered these lawsuits and insinuated that Navient did not act in the best interests of its borrowers. (*Id.* 108–109.) Navient's response said, "[s]tatements that Navient does not inform borrowers of their array of repayment options are patently false." (*Id.*)

As a result of the CFPB's lawsuit, the Department of Education's ("ED") Federal Student Aid ("FSA") office conducted an audit of "Navient's forbearance practices between March 20 and 24, 2017."[3] (Compl. ¶8.) The audit finalized its conclusions in a May 18, 2017 report which found, among other things, that Navient was "placing borrowers into forbearance without providing them with other, more beneficial options." (*Id.*) FSA found that, in almost one out of ten calls with borrowers, forbearance was offered as the only option available, regardless of personal situation. (*Id.* ¶94.) Navient did not publicly disclose the completed audit at this point. (*Id.* ¶9.)

On October 5, 2017, the Pennsylvania AG filed a lawsuit against Navient. (*Id.* ¶121.) Similar to the existing litigation, this suit alleged that Navient failed to inform borrowers of

---

[3] There is some dispute in the parties' briefs as to whether ED conducted an "audit" or an "investigation." As the Court accepts as true the well-pleaded facts in the Complaint and construes them in the light most favorable to Plaintiff, *see Phillips v. Cty. of Allegheny,* 515 F.3d at 231, the Court will refer to the ED's activity as an audit.

potentially beneficial IDR options and "instead pushed borrowers into forbearance." (*Id.* ¶122.) This lawsuit differed from previous ones, however, in that it focused on more recent conduct by Navient, alleging that Navient's forbearance-steering scheme had continued into early 2017. (*Id.* ¶123.) Plaintiff asserts that investors reacted more negatively to the Pennsylvania AG allegations because they were "more expansive," included a more recent time period, and ultimately "led investors to question whether and to what extent Remondi had been telling the truth when denying the CFPB and States AG Complaints' allegations regarding Navient's forbearance practices." (*Id.* ¶127.) Once the Pennsylvania AG lawsuit was announced, Navient's stock price fell 14% from the previous day. (*Id.* ¶128.)

The same day the Pennsylvania AG announced the lawsuit, Navient issued a statement in the *Globe Newswire* calling the Pennsylvania AG's allegations "completely unfounded." (Compl. ¶129.) Remondi again echoed this statement on October 18, 2017 during an investor conference call, stating that the recent lawsuit was "baseless." (*Id.* ¶131.) On October 27, 2017, in Navient's quarterly report (10-Q) for the third quarter of 2017, Defendants Remondi and Lown stated that Navient promotes awareness of IDR and uses forbearance sparingly and uniquely. (*Id.* ¶134.) This 10-Q did not mention the FSA Audit. (*Id.* ¶137.) Similar statements were repeated on January 24, 2018, in a fourth quarter earnings call; on February 26, 2018, in Navient's annual report; and on May 3, 2018, in the 10-Q for Navient's first quarterly report of 2018. (*Id.* ¶¶138, 141, 146.)

On June 28, 2018, the California AG filed a complaint against Navient. (Compl. ¶150.) Similar to the CFPB and Pennsylvania, Illinois, and Washington lawsuits, the California AG alleged that Navient failed "to adequately disclose how students could attain income-repayment recertification." (*Id.* ¶150.)

The same day, Remondi issued a press release calling the allegations unfounded, and claiming that the lawsuit was merely seeking to place blame for the "failures of the higher education system." (Compl. ¶151.) Remondi repeated these statements on July 25, 2018 in an investor conference call, asserting that the CFPB and State AGs had no evidence to support their cases. (*Id.* ¶¶153–154.) On September 13, 2018, Remondi spoke about the lawsuits at an analyst conference, claiming that Navient had no examples of borrower accounts that supported the complaints' accusations. Navient's 10-Qs for the second and third quarter of 2018 continued to state that it was focused on promoting awareness of IDR, and limited forbearance to unique situations. (*Id.* ¶¶157, 164.)

### The FSA Report and AP Article

On November 20, 2018, the last day of the class period, Senator Elizabeth Warren published on her website two things: (1) a letter she wrote to Defendant Remondi, accusing him of withholding and concealing the FSA Audit, and (2) the FSA Audit report itself. (Compl. ¶168.) Senator Warren stated that the audit contradicted Navient's positive statements about its loan programs and appeared "to validate the allegations that Navient boosted its profits by unfairly steering student borrowers into forbearance." (*Id.* ¶¶168–169.)

