<u>NOT FOR PUBLICATION</u>

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE**

|  |  |  |
|---|---|---|
| _____ | : | |
| POPE, | : | |
| | : | |
| Plaintiff, | : | |
| | : | Civil No. 17-8373 (RBK/AMD) |
| v. | : | |
| | : | **OPINION** |
| NAVIENT CORP., et al., | : | |
| | : | |
| Defendants. | : | |
| _____ | : | |

**KUGLER**, United States District Judge:

This matter comes before the Court upon lead Plaintiff Jesse Wayne Pritchard's Motion

for Class Certification (Doc. No. 70). The motion is unopposed. For the reasons set forth below,

Plaintiff's Motion is **GRANTED**.

## I.    BACKGROUND

This federal securities class action is brought by holders of common stock of Defendant

Navient Corporation ("Navient")—one of the largest student loan servicers in the United States.

Lead Plaintiff alleges that Navient and its corporate officers violated Section 10(b) and 20(a) of

the Securities Exchange Act of 1934 when they lied about perpetrating a deceptive forbearance

scheme whereby Navient actively steered borrowers into forbearance status even though income-

driven repayment plans were more economically advantageous.

### A.  Factual Background

Plaintiff brings this federal securities class action on behalf of all persons, excluding Defendants, who purchased or otherwise acquired the publicly-traded securities of Navient Corporation ("Navient") during the period from January 18, 2017 through November 20, 2018.

Navient, a publicly-traded corporation, is "one of the ten major loan servicers that have contracts with the Department of Education." (Doc. 33, ("Compl.") ¶ 34). Defendants include Navient, its Chief Executive Officer John F. Remondi, and its Chief Financial Officers during the class period, Somsak Chivavibul and Christian M. Lown.

Plaintiff alleges that, during the class period, Defendants made materially false and misleading statements regarding Navient's business, causing losses and damages among the holders of Navient securities. The claims arise from Defendants' response to lawsuits brought against Navient by the Consumer Financial Protection Bureau ("CFPB") and State Attorneys General from Illinois, Washington, Pennsylvania, California, and Mississippi. In these lawsuits, Navient was sued for allegedly running a "forbearance scheme," which Plaintiff describes as an "illegal scheme to cheat struggling student borrowers out of their rights to lower repayment plans" by improperly steering borrowers into forbearance status, rather than offering more financially sensible income-driven repayment (IDR) plans. (Compl. ¶ 2).

Plaintiff claims that Navient could operate more efficiently and cost-effectively by steering borrowers into forbearance, whether or not it was financially appropriate for the borrower. Knowing this, Navient allegedly instructed its customer service representatives to "actively steer borrowers into forbearance" during phone conversations, rather than discuss IDR plans, which would necessitate a much lengthier conversation and reduce the number of customers each Navient employee could service. (Compl. ¶¶ 3–4). This instruction to staff allowed Navient to decrease call length per borrower and thus "service more loans in shorter

amounts of time." (*Id.* ¶¶ 3–4). Additionally, forbearance-steering was profitable for Navient because staff could enroll a borrower in forbearance over the phone, whereas IDR required borrowers to fill out and submit paperwork on their own and recertify their IDR application each year. (*Id.* ¶ 50–54). There was no guarantee that borrowers would complete IDR steps on their own, potentially resulting in loans being placed into default or delinquent status. (*Id.*). In contrast, enrolling borrowers in forbearance over the phone guaranteed that loans would not reflect a default or delinquent status. (*Id.*). Plaintiff emphasizes that the status of loans affected executive bonuses, as well as influenced "the number of loans Navient would receive for servicing from the Department of Education." (*Id.* ¶ 4). Forbearance also generated more income for Navient: interest that accrued during the forbearance period capitalized at the end of the forbearance period, potentially increasing monthly payments and overall repayment amount. (*Id.* ¶ 48).

### *Lawsuits against Navient*

On January 18, 2017, the start date of the class period, the CFPB and State Attorneys General ("AG") from Washington and Illinois filed the first set of lawsuits against Navient. (Compl. ¶ 59). These suits alleged "multiple violations relating to predatory lending practices," including allegations relating to the forbearance scheme detailed above. (*Id.*).

That same day, Navient put out three press releases responding to the lawsuits. (*Id.* ¶¶ 62, 98). Navient's press releases called the lawsuits politically motivated, stated that the allegations were unsubstantiated and false, denied the lawsuits' claim that Navient did not educate borrowers about IDR, and went on to highlight successful aspects of Navient's loan repayment system. (*Id.* ¶¶ 62, 98–100). Based on Navient's response, analysts such as Credit Suisse did not downgrade Navient's rating. (*Id.* ¶ 64). Plaintiff claims that Navient's denial—which Plaintiff

alleges contained "false and materially misleading" statements—misled investors and artificially inflated stock prices. (*Id.* ¶¶ 66, 101).