Also on November 20, 2018, the Associated Press "released an exclusive report on Senator Warren's letter to Remondi as well as the FSA Audit." (*Id.* ¶171.) The AP article painted Navient as running a forbearance-steering scheme, and was the first to publicly report "that the FSA had audited Navient in response to the CFPB's lawsuit." (*Id.* ¶14.) The AP article was widely covered by other media. (*Id.* ¶177.) Navient's stock price fell 11% immediately following the article. (*Id.* ¶178)

### b. Procedural History

Several suits against Navient were previously consolidated into the present case. (Docs. 10, 11.) The operative Complaint (Doc. 33) contains two counts: (1) violation of Section 10(b)(5) of the Exchange Act and Rule 10b-5 against all Defendants, and (2) violation of Section 20(a) of the Exchange Act against the individual Defendants. Plaintiff contends that Defendants made "materially false and misleading" quarterly and annual reports, SEC filings, press releases, and media reports as part of a scheme to: "(i) deceive the investing public, including Plaintiff and other Class members," "(ii) artificially inflate and maintain the market price of Navient common stock;" and "(iii) cause Plaintiff and the other members of the Class to purchase or otherwise acquire Navient's common stock at artificially inflated prices." (Compl. ¶¶224–225.) Defendants now move to dismiss the Complaint under Fed. R. Civ. P. 12(b)(6).

## II.    LEGAL STANDARD

### A.  Motion to Dismiss Standard

To survive a motion to dismiss, a complaint must contain enough factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). To make this determination, a court conducts a three-part analysis. *Santiago v. Warminster Twp.*, 629 F.3d 121, 130 (3d Cir. 2010). First, the court must "tak[e] note of the elements a plaintiff must plead to state a claim." *Id.* (quoting *Iqbal*, 556 U.S. at 675). Second, the court identifies allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* at 131 (quoting *Iqbal*, 556 U.S. at 680). Finally, a court "assume[s] the[] veracity" of well-pleaded factual allegations and determines "whether they plausibly give rise to an entitlement for relief." *Id.* (quoting *Iqbal*, 556 U.S. at 680). This plausibility determination is a "context-specific task that requires the reviewing

court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. A complaint cannot survive when a court can only infer that a claim is merely possible rather than plausible. *Id.*

### B. Rule 9(b) and the Private Securities Litigation Reform Act

Rule 9(b) imposes a heightened pleading requirement of factual particularity on allegations of fraud, including claims brought under § 10(b) of the Securities Act. *See In re Rockefeller Ctr. Properties, Inc. Sec. Litig.*, 311 F.3d 198, 216 (3d Cir. 2002) ("Rule 9(b)'s heightened pleading standard gives defendants notice of the claims against them, provides an increased measure of protection for their reputations, and reduces the number of frivolous suits brought solely to extract settlements."). Under Rule 9(b), plaintiffs must state with particularity "the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). To satisfy the particularity requirement, the complaint "must plead or allege the date, time and place of the alleged fraud or otherwise inject precision or some measure of substantiation into a fraud allegation." *Feingold v. Graff*, 516 F. App'x 223, 226 (3d Cir. 2013) (internal quotations omitted).

In addition to satisfying Rule 9(b), allegations of securities fraud must accord with the heightened pleading requirements of the Private Securities Litigation Reform Act of 1995 ("PLSRA"). 15 U.S.C. § 78u–4(b)(1), (b)(2). "The PLSRA established heightened pleading requirements for a plaintiff to meet in order to plead a cause of action successfully in class actions alleging securities fraud." *Rahman v. Kid Brands, Inc.*, 736 F.3d 237, 241 (3d Cir. 2013). It "requires that a complaint state with particularity both the facts constituting the alleged violation, and the facts evidencing scienter, i.e., the defendant's intention to deceive, manipulate, or defraud." *Id*. at 241–42 (internal quotations omitted). Thus, the PLSRA demands that "plaintiffs bringing a claim involving an allegedly false or misleading statement must '(1) specify each statement alleged to have been misleading [and] the reason or reasons why the statement is

misleading, 15 U.S.C. § 78u-4(b)(1), and (2) state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind, § 78u-4(b)(2).'" *In re Newell Brands, Inc. Securities Litigation*, Civ. No. 18-10878, 2019 WL 6715055, at *9 (D.N.J. Dec. 10, 2019) (quoting *Rahman*, 736 F.3d at 242); *see also In re Rockefeller,* 311 F.3d at 217 ("The particularity described in § 78u–4(b)(1) extends that of Rule 9(b) and requires plaintiffs to set forth the details of allegedly fraudulent statements or omissions, including who was involved, where the events took place, when the events took place, and why any statements were misleading.").

## III.    DISCUSSION

Section 10(b) of the Securities Exchange Act of 1934 makes it illegal to "use or employ, in connection with the purchase or sale of any security. . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe." 15 U.S.C. § 78j(b). Under 17 CFR section 240.10b–5 ("Rule 10b–5"), it is "unlawful for any person, directly or indirectly. . . [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 CFR § 240.10b–5.3

To establish a claim for violation of Rule 10b–5, a plaintiff must allege with particularity that: (1) the defendant "made a materially false or misleading statement or omitted to state a material fact necessary to make a statement not misleading"; (2) the "defendant acted with scienter"; and (3) the plaintiff's reliance on defendant's misstatement or omission injured the plaintiff. *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1417 (3d Cir. 1997) (citing *In re Phillips Petroleum Sec. Litig.*, 881 F.2d 1236, 1243 (3rd Cir.1989)).