Plaintiff details several additional times where Defendants deny the substance of the CFPB and Washington and Illinois AG lawsuits. On January 23, 2017, Defendant Remondi commented on the lawsuits in an interview with The Washington Post. (Compl. ¶ 102). In the interview, Remondi "categorically denied" the allegations contained in the government lawsuits, and stated that Navient would not be made economically better off by steering borrowers into forbearance. (*Id.*). On Feburary 24, 2017, Navient issued its annual report, the 2016 10-K, which stated that Navient promotes awareness of IDR plans and limits grants of forbearance, tailoring forbearance to each customer's "unique situation." (*Id.* ¶¶ 104–105). This 10-K was signed by Defendants Remondi and Chivavibul. (*Id.*). In April 2017, Navient responded to a Bloomberg article which covered these lawsuits and insinuated that Navient did not act in the best interests of its borrowers. (*Id.* ¶¶ 108–109). Navient's response said, "[s]tatements that Navient does not inform borrowers of their array of repayment options are patently false." (*Id.*).

As a result of the CFPB's lawsuit, the Department of Education's ("ED") Federal Student Aid ("FSA") office conducted an audit of "Navient's forbearance practices between March 20 and 24, 2017." (Compl. ¶ 8). The audit finalized its conclusions in a May 18, 2017 report which found, among other things, that Navient was "placing borrowers into forbearance without providing them with other, more beneficial options." (*Id.*) FSA found that, in almost one out of ten calls with borrowers, forbearance was offered as the only option available, regardless of personal situation. (*Id.* ¶ 94). Navient did not publicly disclose the completed audit at this point. (*Id.* ¶ 9).

On October 5, 2017, the Pennsylvania AG filed a lawsuit against Navient. (*Id.* ¶ 121). Similar to the existing litigation, this suit alleged that Navient failed to inform borrowers of potentially beneficial IDR options and "instead pushed borrowers into forbearance." (*Id.* ¶ 122). This lawsuit differed from previous ones, however, in that it focused on more recent conduct by Navient, alleging that Navient's forbearance-steering scheme had continued into early 2017. (*Id.* ¶ 123). Plaintiff asserts that investors reacted more negatively to the Pennsylvania AG allegations because they were "more expansive," included a more recent time period, and ultimately "led investors to question whether and to what extent Remondi had been telling the truth when denying the CFPB and States AG Complaints' allegations regarding Navient's forbearance practices." (*Id.* ¶ 127). Once the Pennsylvania AG lawsuit was announced, Navient's stock price fell 14% from the previous day. (*Id.* ¶ 128).

The same day the Pennsylvania AG announced the lawsuit, Navient issued a statement in the Globe Newswire calling the Pennsylvania AG's allegations "completely unfounded." (Compl. ¶ 129). Remondi again echoed this statement on October 18, 2017 during an investor conference call, stating that the recent lawsuit was "baseless." (*Id.* ¶ 131). On October 27, 2017, in Navient's quarterly report (10-Q) for the third quarter of 2017, Defendants Remondi and Lown stated that Navient promotes awareness of IDR and uses forbearance sparingly and uniquely. (*Id.* ¶ 134). This 10-Q did not mention the FSA Audit. (*Id.* ¶ 137). Similar statements were repeated on January 24, 2018, in a fourth quarter earnings call; on February 26, 2018, in Navient's annual report; and on May 3, 2018, in the 10-Q for Navient's first quarterly report of 2018. (*Id.* ¶¶ 138, 141, 146).

On June 28, 2018, the California AG filed a complaint against Navient. (Compl. ¶ 150). Similar to the CFPB and Pennsylvania, Illinois, and Washington lawsuits, the California AG

alleged that Navient failed "to adequately disclose how students could attain income-repayment recertification." (*Id.* ¶ 150).

The same day, Remondi issued a press release calling the allegations unfounded, and claiming that the lawsuit was merely seeking to place blame for the "failures of the higher education system." (Compl. ¶ 151). Remondi repeated these statements on July 25, 2018 in an investor conference call, asserting that the CFPB and State AGs had no evidence to support their cases. (*Id.* ¶¶ 153–154). On September 13, 2018, Remondi spoke about the lawsuits at an analyst conference, claiming that Navient had no examples of borrower accounts that supported the complaints' accusations. Navient's 10-Qs for the second and third quarter of 2018 continued to state that it was focused on promoting awareness of IDR, and limited forbearance to unique situations. (*Id.* ¶¶ 157, 164).

### *The FSA Report and AP Article*

On November 20, 2018, the last day of the class period, Senator Elizabeth Warren published on her website two things: (1) a letter she wrote to Defendant Remondi, accusing him of withholding and concealing the FSA Audit, and (2) the FSA Audit report itself. (Compl. ¶ 168). Senator Warren stated that the audit contradicted Navient's positive statements about its loan programs and appeared "to validate the allegations that Navient boosted its profits by unfairly steering student borrowers into forbearance." (*Id.* ¶¶ 168–169).