In moving to dismiss the Complaint, Defendants argue that Plaintiff fails to plead any of material falsity, scienter, or loss causation. (Doc. 36, "Def. Mot.")

### A. Documents Attached to the Motion to Dismiss

Prior to addressing the substantive arguments in Defendants' motion, the Court must address the fact that Defendants' arguments rely on several documents outside the pleadings. Plaintiff takes issue with the use of two of these external documents: Defense Exhibit 7, an "untitled bulletin" allegedly released by the U.S. Department of Education, and Defense Exhibit 8, "Defendant's Motion and Evidence" from a lawsuit that the CFPB brought against Navient. (Doc. 36-12 at 2–5.) Defendants argue that these exhibits are incorporated into the Complaint by reference; alternatively, they ask the Court to take judicial notice of these exhibits. (*Id.*)

"Although a district court generally must confine its review to the pleadings on a Rule 12(b)(6) motion, *see* Fed. R. Civ. P. 12(d), 'a court may consider certain narrowly defined types of material' beyond the pleadings without converting the motion to dismiss to a motion for summary judgment." *United States v. Hovnanian*, Civ. No. 18-15099, 2019 WL 1233082, at *3 (D.N.J. Mar. 18, 2019) (quoting *In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 184 F.3d 280, 287 (3d Cir. 1999). These types of material include "documents that are attached to or submitted with the complaint, and any matters incorporated by reference or integral to the complaint, items subject to judicial notice, matters of public record, orders, and items appearing in the record of the case." *Buck v. Hampton Twp. Sch. Dist.,* 452 F.3d 256, 260 (3d Cir. 2006)); *see also Pryor v. Nat'l Collegiate Athletic Ass'n*, 288 F.3d 548, 560 (3d Cir. 2002) (finding courts may consider "documents whose contents are alleged in the complaint and whose authenticity no party questions, but which are not physically attached to the pleading," as well as "[d]ocuments that the defendant attaches to the motion to dismiss . . . if they are referred to in the plaintiff's complaint and are central to the claim").

The Third Circuit's underlying rationale for the doctrine of incorporation by reference "is that the primary problem raised by looking to documents outside the complaint—lack of notice to the plaintiff—is dissipated where plaintiff has actual notice and has relied upon these documents in framing the complaint." *In re Burlington*, 114 F.3d at 1426. The rule is designed to prevent a "situation in which a plaintiff is able to maintain a claim of fraud by extracting an isolated statement from a document and placing it in the complaint, even though if the statement were examined in the full context of the document, it would be clear that the statement was not fraudulent." *Id*. The essential question in this analysis is "whether the claims in the complaint are 'based' on an extrinsic document, and not merely whether the extrinsic document was explicitly cited." *Id*.

Even if not incorporated into the Complaint by reference, the "court may judicially notice a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201.

### Defense Exhibit 7

Defendants first argue that Exhibit 7, the Department of Education's purported response ("ED Response") to the November 20, 2018 AP article referenced in the Complaint, is incorporated by reference. The ED Response contains a number of facts helpful to Navient: it states that the FSA conducted an investigation, not an audit; it states that the FSA found Navient to be "substantially in compliance with its obligations"; and notes that "nothing in the [FSA] report indicates forbearances were applied inappropriately." (Def. Mot. at 7-8.)

Defendants concede that the Complaint does not actually mention the ED Response, but argue that Exhibit 7 is "is inextricably linked with the AP Article" that details the FSA's investigation into Navient, and is thus incorporated by reference. (Def. Mot. at 7–8.) Alternatively,

Defendants request that the Court judicially notice that ED "released a statement clarifying that the document disseminated by the AP was an internal review, not an audit." (*Id.*)

Plaintiff opposes this request, arguing that the authenticity of Exhibit 7 cannot be verified. (Doc. 37 ("Pl. Resp.") at 21.) Although Defendants allege that the ED Response was published in a Politico article, Plaintiff points out that this article does not seem to exist on Politico's website, and that the document Defendants attach does not contain verifiable information regarding authors, date, or the source. (*Id.*)

The Court agrees with Plaintiff that the authenticity of this document cannot be established. The document Defendants seek to have noticed contains plain text against a white background, with no markers identifying its source. (Doc. 36-10.) It is readily available solely on Navient's own website and does not seem to appear in any other source. "[P]rivate corporate websites . . . generally are not the sorts of 'sources whose accuracy cannot reasonably be questioned' that our judicial notice rule contemplates." *Victaulic Co. v. Tieman*, 499 F.3d 227, 236 (3d Cir. 2007), as amended (Nov. 20, 2007) (internal citations omitted). Further, the Third Circuit instructs that judicial notice "should be done sparingly at the pleading stage," and "[o]nly in the clearest of cases should a district court reach outside the pleadings for facts necessary to resolve a case at that point." *Id.* This unverifiable document does not present "the clearest of cases." *Id.* Accordingly, Defendants' request for judicial notice of Exhibit 7 (Doc. 36-10) is denied, and the Court does not consider this exhibit to be incorporated into the Complaint by reference.