Also on November 20, 2018, the Associated Press "released an exclusive report on Senator Warren's letter to Remondi as well as the FSA Audit." (*Id.* ¶ 171). The AP article painted Navient as running a forbearance-steering scheme and was the first to publicly report "that the FSA had audited Navient in response to the CFPB's lawsuit." (*Id.* ¶ 14). The AP article

was widely covered by other media. (*Id.* ¶ 177). Navient's stock price fell 11% immediately following the article. (*Id.* ¶ 178).

### B.  Procedural History

Several suits against Navient were previously consolidated into the present case. (Docs. 10, 11). The operative Complaint (Doc. 33) contains two counts: (1) violation of Section 10(b)(5) of the Exchange Act and Rule 10b-5 against all Defendants, and (2) violation of Section 20(a) of the Exchange Act against the individual Defendants. Defendants moved to dismiss the Complaint under Fed. R. Civ. P. 12(b)(6). (Doc. No. 36). The motions were denied and now Plaintiff moves for class certification. (Doc. No. 40, 41, 70).

## II.   LEGAL STANDARD

### A.  Federal Rule of Civil Procedure 23(a) and (b)

Before a class may be certified, Lead Plaintiffs bear the burden of satisfying each of the four requirements set forth in Federal Rule of Civil Procedure 23(a). Under Rule 23(a), plaintiffs must show that (1) the proposed class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims asserted by or the defenses asserted against the named plaintiff are typical of the claims or defenses of the class, and (4) the named plaintiff will fairly and adequately protect the interests of the class. Fed.R.Civ.P. 23(a). *See also Beck v. Maximus, Inc*., 457 F.3d 291, 297 (3d Cir.2006). Additionally, named plaintiff must satisfy the provisions of one of the sub-parts of Rule 23(b). In this case, Lead Plaintiffs seek certification under Rule 23(b)(3), which requires the Court to find that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed.R.Civ.P. 23(b)(3).

"A class may be certified only if the court is 'satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied.'" *Beck*, 457 F.3d at 297 (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 161 (1982)). In undertaking this analysis, the Court is not confined to the allegations set forth in the complaint; rather, it must "probe beyond the pleadings before coming to rest on the certification question." *Johnston v. HBO Film Mgmt., Inc.*, 265 F.3d 178, 188 (3d Cir.2001) (citing Falcon, 457 U.S. at 147, 102 S.Ct. 2364).

This inquiry may require "courts to answer questions that are often enmeshed in the factual and legal issues comprising the plaintiff's cause of action." *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc*., 259 F.3d 154, 167 (3d Cir.2001) (internal quotations omitted). The Court remains mindful, however, that any analysis of the merits at the class certification stage is necessitated not by a requirement that plaintiff make some initial showing of probable success at trial; instead, a merits inquiry is required, if at all, because of the unavoidable overlap with class certification issues. *See In re Linerboard Antitrust Litig*., 305 F.3d 145, 152 (3d Cir.2002) ("[A]t the class certification stage, the Court need not concern itself with whether Lead Plaintiffs can prove their allegations . . . the Court need only assure itself that Lead Plaintiffs' attempt to prove their allegations will predominately involve common issues of fact and law.").

In the context of securities fraud actions, the Third Circuit has observed that "[c]lass actions are a particularly appropriate and desirable means to resolve claims based on the securities laws, since the effectiveness of the securities laws may depend in large measure on the application of the class action device." *Yang v. Odom*, 392 F.3d 97, 109 (3d Cir.2004). Ultimately, the decision of whether to certify a class action is left to the discretion of the court. *Califano v. Yamasaki*, 442 U.S. 682, 703 (1979).

### B. Elements of Substantive Claims

The Amended Complaint alleges violations of 10(b) and 20(a) of the Securities Exchange Act, 15 U.S.C. § 78a et seq. Section 20(a) is a derivative claim predicated on finding Section 10(b) liability. *See Rahman v. Kid Brands, Inc.*, 736 F.3d 237, 247 (3d Cir. 2013). Thus, an analysis of Lead Plaintiff's Section 10(b) claim will determine the viability of the Section 20(a) claim.

Section 10(b) and Rule 10b-5 prohibit deception in connection with the sale or purchase of securities. To recover damages for securities fraud, a plaintiff must prove the following elements: "(1) a material misrepresentation or omission, (2) scienter, (3) a connection between the misrepresentation or omission and the purchase or sale of a security, (4) reliance upon the misrepresentation or omission, (5) economic loss, and (6) loss causation." *City of Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159, 167 (3d Cir. 2014).