## **Defense Exhibit 8**

Defendants next ask the Court to judicially notice, or accept as incorporated in the Complaint by reference, their brief and select exhibits in support of partial summary judgment in the case *Consumer Financial Protection Bureau v. Navient Corporation et al.*, Civ. No. 17-00101

(M.D. Pa.). Defendants argue that the *CFPB* filings are incorporated in the Complaint by reference, as ¶70 of the Complaint reproduces sections of interrogatories taken between Navient and the CFPB in that action.

Defendants, however, do not just attach interrogatories from *CFPB v. Navient* in their request for judicial notice. Exhibit 8 is comprised of Defendants' brief in support of partial summary judgment in the *CFPB* action, Defendants' statement of material fact, supplemental responses to interrogatories, debtor invoices, transcripts of phone calls between debtors and Navient staff, and deposition transcripts. Other than the interrogatories, which comprise roughly 40 pages out of the 238 pages Exhibit 8 encompasses, none of Defendants' material is "integral to or explicitly relied upon in the complaint" as would be required for this Court to incorporate it by reference. Defendants here seek to incorporate their entire statement of material facts, which they would then rely on to dismiss the Complaint. If Defendants wish to file a motion for summary judgment, they may more appropriately set out a statement of material fact there, rather than attempt to recycle their statement of material fact from separate litigation and rely upon it at the motion to dismiss stage.

Similarly, the Court will not take judicial notice of Exhibit 8. "The Third Circuit has held that a court hearing a motion to dismiss may take judicial notice of a judgment in another case but not the facts therein." *Gillespie v. Acme Markets, Inc.*, Civ. No. 14-7779, 2015 WL 5770021, at *1 (D.N.J. Sept. 30, 2015) (citing *S. Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Group Ltd.*, 181 F.3d 410, 413 (3d Cir. 1999)). It is the Defendants' version of facts, legal arguments in the motion for partial summary judgment brief, and transcripts supporting same that comprise the majority of Exhibit 8. Defendants do not seek to have this Court take judicial notice of any actual judgment in *CFPB v. Navient*. Accordingly, this request is denied.

Having determined that Exhibits 7 and 8 are neither incorporated into the Complaint by reference or appropriate to be judicially noticed, "[t]his Court has discretion to either convert the motion to dismiss into a motion for summary judgment, or to ignore the matters presented outside the pleadings and continue to treat the filing as a motion to dismiss." *Yuratovich v. U.S. Dep't of Justice*, Civ. No. 13-5651, 2015 WL 8328328, at *3 (D.N.J. Dec. 8, 2015) (collecting cases). Here, "the Court declines to convert the motion to dismiss into a motion for summary judgment," as the parties appear to be at an early stage in discovery. *Id*. at *4; *see also Bobo v. Wildwood Pub. Sch. Bd. of Educ.*, Civ. No. 13-5007, 2014 WL 7339461, at *4 (D.N.J. Dec. 23, 2014) (stating that a "court should not convert a motion to dismiss into a motion for summary judgment when little discovery has taken place"). The Court will instead address Defendants' arguments in their motion to dismiss to the extent that they do not rely on Exhibits 7 or 8.

### B. Defendants' Substantive Arguments

Defendants argue that the Complaint "fails to meet the high pleading burden set by the [PSLRA] in order to establish a claim of securities fraud." (Def. Mot. at 2.) They argue that Plaintiff fails to plead all three requirements for this claim: material falsity, scienter, and loss causation.

### a. Material Falsity

A complaint must establish both materiality and falsity. *See Lord Abbett*, 363 F.Supp. 3d at 487 ("materiality goes to why a statement is important, and falsity goes to why a statement is untrue or misleading"). "A statement or omission is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to act." *In re Aetna, Inc. Sec. Litig.,* 617 F.3d 272, 283 (3d Cir. 2010) (internal quotations omitted). Additionally, "[t]o establish falsity, the PSLRA requires a complaint to plead with particularity 'the reasons why' the

statements were false or misleading when made." *Lord Abbett Affiliated Fund, Inc. v. Navient Corp.*, 363 F. Supp. 3d 476, 487 (D. Del. 2019) (citing *Institutional Inv'rs Grp. v. Avaya, Inc.*, 564 F.3d 242, 252 (3d Cir. 2009).

In moving to dismiss, Defendants argue that the Complaint fails to plead material falsity because it does not "plead with particularity facts showing that a systemic forbearance-steering scheme actually existed at Navient." (Def. Mot. at 3.) Defendants argue that the factual allegations in the Complaint improperly rely on confidential witness statements and factual allegations from government complaints, and that without these supports, the Complaint fails to plead facts suggesting material falsity.