At the class certification stage, the Court need not consider materiality and loss causation but must consider reliance. *See Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 473 (2013) (materiality); *Erica P. John Fund, Inc. v. Halliburton Co*. (Halliburton I), 563 U.S. 804, 812–13 (2011) (loss causation); *Halliburton Co. v. Erica P. John Fund, Inc*., 573 U.S. 258, 267 (2014) (reliance). To establish reliance, a plaintiff may invoke the rebuttable presumption set forth in *Basic, Inc. v. Levinson*, that all investors rely on the integrity of the market price when deciding whether to buy or sell stock. 485 U.S. 224, 246–47 (1988). The *Basic* presumption of reliance is based on the "fraud-on-the-market" theory, which provides that where a company's stock trades on an efficient market, its stock prices incorporates all material public information, including misrepresentations. *See id.* at 246–47. A plaintiff bears the burden to invoke the Basic presumption by showing: "(1) that the alleged misrepresentations were publicly known, (2) that they were material, (3) that the stock traded in an efficient market, and (4) that the plaintiff

traded the stock between the time the misrepresentations were made and when the truth was revealed." *Halliburton II*, 573 U.S. at 268.

If the plaintiff meets that initial burden, the defendant may rebut the presumption by making "[a]ny showing that severs the link between the alleged misrepresentation and either the prices received (or paid) by the plaintiff, or his decision to trade at a fair market price." *Basic*, 485 U.S. at 248, 108 S.Ct. 978. To satisfy this standard, the defendant must produce "enough evidence 'to withstand a motion for summary judgment or judgment as a matter of law on the issue.'" *Bing Li v. Aeterna Zentaris, Inc*., 324 F.R.D. 331, 344 (D.N.J. 2018) (quoting *Lupyan v. Corinthian Colleges, Inc*., 761 F.3d 314, 320 (3d Cir. 2014)).

## III.   DISCUSSION

Before considering Rule 23(a) and Rule 23(b)(3), we must address two preliminary matters: (1) the class definition and claims to be given class treatment; and (2) whether the class is currently and readily ascertainable based on objective criteria.

### A.  Preliminary Matters

#### i.  Class Definition and Claims to be Given Class Treatment

An order that certifies a class action must define the class and the class claims, issues or defenses. Fed.R.Civ.P. 23(c)(1)(B). Specifically, "the text of the order or an incorporated opinion must include (1) a readily discernible, clear, and precise statement of the parameters defining the class or classes to be certified, and (2) a readily discernible, clear, and complete list of the claims, issues, or defenses to be treated on a class basis." *Wachtel v. Guardian Life Ins. Co*., 453 F.3d 179, 187 (3d Cir.2006).

Lead Plaintiff seeks certification of a class consisting of:

All persons or entities who purchased or otherwise acquired Navient common stock during the Class Period (January 18, 2017 to November 20, 2018). Excluded from the

proposed class are: Defendants; the officers and directors of Navient, at all relevant times; members of their immediate families and their legal representatives, heirs, successors, or assigns and any entity in which Defendants have or had a controlling interest. Likewise, class members who were not damaged as a result of the alleged fraud would not be eligible to participate in any recovery.

This proposed class definition sets forth readily discernible, clear, and precise parameters for determining class membership. The claims to receive class treatment are:

a. violation of Section 10(b) of the Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b) and Rule 10b-5, 17 C.F.R. § 240.10b-5(b), against all Defendants; and

b. violation of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), against the Individual Defendants.

### ii. Ascertainability

An essential prerequisite of a class action, at least with respect to actions under Rule 23(b)(3), is that the class must be currently and readily ascertainable based on objective criteria. *Hayes v. Wal-Mart Stores, Inc.*, 725 F.3d 349, 354 (3d Cir. 2013). There are two important elements for ascertainability: (1) the class must be defined with reference to objective criteria; and (2) there must be a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition. *City Select Auto Sales Inc. v. BMW Bank of N. Am. Inc.*, 867 F.3d 434, 439 (3d Cir. 2017).

Ascertainability is easily demonstrated in securities class actions and this case is no different. The class members will be readily ascertainable through their registered shares or from Defendant's books and records. *See In re Urban Outfitters, Inc., Sec. Litig.*, No. CV 13-5978, 2016 WL 1043014, at *4 (E.D. Pa. Feb. 29, 2016); *Fogarazzo v. Lehman Bros.*, 263 F.R.D. 90, 101 (S.D.N.Y. 2009).

### B. Rule 23(a) Requirements

### i. Numerosity

11

The numerosity requirement is satisfied when "the class is so numerous that joinder of all members is impracticable." *In re Modafinil Antitrust Litig*., 837 F.3d 238, 249 (3d Cir. 2016) (quoting Fed. R. Civ. P. 23(a)(1)). Joinder is often impractical in securities fraud cases involving publicly owned and nationally listed corporations that had a large amount of outstanding and traded shares during the relevant class period. *Roofer's Pension Fund v. Papa*, 333 F.R.D. 66, 74 (D.N.J. 2019). Moreover, courts "have recognized a presumption that the numerosity requirement is satisfied when a class action involves a nationally traded security." *In re DVI Inc. Sec. Litig*., 249 F.R.D. 196, 200 (E.D. Pa. 2008) (DVI I) (quoting *In re CIGNA Corp. Sec. Litig*., No. 02–8088, 2006 WL 2433779, at *2, 2006 U.S. Dist. LEXIS 58560, at *6 (E.D.Pa. Aug. 18, 2006)).