### Allegations in Government Complaints

Defendants rely on the holding from *Gaer v. Educ. Mgmt. Corp.*, 2011 WL 7277447 (W.D. Pa. Aug. 30, 2011) to assert that the Court must not give any weight to "allegations taken from a third-party complaint." (Def. Mot. at 32.) Defendants' exact argument was explicitly rejected by another court within the Third Circuit on similar facts. *See Lord Abbett*, 363 F. Supp. 3d 476. In *Lord Abbett,* the court explained that the plaintiff in *Gaer*, bringing a *qui tam* action, was "relying on the fact that the government has brought an action to bolster the merits of their own suit." *Id.* at 493. The *Lord Abbett* court explained that the situation in *Gaer* is distinguishable from situations in which a plaintiff relies "on specific factual allegations in the government complaint, which must under Fed. R. Civ. P. 11 be based on a reasonable inquiry, to corroborate similar factual allegations in its own complaint." *Id.* Finding that the defendants had not "presented any binding or persuasive authority on the issue of whether Plaintiff may rely on allegations in government complaints to adequately plead falsity," the court chose not to "deeply discount or decline to consider altogether those allegations." *Id.* at 494.

The reasoning in *Lord Abbett* is both persuasive and directly on point here. Accordingly, the Court will not discount the factual assertions in the Complaint that rely on allegations contained in government complaints.

### Confidential Witness Statements

"In the case of confidential witness allegations," the Third Circuit instructs courts to apply the relevant particularity requirement "by evaluating the detail provided by the confidential sources, the sources' basis of knowledge, the reliability of the sources, the corroborative nature of other facts alleged, including from other sources, the coherence and plausibility of the allegations, and similar indicia." *Avaya*, 564 F.3d at 263 (internal quotations omitted). If "a complaint's confidential witness allegations are adequately particularized, [a court] will not dismiss them simply on account of their anonymity." *Id*. If a court finds that any of the particularity factors are lacking, then it should appropriately discount the confidential witnesses' statements. *Id*.

The Complaint draws on statements from two confidential witnesses (CW1 and CW2) who worked for Navient at various points, and who allege that they were instructed to steer borrowers towards forbearance. CW1 worked in Navient's Muncie, Indiana office from March 2015 to November 2016, handling inbound calls and working with borrower who had trouble making payments. (Compl. ¶¶75–86.) CW1 described supervisors as providing a "hierarchy" of loan repayment options for employees to follow, with the first option being forbearance and the last being IDR. (*Id*.) CW1 also stated that employees were written up if their call times went over four minutes; CW1 explained that four minutes was sufficient to enroll a borrower in forbearance, but that IDR took roughly fifteen minutes. (*Id*.) CW1 also detailed the software used by management, which showed supervisors how long employees were spending on calls, and explained that the software warned employees to end the calls if they had gone on longer than five minutes. (*Id*.)

CW2 worked from June 2015 to June 2017 in Navient's Wilkes-Barre, Pennsylvania office as a student loans customer service specialist in the Spanish-speaking group. (*Id.* ¶¶86–91.) CW2 similarly detailed the time limits management set for phone calls, and explained that this limit did not allow time to explain IDR, or even to thoroughly explain forbearance before enrolling the borrower. (*Id.*) CW2 added that employees were instructed to make forbearance sound attractive, and that employees were not allowed to mention that forbearance could negatively affect a borrower's interest by compounding it. (*Id.*)

Defendants argue that the confidential witness statements in the Complaint "must be totally discounted" due to the CWs' low-level employment status. (Def. Mot. at 32.) As low-level employees working in separate call centers, Defendants argue the CWs had no way of knowing if a "company-wide, forbearance-steering scheme existed." (*Id.*) Plaintiff argues that the "purpose of the confidential witness testimony is not the confidential witnesses' direct knowledge of a company-wide practice or policy, but rather the confidential witnesses' work experience circumstantially indicating the existence of a company-wide, forbearance-steering scheme." (Pl. Resp. at 27.)

Although the CWs' statements may not be sufficient standing alone to plead a company-wide forbearance scheme, the Court finds that the CWs are described with sufficient particularity, and that the anecdotal evidence offered by the CWs supports the element of material falsity. The forbearance practices described by the CWs here directly conflict with Defendants' statements describing how Navient employees apply forbearance. *See Avaya*, 564 F.3d at 264 (taking into account confidential witness statements which offered evidence that, while anecdotal, "directly conflict[ed] with" statements made by a defendant director); *see also Lord Abbett,* 363 F.Supp.3d at 493 (collecting cases in which low-level employees were permissibly used as confidential

witnesses). Further, the CWs allege that they followed scripts and flowcharts prepared by management, which helps to indicate that the forbearance practices extended to higher levels within Navient.[4]

### FSA Audit

The Complaint also relies on findings from the FSA Audit to plead material falsity. Defendants argue that the ED Response refutes the FSA Audit, and that the Court should thus discount these allegations. As explained above, the Court declines to consider the ED Response at the motion to dismiss stage; accordingly, Defendants have provided no reason why it would be inappropriate for Plaintiff to rely on factual allegations from the FSA Audit.