Here, even though the exact number of shareholders that make up the class is unknown at this time, Lead Plaintiff has satisfied the numerosity requirement because Navient is a nationally traded security. During the class period, Navient's stock was actively traded on the NASDAQ, there were more than 263 million shares outstanding, and there was an average weekly trading volume of 14.68 million shares. This is more than sufficient for the Court to conclude the class is so numerous that joinder of all members would be impractical. *In re Safeguard Scis*., 216 F.R.D. 577, 580 (E.D. Pa. 2003) (concluding the numerosity requirement was satisfied even though the number of shareholders in the class was unknown because there were millions of shares of the common stock publicly traded during the class period); *Roofer's Pension Fund v. Papa*, 333 F.R.D. 66, 74 (D.N.J. 2019) (concluding numerosity was satisfied because the defendant was a publicly traded corporation and had an average weekly trading volume of approximately 9.5 million shares during the class period). Accordingly, in light of the potential number of class members, the proposed class representative has satisfied Rule 23(a)(1).

### ii.  Commonality

Commonality requires Lead Plaintiff to "share at least one question of fact or law with the grievances of the prospective class." *Rodriguez v. Nat'l City Bank*, 726 F.3d 372, 382 (3d Cir. 2013); *see* Fed. R. Civ. P. 23(a)(2). "[C]ourts in this [C]ircuit ... have recognized that securities fraud cases often present a paradigmatic common question of law or fact of whether a company omitted material information or made misrepresentations that inflated the price of its stock." *Bing Li v. Aeterna Zentaris, Inc.,* 324 F.R.D. 331, 339 (D.N.J. 2018), aff'd sub nom. *Vizirgianakis v. Aeterna Zentaris, Inc.*, 775 F. App'x 51 (3d Cir. 2019).

Common questions of law and fact exist in this case. The factual gravamen of the Complaint is that Defendants made false and misleading statements and omissions to the investing public in Navient's SEC filings, press releases and on conference calls thereby causing the stock to trade at artificially inflated prices during the class period. Therefore, as Plaintiff identifies in his brief in support of this motion, this action is replete with common questions of law and fact, including: (1) whether Defendants violated the Exchange Act; (2) whether statements made by Defendants to the investing public during the Class Period misrepresented or omitted facts that were necessary to make the statements made not misleading; (3) whether the facts misrepresented or omitted were material; (4) whether Defendants knew or were deliberately reckless in not knowing that their statements and omissions were false and misleading; (5) whether the price of Navient common stock was artificially inflated; (6) whether Defendant's conduct caused members of the class to sustain damages; and (7) the extent of damage sustained by Class members and the appropriate measure of damages. Thus, the commonality requirement of Rule 23(a)(2) is met.

### iii.  Typicality

The typicality requirement "centers on whether the interests of the named plaintiffs align with the interests of the absent members." *Stewart v. Abraham*, 275 F.3d 220, 227 (3d Cir. 2001). The standard for demonstrating typicality is undemanding and requires that "the claims of the named plaintiffs and putative class members involve the same conduct by the defendant." *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc*., 259 F.3d 154, 183–84 (3d Cir. 2001). It does not require that the putative class members all share identical claims. *In re Warfarin Sodium Antitrust Litig*., 391 F.3d 516, 531–32 (3d Cir. 2004). Rather, so long as the named plaintiffs and putative class challenge "the same unlawful conduct" the typicality requirement is "usually satisf[ied] ... irrespective of the varying fact patterns underlying the individual claims." *Stewart*, 275 F.3d at 227 (citation omitted); *see also In re Schering Plough Corp. ERISA Litig*., 589 F.3d 585, 598 (3d Cir. 2009) ("Complete factual similarity is not required; just enough factual similarity so that maintaining the class action is reasonably economical and the interests of the other class members will be fairly and adequately protected in their absence.").

The named plaintiff, however, "must not be subject to a defense that is both inapplicable to many members of the class and likely to become a major focus of the litigation." *Id.* at 599. Defendant bears the burden to "show some degree of likelihood a unique defense will play a significant role at trial." *Beck v. Maximus, Inc*., 457 F.3d 291, 300 (3d Cir. 2006). Speculative defenses will not suffice. *See id.* at 301.

The typicality requirement is easily satisfied. First, the Lead Plaintiff is asserting the same claims—both in terms of the legal theory advanced and the factual circumstances underlying the theory—as the class. Specifically, the Lead Plaintiff's 10b-5 and Section 20(a) claims are based on his purchase of Navient common stock during the class period at prices that were artificially inflated due to the same misrepresentations and omissions of material fact that

14

impacted the prices of all other class members. Second, Lead Plaintiff is not subject to any unique defenses that is both inapplicable to many class members and likely to become a major focus of the litigation. Indeed, it is Defendant's burden to show "some degree of likelihood that a unique defense will play a significant role at trial" and it has presented none. *Bing Li v. Aeterna Zentaris, Inc.*, 324 F.R.D. 331, 340 (D.N.J. 2018), aff'd sub nom. *Vizirgianakis v. Aeterna Zentaris, Inc.*, 775 F. App'x 51 (3d Cir. 2019). Third, the interests and incentives of Lead Plaintiff are sufficiently aligned with those of the class because the factual and legal predicates of his claims are the same as those of the class members. In other words, because the Lead Plaintiff and class members claims are the same their interests converge—they are incentivized to establish Defendant's liability and maximize recovery. Therefore, the Court is satisfied that Lead Plaintiff has fulfilled Rule 23(a)(3)'s typicality requirement.