Because Defendants have not shown that the Complaint fails to plead the element of material falsity, Defendants' motion to dismiss on this ground is denied.

### b. Scienter

"Scienter is a mental state embracing intent to deceive, manipulate, or defraud, and requires a knowing or reckless state of mind." *Avaya*, 564 F.3d at 252 (internal citations omitted). In private securities actions, a plaintiff "alleging that the defendant made a false or misleading statement must state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id.* at 253 (internal quotations omitted). On a motion to dismiss, when "determining whether the pleaded facts give rise to a 'strong' inference of scienter, the court must take into account plausible opposing inferences." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308 (2007). A "complaint will survive [a Rule 12(b)(6) motion] . . . only if a reasonable

---

[4] *Accord Lord Abbett,* 363 F.Supp.3d at 493 ("the Complaint does not rest solely on allegations from purportedly 'low-level' employees who worked at Navient for less than the full class period. It alleges the direct involvement of the CWs supervisors . . . and alleges that the actions taken by the CWs were guided by incentive programs, employee rating programs, and scripts . . . It is reasonable to infer that those programs and scripts would have been prepared and approved by employees who are not low-level. Finally, at least one CW was employed at any point during the Class Period.")

person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *In re Merck & Co., Inc. Sec., Derivative, & ERISA Litig.*, Civ. No. 05-1151, 2011 WL 3444199, at *18 (D.N.J. Aug. 8, 2011) (quoting *Tellabs*, 551 U.S. at 324). The ultimate "inquiry . . . is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* (emphasis in original).

The Complaint alleges scienter by drawing on the following: confidential witness allegations;[5] factual allegations in government complaints and the FSA Audit; the centrality of the forbearance-steering scheme to Navient; company-wide incentive policies, flowcharts, and telephone scripts; and motive allegations. Defendants argue that none of these theories adequately support a finding of scienter, and that "Plaintiff has failed to plead facts supporting a strong inference that any Defendant was aware of (or recklessly disregarded)" the existence of a forbearance-steering scheme. (Def. Mot. at 10.)

### The FSA Audit

Plaintiff argues that "Defendants knew that there was evidence indicative of a forbearance-steering scheme as of May 18, 2017, when it received the FSA Audit report, [Compl. ¶¶92, 118], meaning that Defendants possessed scienter for every statement[ ] made after that date." (Pl. Resp. at 29.) Defendants' only argument against using the FSA Audit to infer scienter is based on the purported ED Response. (Def. Mot. at 11, 24.) As explained above, the Court does not consider the ED Response on this motion to dismiss.

---

[5] The Court has already rejected Defendants' arguments for discounting the confidential witness allegations, and will not address them again here. *See Lord Abbett,* 363 F.Supp.3d 476 (refusing to "again address Defendants' arguments about . . . the reliability of the confidential witnesses" after rejecting them when analyzing the material falsity element).

Defendants also argue that the Complaint does not properly allege that Defendants were aware of the FSA Audit's findings. (Def. Mot. at 26.) This argument is unpersuasive. The Complaint quotes Senator Warren's letter to Remondi, which alleges that Remondi and Navient had "received an official Education Department audit that revealed [Navient] was not meeting federal standards or adequately servicing student loan borrowers," yet withheld the audit and publicly and privately denied its contents. (Compl. ¶168.) Thus, the Complaint sufficiently alleges scienter based on Defendants' receipt of the findings from the FSA Audit.

### Allegations in Government Complaints and FSA Audit

The Complaint alleges that Defendants had knowledge of the CFPB and AG lawsuits against Navient, and though aware of the forbearance-steering scheme alleged in that litigation, nonetheless publicly stated that the lawsuits were baseless. Defendants argue that allegations from government litigation against Navient cannot support an inference of scienter. (Def. Mot. at 13.) Plaintiff responds that "the CFPB and State AG Complaints qualify as 'red flags' that put Defendants on notice." (Pl. Resp. at 30.)

As noted above, the Complaint alleges that Defendants had the FSA Audit, which detailed improper forbearance practices and thus bolstered the allegations in the CFPB and AGs' complaints. It does not appear that Plaintiff is suggesting that the lawsuits alone establish scienter; rather, it seems Plaintiff alleges that the government complaints provide factual allegations of the forbearance-steering scheme, and the FSA Audit, which the Complaint alleges Defendants were aware of, then confirmed those allegations. In tandem, the government complaints and FSA Audit show that Defendants knew they were making false statements when denying that Navient improperly placed borrowers into forbearance. (Pl. Resp. at 28–20.) Defendants' argument that

Plaintiff is relying on the mere existence of the government complaints to show scienter (Doc. 39 ("Def. Reply") at 9) is thus without merit.