### iv. Adequacy

The adequacy requirement requires a showing that a named plaintiff "will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "Class representatives must be part of the class and possess the same interest and suffer the same injury as the class members." *Beneli v. BCA Fin. Servs., Inc*., 324 F.R.D. 89, 98 (D.N.J. 2018) (citation omitted). Determining adequacy involves a two-part inquiry: (1) "the named plaintiff's interests must be sufficiently aligned with the interests of the absentees;" and (2) "the plaintiff's counsel must be qualified to represent the class." *Id.* at 98. A named plaintiff is adequate if his or her interests do not conflict with those of the class members. *Id.*

In examining the typicality requirement above, we concluded that the interests of the Lead Plaintiff are aligned with the interests of the class. Likewise, we concluded that Lead Plaintiff advances the same claims as those of the class members, and therefore we cannot now

conclude that the Lead Plaintiff's interests are antagonistic to the interests of the class. As for the qualifications of Lead Plaintiff's counsel, the Court also finds that they are well qualified and highly experienced such that they can adequately conduct this litigation and represent the interests of the class. Levi & Korsinsky is highly experienced in complex securities class actions and has achieved significant results on behalf of shareholders. They have also demonstrated their expertise in this matter by defeating Defendants' motions to dismiss. Accordingly, the adequacy requirement of Rule 23(a)(4) is met.

### C. Rule 23(b)(3) Requirements

Having found that Lead Plaintiff satisfied each of Rule 23(a)'s necessary prerequisites for class certification, the Court now turns to whether the class action is maintainable under Rule 23(b)(3).

### i. Superiority

A party seeking class certification under Rule 23(b)(3) must show that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). "The superiority requirement asks the court to balance, in terms of fairness and efficiency, the merits of a class action against those of alternative available methods of adjudication." *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 316 (3d Cir. 1998) (internal quotation marks and citation omitted). Rule 23(b)(3) provides a non-exhaustive list of factors relevant to the superiority requirement, including: the class members' interest in individually controlling the prosecution of separate actions; the extent and nature of any similar litigation already commenced by class members; the desirability of concentrating the litigation in a particular forum; and the difficulties likely to be encountered in the management of a class action. Fed. R. Civ. P. 23(b)(3)(A)–(D).

16

A class action is certainly the superior method for adjudicating the instant controversy. Generally, "[a]s a practical matter, investors defrauded by securities law violations have no recourse other than class relief." *Shapiro v. Alliance MMA, Inc.*, No. 17-2583, 2018 WL 3158812, at *6 (D.N.J. June 28, 2018); *see also Smith v. Suprema Specialties, Inc.*, No. 02-168, 2007 WL 1217980, at *10 (D.N.J. Apr. 23, 2007) ("[C]lass actions are favored in the securities litigation context because they are necessary to meaningfully enforce the securities laws."). This is also true here where Lead Plaintiff seeks to represent a large class of geographically dispersed securities purchasers "whose individual damages may well be small enough to render individual litigation prohibitively expensive." *See In re Merck & Co., Inc. Vytorin/Zetia Sec. Litig.*, No. 08-2177, 2012 WL 4482041, at *8 (D.N.J. Sept. 25, 2012).

### ii. Predominance

Class certification under Rule 23(b)(3) is appropriate only if the Court finds that common questions of law or fact predominate over questions exclusively affecting individual members. Fed. R. Civ. P. 23(b)(3). "Rule 23 does not require the absence of all variations in a defendant's conduct or the elimination of all individual circumstances." *Reyes v. Netdeposit, LLC*, 802 F.3d 469, 489 (3d Cir. 2015); *see also Harnish v. Widener Univ. Sch. of Law*, 833 F.3d 298, 304 (3d Cir. 2016) ("[I]f the court decides that the central, predominant issues in the case are common, then Rule 23(b)(3) is met despite the possibility that some subsidiary issues will require individualized evidence."). Rather, the predominance inquiry turns on whether the evidence necessary to prove the essential elements of the underlying claims will vary from class member to class member, causing the Court to engage in individual treatment of the issues. *See Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016); *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 311 (3d Cir. 2008).

17

Here, Lead Plaintiff alleges violations of Section 10(b) and Rule 10b-5 and Section 20(a) against Navient and its executives. As stated earlier, establishing a securities law violation is an essential prerequisite to finding Section 20(a) liability. *See In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 284 (3d Cir. 2006) (explaining that Section 20(a) holds liable those who control a Section 10(b) violator). For those reasons, the Court analyzes the elements of a Rule 10b-5 violation to determine whether Lead Plaintiff has satisfied the predominance requirement.