### Core Operations Doctrine

"Under the core operations doctrine, material misrepresentations concerning 'core matters' of central importance to a company may support an inference of scienter when accompanied by some additional allegation of specific information conveyed to management and related to the fraud." *Carmignac Gestion, S.A. v. Perrigo Co. PLC*, Civ. No. 17-10467, 2019 WL 3451523, at *16 (D.N.J. July 31, 2019) (citing *Martin v. GNC Holdings, Inc.*, 757 F. App'x 151, 155 (3d Cir. 2018).

Plaintiff argues that the core operations doctrine allows for an inference of scienter, as education-related revenue comprises 82.8% of Navient's total revenue. (Pl. Resp. at 31.) Defendants argue in large part that this percentage is meaningless, because Plaintiff does not allege facts supporting the theory that a forbearance-steering scheme existed. (Def. Mot. at 23.) As detailed above, this Court finds that Plaintiff has properly alleged facts showing a forbearance-steering scheme. "Allegations that fraud related to a high-earning segment of a company have been found sufficient to support a core operations inference." *Carmignac Gestion*, 2019 WL 3451523, at *16 (collecting cases). Here, the Complaint emphasizes the importance of education-related revenue to Navient. Accordingly, "[i]n light of the additional allegations that support an inference of scienter, the Court "finds the core operation inference applicable here." *Carmignac Gestion*, 2019 WL 3451523, at *16.

### Motive and Opportunity Allegations

When using motive and opportunity allegation to show scienter, "blanket assertions of motive and opportunity" and "catch-all allegations that defendants stood to benefit from

wrongdoing and had the opportunity to implement a fraudulent scheme are [not] sufficient, because they do not state facts with particularity or give rise to a strong inference of scienter." *GSC Partners CDO Fund v. Washington*, 368 F.3d 228, 237 (3d Cir. 2004). Further, "motives that are generally possessed by most corporate directors and officers do not suffice; instead, plaintiffs must assert a concrete and personal benefit to the individual defendants resulting from this fraud." *GSC Partners*, 368 F.3d at 237.

The Complaint alleges that the individual Defendants had motive to engage in forbearance-steering, because this scheme resulted in above-target personal bonus payments for Defendants under the "Management Incentive Plan." (Compl. ¶200.) For example, Remondi and Chivavibul, whose respective base salaries were $1,000,000 and $380,000, were awarded performance-based bonuses of $1,666,500 and $633,270 respectively, on top of their base salaries. (*Id.*) Plaintiff argues that these bonuses were made possible because of the success of the forbearance-steering scheme. Additionally, the Complaint alleges that Defendants were motivated to steer borrowers into forbearance to appear more in compliance with ED guidelines and win further ED contracts. (*Id.* ¶¶201–202.)

Although increased compensation to Defendants is a personal benefit, courts generally do not find financial bonuses alone adequate for scienter purposes. *See, e.g., GSC Partners*, 368 F.3d at 238 (collecting cases); *Tuchman v. DSC Communications Corp.*, 14 F.3d 1061, 1068 (5th Cir. 1994) ("[I]ncentive compensation can hardly be the basis on which an allegation of fraud is predicated"); *Leventhal v. Tow*, 48 F.Supp.2d 104, 115 (D. Conn. 1999) ("[T]he allegation that the defendants artificially inflated Citizens' stock price in order to protect and enhance their executive positions . . . also fail[s] to give rise to a strong inference of scienter. This motive has been rejected routinely") (internal quotations omitted). Because Plaintiff's motive allegations are based

primarily on Defendants' desire to increase their compensation and to secure loan contracts, the Court finds these allegations unavailing.

However, as noted above, "[t]he pertinent question is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Avaya*, 564 F.3d at 267–68. The Court finds that the allegations in the Complaint, when viewed holistically, "support a reasonable inference of scienter." *See Lord Abbett*, 363 F.Supp.3d at 498–499 ("the scienter analysis is 'case specific' and should 'rest not on the presence or absence of certain types of allegations but on a practical judgment about whether, accepting the whole factual picture painted by the Complaint, it is at least as likely as not that defendants acted with scienter'") (quoting *Avaya*, 564 F.3d at 269). Defendants' motion to dismiss on the ground that the Complaint fails to plead scienter is denied.

### c. Loss Causation

Finally, Defendants argue that the Complaint fails to plead loss causation. Loss causation, on which the burden of proof rests with the plaintiff, is an essential element of a 10b–5 case. *See Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 177 (3d Cir. 2001). To satisfy the element of loss causation, a plaintiff must "establish that the alleged misrepresentations proximately caused the decline in the security's value." *See Semerenko v. Cendant Corp.*, 223 F.3d 165, 185 (3d Cir. 2000). To establish proximate cause, "it is not sufficient to show inflation caused by a misrepresentation and subsequent loss." *See In re IKON Office Solutions, Inc. Sec. Litig.*, 131 F.Supp.2d 680, 690 (E.D. Pa. 2001). Rather, a plaintiff must provide "proof of a causal connection between the misrepresentation and the investment's subsequent decline in value." *Robbins v. Koger Props, Inc.*, 116 F.3d 1441, 1448 (11th Cir. 1997)*, cited with approval in Semerenko*, 223 F.3d at 185. Loss causation thus "describes the link between the defendant's misconduct and the

plaintiff's economic loss." *Robbins*, 116 F.3d at 1447. "Where the value of the security does not actually decline as a result of an alleged misrepresentation, it cannot be said that there is in fact an economic loss attributable to that misrepresentation." *Semerenko*, 223 F.3d at 185.