To establish its Rule 10b-5 securities fraud claim, Lead Plaintiff must demonstrate: "(1) a material misrepresentation or omission, (2) scienter, (3) a connection between the misrepresentation or omission and the purchase or sale of a security, (4) reliance upon the misrepresentation or omission, (5) economic loss, and (6) loss causation." *City of Edinburgh Council v. Pfizer, Inc.,* 754 F.3d 159, 167 (3d Cir. 2014). Lead Plaintiff may invoke the *Basic* presumption to establish reliance by showing "(1) that the alleged misrepresentations were publicly known, (2) that they were material, (3) that the stock traded in an efficient market, and (4) that the plaintiff traded the stock between the time the misrepresentations were made and when the truth was revealed." *Halliburton II*, 573 U.S. at 268, 134 S.Ct. 2398. If Lead Plaintiff satisfies those requirements, Defendants may rebut the presumption by producing "enough evidence 'to withstand a motion for summary judgment or judgment as a matter of law on the issue.'" *Bing Li*, 324 F.R.D. at 344 (citation omitted).

### 1. Reliance

Lead Plaintiff bears the burden to establish that the *Basic* presumption applies and therefore must demonstrate that: (1) Navient's alleged misrepresentations and omissions were publicly known; (2) Navient's stock traded in an efficient market; and (3) Lead Plaintiff traded

stock between the time the misrepresentations were made and the truth was revealed.[1] The Court is satisfied that these requirements are met here.

Lead Plaintiff alleges Navient's misrepresentations and omissions were publicly known because they were made in SEC filings, press releases and earning calls. Likewise, Lead Plaintiff and other members of the class purchased Navient stock after Defendants made their initial misrepresentations about Navient's forbearance policy. Finally, the third requirement, an efficient market, is also satisfied here.

To determine whether a market is efficient, courts consider the five *Cammer* factors, which are: (1) whether the security trades at a large weekly volume; (2) whether a significant number of analysts follow and report on the security; (3) whether the security has market makers; (4) whether the company is eligible to file an S-3 registration statement; and (5) whether empirical facts show a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the security's price. *Cammer v. Bloom*, 711 F. Supp. 1264, 1286–87 (D.N.J. 1989). Courts have also considered the three *Krogman* factors, which are: (1) the market capitalization of the company; (2) the bid-ask spread of the security; and (3) the size of the public float. *Krogman v. Sterritt*, 202 F.R.D. 467, 478 (N.D. Tx. 2001).

### a. Cammer Factor 1: Average Weekly Trading Volume

High weekly trading volume is evidence of market efficiency "because it implies significant investor interest in the company. Such interest, in turn, implies a likelihood that many investors are executing trades on the basis of newly available or disseminated corporate information." *Cammer*, 711 F. Supp. at 1286; *Unger v. Amedisys Inc.*, 401 F.3d 316, 324 (5th Cir. 2005) ("A high weekly stock trading volume suggests the presence of active, informed

---

[1] As previously noted, materiality does not have to be shown at class certification.

investors."). *Cammer* did not create a bright-line rule for adequate trading volume but presumed that a trading volume of two percent or more justifies a strong presumption of market efficiency. *See id.* (citing Bromberg & Lowenfels, 4 Securities Fraud and Commodities Fraud § 8.6 (Aug. 1988)).

Here Navient's trading volume of 5.45% far exceeds the threshold of 2% cited by *Cammer* as establishing a strong presumption of market efficiency. Therefore, this factor points in favor of finding market efficiency.

### b.  Cammer Factor 2: Analyst Coverage

Significant securities analyst coverage of a company's stock is "persuasive" evidence of market efficiency. *See Cammer*, 711 F. Supp. at 1286. Here, fourteen firms issued at least 203 equity analyst reports on Navient. This coverage is sufficiently significant to suggest market efficiency. *See Villella v. Chem. & Mining Co. of Chile*, 333 F.R.D. 39, 54 (S.D.N.Y. 2019) (finding the second *Cammer* factor satisfied based on only 15 analysts); *In re DVI Inc. Sec. Litig.*, 249 F.R.D. 196, 209 (E.D. Pa. 2008), aff'd sub nom. *In re DVI, Inc. Sec. Litig.*, 639 F.3d 623 (3d Cir. 2011) (concluding over 80 analyst reports published by three analysts was sufficient to favor a finding of market efficiency). Accordingly, the second factor supports a finding of market efficiency.

### c.  Cammer Factor 3: Market Makers

"'A market-maker is one who helps establish a market for securities by reporting bid-and-asked quotations . . . and who stands ready to buy or sell these publicly quoted prices.'" *Hull v. Glob. Digital Sols., Inc.*, No. 16-5153, 2018 WL 4380999, at *8 (D.N.J. Sept. 14, 2018) (quoting *In re Countrywide Fin. Corp. Sec. Litig.*, 273 F.R.D. 586, 613–14 (C.D. Cal. 2009)). Market makers "react swiftly to company news and reported financial results by buying or

selling stock and driving it to a changed price level." *Cammer*, 711 F. Supp. at 1287. A higher number of market makers for a given security suggests that the security is liquid, and therefore, that the market for the security is efficient. *Hull*, 2018 WL 4380999, at *8.