"Typically, a plaintiff shows loss causation by pleading that a company's stock price dropped in response to a 'corrective disclosure' of new information that directly demonstrates that the defendant's representations were false." *Teamsters Local 456 Pension Fund v. Universal Health Servs.*, 396 F. Supp. 3d 413, 477 (E.D. Pa. 2019). Disclosure of the fraud need not originate with a defendant, and may be indirect; that is, through disclosure of another event. However, in that case, plaintiffs must provide proof that the market recognized a relationship between the event disclosed and the fraud. *See IKON*, 131 F.Supp.2d at 690 (citing *Robbins*, 116 F.3d at 1448). The key is for the plaintiffs to demonstrate that the "artificial inflation" caused by the fraud "was removed from the market price of [the] stock, thereby causing a loss." *See Semerenko*, 223 F.3d at 185.

Here, the Complaint alleges that misrepresentations Defendants made when responding to government complaints artificially inflated Navient's stock price. (Compl. ¶203–209.) It asserts that the Pennsylvania AG lawsuit and the AP article disclosing the FSA Audit both revealed to the market that Defendants' statements were fraudulent, causing Navient's stock to decline sharply. (*Id.*)

Defendants argue that the Pennsylvania AG's lawsuit "merely restated allegations made by the CFPB ten months earlier," and thus did not reveal new information that could have caused a loss affecting the class period. (Def. Mot. at 3.) Defendants also argue that the FSA Report was

not a corrective disclosure, because it "did not conclude that Navient was improperly steering borrowers into forbearance." (Def. Reply at 13.)[6]

Defendants' argument that the Pennsylvania AG complaint does not contains new allegations is unpersuasive. The Complaint specifically alleges that this suit contains new allegations; most importantly, the Pennsylvania AG suit alleged that Navient's forbearance-steering scheme continued during the class period at issue here, whereas the previous suits were confined to earlier time periods. (Pl. Resp. at 35.) Plaintiff argues further that "[n]ews of a lawsuit in a new state that include new allegations, violations of state law, as well as reports from victims of Navient's abusive practices that corroborate the alleged violations in previous complaints that Navient had previously affirmatively and zealously denied, provided new information to investors." (Pl. Resp. at 35.) The Complaint corroborates this account by including the statement of an equity analyst, who described the Pennsylvania AG suit as including "more expansive accusations." (Compl. ¶127.)

To show a loss following the Pennsylvania AG suit, Plaintiff points to the 14% decline in Navient's stock price immediately following news of the Pennsylvania AG complaint. (Compl. ¶128.) In order "[t]o establish loss causation, a plaintiff must allege . . . that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security." *In re Intelligroup Sec. Litig.*, 527 F. Supp. 2d 262, 297 (D.N.J. 2007). Here, the Pennsylvania AG suit meets this standard, because it disclosed a new time period during which the alleged forbearance-steering scheme operated, and it was immediately followed by a decline

---

[6] Again, the Court will not address this argument, as it relies on the ED Response; only arguments relating to the Pennsylvania AG lawsuit will be discussed herein.

in the price of Navient's stock. Thus, the Court finds that the Complaint adequately pleads loss causation.[7]

### C.  Section 20(a)

Section 20(a) of the Exchange Act provides that:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t. "Accordingly, liability under Section 20(a) is derivative of an underlying violation of Section 10(b) by the controlled person." *Institutional Inv'rs Grp.*, 564 F.3d at 252.

Here, Plaintiff alleges that individual Defendants are liable under Section 20(a) for the alleged misrepresentations made by Navient, a "controlled person," during the class period. Because the Court declines to dismiss the underlying 10(b) claim, Defendants' motion to dismiss is also denied as to the Section 20(a) claim.

## IV.  CONCLUSION

Defendants have not shown that the Complaint fails to plead the elements required to state a claim. As such, Defendants' motion to dismiss (Doc. 36) is denied. An accompanying Order shall issue.


Dated:_____12/30/2019_____                    /s Robert B. Kugler_____
                                                 ROBERT B. KUGLER
                                                 United States District Judge

---

[7] Defendants also argue that the decline in Navient's stock price is insufficient for loss causation because Defendants previously disclosed the risk that additional lawsuits relating to issues raised by the CFPB could be filed. (Def. Mot. at 39–40.) However, the Court has found that the Pennsylvania AG lawsuit was more expansive than the earlier lawsuits; Defendant, arguing that the Pennsylvania AG complaint does not raise new allegations, has not argued that risk as to these additional allegations was also disclosed.