This factor is not particularly relevant here given that Navient's stock traded on a major exchange with continuous public price and volume reporting as opposed to the over-the-counter markets where market makers have more significance. Notwithstanding this fact, this factor is easily satisfied because during the class period there were at least 108 market makers for Navient common stock. Accordingly, the third factor also weighs in favor of a finding of market efficiency.

### d.   Cammer Factor 4: S-3 Registration

The fourth *Cammer* factor addresses whether Navient "was entitled to file an S-3 Registration Statement in connection with public offerings." *Cammer*, 711 F. Supp. at 1287. "Corporations permitted to use the S-3 form are . . . presumed to be actively traded and widely followed," so a company's ability to file an S-3 registration statement evidences an efficient market. *Krogman v. Sterritt*, 202 F.R.D. 467, 476 (N.D. Tex. 2001). As set forth in the expert report, Navient had the ability to file a Form S-3 registration statement. Therefore, the fourth factor also points toward a finding of market efficiency.

### e.   Cammer Factor 5: Cause-and-Effect Relationship Between Stock Price and Unexpected Corporate Events or Financial Releases

Under the fifth *Cammer* factor, the Court assesses whether there is empirical evidence of changes in Navient's stock price in response to unexpected corporate information. *Cammer*, 711 F. Supp. at 1287. This factor is "normally the most important factor in an efficiency analysis,"

but it alone is not dispositive. *In re DVI, Inc. Sec. Litig.*, 639 F.3d at 634; *West Palm Beach Police Pension Fund v. DFC Glob. Corp.*, No. 13-6731, 2016 WL 4138613, at *12 (E.D. Pa. Aug. 4, 2016) (collecting cases); *Cammer*, 711 F. Supp. at 1287 (explaining that establishing a cause-and-effect relationship is merely "helpful to a plaintiff seeking to allege an efficient market.") (emphasis added).

Mr. Coffman performed an event study where he examined the movement of Navient's stock price immediately following eight earnings announcements during the class period. Of the eight earning announcements issued during the class period, four resulted in statistically significant price movements above the 95% confidence level. He then compared this result to the 34 days during the class period where there was only one or no Navient related new articles and when there were no analyst reports or SEC filings issued. Of these 34 days, there were only four days with a statistically significant price movement. Thus, during the class period there was a statistically significant price reaction on 50% of the earning announcements but only a statistically significant price reaction on 11.8% of the days with the least amount of Navient related news. Ultimately, Mr. Coffman found statistically significant changes in Navient's stock price attributable to the earnings announcements for four of the eight days examined. Based on this result, Mr. Coffman concluded that Navient's stock traded in an efficient market during the class period. This Court is satisfied that Mr. Coffman's opinion concerning market efficiency is reliable and that this factor also supports a finding of market efficiency.

Having considered the evidence submitted by Lead Plaintiff, the Court finds that the *Cammer* factors favor a finding of market efficiency. Thus, the Court concludes that Lead Plaintiff is entitled to the *Basic* presumption of reliance.

**D.  Notice to Potential Class Members**

22

Federal Rule of Civil Procedure 23(c)(2)(B) provides that for "any class certified under Rule 23(b)(3) . . . the court must direct to class members the best notice that is practicable under the circumstances." Plaintiff should submit a proposed form of notice to the class within 30 days.

### E.  Appointment of Class Representative and Class Counsel

As discussed above, the Court that finds that Lead Plaintiff will fairly and adequately represent the interests of the class members. Accordingly, Lead Plaintiff is appointed as class representatives.

Under Federal Rule of Civil Procedure 23(g)(1)(A), a court that certifies a class must appoint class counsel. In appointing class counsel, a court must consider the work counsel has done in identifying or investigating potential claims in the action, counsel's experience in handling class actions, other complex litigation, and claims of the type asserted in the action, counsel's knowledge of the applicable law, and the resources counsel will commit to representing the class. Fed.R.Civ.P. 23(g)(1)(C).

As discussed above, the Court finds that Levi & Korsinsky has extensive experience litigating complex securities class actions and has more than competently managed the matter up until this point. Accordingly, Levi & Korsinsky is appointed as class counsel.

## IV.   CONCLUSION

Plaintiff has demonstrated by a preponderance of the evidence that the proposed class, as defined herein, satisfies all four factors under Rule 23(a) and meets the requirements of Rule 23(b)(3). Therefore, class certification is appropriate, and Plaintiff's motion will be **GRANTED**.

Dated:  3/9/2021_____                              s/ Robert B. Kugler_____
                                                        ROBERT B. KUGLER
                                                        United States District Judge