Adam M. Apton
LEVI & KORSINSKY, LLP
55 Broadway, 10th Floor
New York, New York 10006
Tel.: (212) 363-7500
Fax: (212) 363-7171
Email: aapton@zlk.com

*Attorneys for Class Representative
and Class Counsel*

[Additional Counsel on Signature Page]

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re NAVIENT CORPORATION SECURITIES LITIGATION | Master File No. 17-8373 (RBK/AMD)<br><br>**PLAINTIFF'S BRIEF IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>Motion Day: September 7, 2021 |

## **TABLE OF CONTENTS**

I.   Preliminary Statement ...................................................................1

II.  Statement of Facts.......................................................................3

    A.   The Washington State Attorney General's Lawsuit is Meritorious......3

        1.   The Washington State Attorney General's Lawsuit ..................3

        2.   Navient's Response to the Lawsuits. ...........................................4

        3.   The Washington Attorney General's Successful Motion for Partial Summary Judgment. .....................................................4

    B.   The FSA audit of Navient's forbearance practices was a non-routine review that was targeted to address the Lawsuits' allegations. ............8

        1.   The FSA review of Navient's forbearance practices and the corresponding report. ................................................................8

        2.   The FSA review was a targeted non-routine review. ...............13

        3.   Defendants failed to disclose the FSA's review and the "Navient Use of Forbearance" Report. .....................................16

III. ARGUMENT...............................................................................18

    A.   Legal Standard....................................................................18

    B.   Plaintiff is entitled to Partial Summary Judgment on Certain Elements of his Section 10(b) Claims Against Defendants. ...............................19

        1.   There is no genuine dispute that Defendants made misstatements of material fact with respect to the Washington State Attorney General's lawsuit. .............................................20

        2.   There is no genuine dispute that Defendants' concealment of the FSA review of its forbearance practices was materially misleading. ..............................................................................23

IV.  Conclusion ................................................................................32

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)................................................................18

*In re Apollo Grp. Inc. Sec. Litig.*,
395 F. Supp. 2d 906 (D. Ariz. 2005) ....................................20

*In re ArthoroCare Corp. Sec. Litig.*,
726 F. Supp. 2d 696 (W.D. Tex. 2010) ................................20

*Basic v. Levinson*,
108 S.Ct. 978 (1988)................................................................25

*In re BioScrip, Inc. Sec. Litig.*
95 F. Supp 3d 711 (S.D.N.Y. 2015) ....................................30

*California Pub. Employees' Ret. Sys. v. Chubb Corp.*,
394 F.3d 126 (3d Cir. 2004) ................................................19

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986)................................................................18

*City of Philadelphia v. Fleming Cos.*,
264 F.3d 1245 (10th Cir. 2001) ............................................30

*City of Westland Police & Fire Ret. Sys.*,
928 F. Supp. 2d 705 (S.D.N.Y. 2013) ..................................30

*In re Craftmatic Sec. Litig.*,
890 F.2d 628 (3d Cir. 1990) ................................................29

*Dura Pharms., Inc. v. Broudo*,
544 U.S. 336 (2005)................................................................19

*EP Medsystems, Inc. v. EchoCath, Inc.*
235 F.3d 865 (3d Cir. 2000) ................................................28

*Federal Housing Finance Agency v. Nomura Holding America Inc.*,
68 F. Supp. 3d 439 (S.D.N.Y. 2014) ..................................19

*Grossman v. Waste Mgmt., Inc.*,
589 F. Supp. 395 (N.D. Ill. 1984) ........................................................................25

*Indoor Billboard/Washington. Inc. v. Integra Telecom of Washington, Inc.*,
162 Wn.2d 59 (2007) ............................................................................................22

*Institutional Investors Group v. Avaya, Inc.*,
564 F.3d 242 (3d. Cir. 2009) ...............................................................................19

*Jaroslawicz v. M&T Bank Corp.*,
962 F.3d 701 (3d Cir. 2020) ......................................................................... 25, 27

*Lord Abbett Affiliated Fund, Inc. v. Navient Corp.*,
363 F. Supp. 3d 476 (D. Del. 2019)......................................................................19

*Matrixx Initiatives, Inc. v. Siracusano*,
131 S. Ct. 1309 (2011) ..........................................................................................24

*In re Media Vision Tech. Sec. Litig.*,
No. C94-1015 (N.D. Cal. Sept. 23, 2003) ............................................................23

*Menaldi v. Och-Ziff Cap. Mgmt. Grp. LLC*,
164 F. Supp. 3d 568 (S.D.N.Y. 2016) ............................................................ 29, 30

*In re NAHC, Inc. Sec. Litig.*,
306 F.3d 1314 (3d Cir. 2002) ...............................................................................20

*Operating Local 649 Annuity Tr. Fund v. Smith Barney Fun. Mgmt., LLC*,
595 F.3d 86 (2d Cir. 2010) ...................................................................................29

*Parklane Hosiery v. Shore*
99 S.Ct. 645 (1979) ...............................................................................................23

*Roeder v. Alpha Indus., Inc.*,
814 F.2d 22 (1st Cir. 1987).....................................................................................25

*S.E.C. v. Glob. Telecom Servs., L.L.C.*,
325 F. Supp. 2d 94 (D. Conn. 2004).....................................................................23

*S.E.C. v. Gorsek*,
222 F. Supp. 2d 1099 (C.D. Ill. 2001) ..................................................................23

*Sec. & Exch. Comm'n v. Murray,*
    No. 12-CV-01288 (N.D. Cal. Nov. 23, 2016) ......................................................23

*Semerenko v. Cendant Corp.,*
    223 F.3d 165 (3d Cir. 2000) ...............................................................................24

*In re Signet Jewelers Ltd. Sec. Litig.,*
    2018 WL 6167889 (S.D.N.Y. Nov. 26, 2018).....................................................26

*S.E.C. v. Weintraub,*
    No. 11-21549-CIV (S.D. Fla. Dec. 30, 2011).....................................................23

*In re Time Warner Inc. Sec. Litig.,*
    9 F.3d 259 (2d Cir. 1993) ...................................................................................25

*Vancouver Alumni Asset Holdings Inc. v. Daimler AG,*
    No. CV 16-02942 (C.D. Cal. May 31, 2017) ......................................................20

*W. Telepage, Inc. v. City of Tacoma Dep't of Fin.,*
    140 Wn.2d 599 (2000) .........................................................................................22

*Wielgos v. Commonwealth Edison Co.,*
    688 F. Supp. 331 (N.D. Ill. 1988) ........................................................... 26, 27, 29

*Zell v. Intercapital Income Sec., Inc.,*
    675 F.2d 1041 (9th Cir. 1982) .............................................................................30

*Zhengyu He v. China Zenix Auto Int'l Ltd.,*
    2020 U.S. Dist. LEXIS 103673 (D.N.J. June 12, 2020)......................................30

**Statutes**

15 U.S.C. § 78j(b) ............................................................................................. 1, 3, 24

**Other Authorities**

Washington State's Consumer Protection Act.............................................................3

**Rules**

17 C.F.R. § 229.103 ...................................................................................................25

17 C.F.R. § 240.10b-5..............................................................................................1, 3

34 C.F.R. § 682 .........................................................................................................15

34 C.F.R. § 685 ...................................................................................................15

Fed. R. Civ. P. 56(a)..........................................................................................18

## I.      Preliminary Statement

Plaintiff sued Defendants for violating Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5. These provisions of the federal securities laws provide investors with recourse when they have been lied to in connection with the purchase or sale of a security. Liability requires proof of a false and/or misleading statement. Plaintiff seeks partial summary judgment on this key element of his claims.

On January 18, 2017, the Consumer Financial Protection Bureau and the State Attorneys General from Washington and Illinois filed suit against Navient Corporation for violating various consumer protection laws. Navient and its CEO, John F. Remondi, promptly responded to the allegations by calling them "unsubstantiated," "completely false," and "unfounded." This was not true; in reality, the allegations were based on a deep and expansive record of facts that resulted in an award of partial summary judgment on liability in favor of the Washington State Attorney General against Navient.

On March 20-24, 2017, shortly after the CFPB and Attorneys General filed suit, the Department of Education's Federal Student Aid Office ("FSA") commenced an unplanned, extraordinary review of Navient's servicing practices. The FSA focused specifically on Navient's illegal use of forbearance for its student borrowers given its prominence in the lawsuits filed by the CFPB and the Attorneys

General. Navient never disclosed the FSA's review despite its regulatory obligation to do so or that it resulted in objective findings of fact proving the claims being asserted by the CFPB and the Attorneys General. Instead, Navient and Remondi concealed the FSA's review and continued to falsely represent that the regulatory lawsuits were "completely unfounded," "baseless," and "unsubstantiated."

Navient and Remondi concealed the factual bases underlying the CFPB's and Attorneys General's lawsuits. They also actively concealed the FSA's review, the fact that it was commenced in response to the regulator lawsuits, and the reality that it uncovered evidence in support of the accusations they were contemporaneously disavowing.

The discovery record on these points is undisputed. Navient's servicing practices and policies gave rise to the CFPB's and Attorneys General's lawsuits. Navient's internal documentation of these policies was so extensive and one-sided that it supported an award of summary judgment in favor of the Washington State Attorney General. The undisputed facts giving rise to that award of summary judgment remain undisputed now and cannot be reconciled with Navient's and Remondi's representation that the regulator lawsuits were "completely unfounded," "baseless," or "unsubstantiated." Similarly, Navient and Remondi cannot dispute that the FSA commenced an investigation into their servicing practices over

allegations about illegal use of forbearance. Navient was duty bound to disclose the existence of that investigation, but undeniably failed to do so.

The record is clear on these points and, for the reasons set forth below, supports granting Plaintiff partial summary judgment holding that Navient's and Remondi's statements and omissions on these matters were false for the purposes of establishing liability under Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5.

## II.   Statement of Facts

### A. The Washington State Attorney General's Lawsuit is Meritorious.

#### 1.  The Washington State Attorney General's Lawsuit

On January 18, 2017, the Consumer Financial Protection Bureau ("CFPB"), the Illinois Attorney General, and the Washington State Attorney General ("WA AG") filed lawsuits against Navient claiming that the company engaged in predatory lending practices, as well as unfair and deceptive loan servicing practices (collectively the "Lawsuits").  The WA AG's complaint includes three causes of action against Navient and three of its subsidiaries for violations of Washington State's Consumer Protection Act. Apton Decl., Exhibit 20 at 49-52. The complaint specifically alleged fifteen categories of fraudulent servicing practices, many of which related to Navient's "cosigner release" program. *Id.* at 50-51. Other categories included deceptively offering forbearances to federal student loan borrowers and

presenting the federal loan repayment options available to borrowers in a deceptive manner. *Id.*

### 2.  Navient's Response to the Lawsuits.

In response to the Lawsuits, on January 18, 2017, Navient issued three press releases, which stated "[t]he allegations…are unfounded…," and characterized each lawsuit as an "unsubstantiated, unjustified and politically driven action." Apton Decl., Exhibits 21-23. Throughout the Class Period, Navient CEO, Jack Remondi, continued to comment on the Lawsuits' merits. During a January 24, 2018, earnings call, Remondi characterized the Lawsuits as "unsubstantiated claims." Apton Decl., Exhibit 34. Also, in a June 28, 2018 press release, Remondi made the following statement about the Lawsuits: "The allegations are unfounded, and the lawsuit is another attempt to blame a single servicer for the failures of the higher education system and the federal student loan program to deliver desired outcomes . . . The need to blame someone has driven these lawsuits." Apton Decl., Exhibit 36.

### 3.  The Washington Attorney General's Successful Motion for Partial Summary Judgment.

On January 4, 2021, the Washington Attorney General moved for partial summary judgment on, *inter alia*, the claim that Navient's practices surrounding its "co-signor release" program were unfair and deceptive. Apton Decl., Exhibit 42. On March 8, 2021, the court entered its order, dated March 5, 2021, granting the WA AG partial summary judgment. Apton Decl., Exhibit 43. Judge Alicea-Galván found

that there was no genuine issue of material fact that Navient's representations to borrowers about the co-signer release program had the capacity to deceive reasonable borrowers and/or cosigners and therefore violated Washington State law.

Judge Alicea-Galvan based her decision on a fulsome evidentiary record. In denial letters sent to student loan applicants, Navient vigorously promoted the use of cosigners and encouraged reapplying with a cosigner and explicitly offered a "cosigner release" if certain conditions were met. Apton Decl., Exhibit 3 at 3; Exhibit 18 at 1. Navient's website and internal communications from 2013 and 2014 also demonstrated that they promoted their cosigner release program, advising that borrowers could apply to have their cosigner released if they made 12 consecutive on-time principal and interest payments. Apton Decl., Exhibit 7 at 1; Exhibit 8 at 2.

 A 2014 Navient training module highlighted those cosigners as valuable to the company because they could be a source of payment in the event a borrower experienced financial hardship and as potential leverage to negotiate with a struggling borrower. Apton Decl., Exhibit 4 at 4-9.  The 2014 training module and internal emails from 2009 and 2010 demonstrated that Navient regarded their cosigner releases as a "benchmark favorably against competitors" and a "sales tool to entice borrowers to add a cosigner." Apton Decl., Exhibit 4 at 4-9; Exhibit 5 at 1; Exhibit. 6 at 1.

However, Navient failed to disclose that it was exceptionally difficult to meet their qualifications for cosigner release and it granted release for as few as 1% of the total cosigned loans. Apton Decl., Exhibit 9 at 12. According to a company submission to the CFPB dated September 10, 2015, Navient denied more than 85% of applications seeking a cosigner release between 2010 and 2015. *Id.* at 11-12. As far back as 2009, internal documents demonstrated that Navient knew that "most borrower requests are denied for the [on-time payment requirement] before ever being sent the cosigner release application." *Id.;* Exhibit 6 at 2. The CFPB 2015 ombudsman report found that 90% of borrowers who applied for co-signer release were rejected and the most common reason was that they failed to make a specified number of on-time payments. Apton Decl., Exhibit 19 at 15-16.

Navient did not tell borrowers and cosigners how it defined an "on-time" payment for the purposes of the cosigner release. Apton Decl., Exhibit 42 at 13:8-15. According to its promissory notes and the 2015 deposition testimony of John Zemetro, Navient's Senior Director of Servicing Operations, Navient allowed borrowers to pay-ahead or make excess payments that were a multiple of their monthly payments without being considered delinquent for the future payments or being assessed late fees. Apton Decl., Exhibit 10 at 132:10-133:19; Exhibit 11 at 2. For example, as the AG demonstrated, if a borrower's monthly payment was $100, but she made a $300 payment one month, Navient would advance her due date and

6

would send a bill with $0 due for the next two months. Apton Decl., Exhibit 42 14:17-22. However, if the borrower did not send additional payments in response to those $0 bills, Navient would count that as a failure to make consecutive, on-time payments, even though the bills were paid ahead. *Id*.

Although Navient instructed its call staff in 2014 that paid ahead loans were excluded from satisfying the on-time payment requirement, Navient represented to borrowers in its promissory notes, billing statements, and guidance to borrowers that an account in paid ahead status would not be considered delinquent, excess payments would advance the due date, and that "there's no penalty for making an additional payment or paying more than your minimum monthly payment." Apton Decl., Exhibits 71, 74, 75 at 13, and 76. Navient, in fact, penalized borrowers who paid ahead by failing to count their payments towards the timely consecutive payment requirement for cosigner release. Apton Decl., Exhibit 75 at 13.

In 2015, Navient hired a third-party vendor to review its internal processes related to cosigner release. Apton Decl., Exhibit 16. The vendor noted that Navient's agents did not understand the on-time payment requirement for cosigner release and there were complications with borrowers who had paid ahead. *Id.* at 18. By mid-2015, Navient changed its cosigner release policy to specify that paid ahead loans are valid for satisfying the on-time payment requirement. Apton Decl., Exhibit 17 at 16.

This evidence demonstrated that Navient's representations about "on-time" payments were false and misleading because its practices did not follow its affirmative representations. Apton Decl., Exhibit 42 at 14-15. The Court agreed that these facts were undisputed and sufficient to establish, as matter of law, that Navient's misrepresentations about their co-signer release program violated Washington State's Consumer Protect Act. Apton Decl., Exhibit 43 at 3.

**B. The FSA audit of Navient's forbearance practices was a non-routine review that was targeted to address the Lawsuits' allegations.**

**1. The FSA review of Navient's forbearance practices and the corresponding report.**

In response to the Lawsuits, the Department of Education's Federal Student Aid Office ("FSA") examined Navient's forbearance practices.   Apton Decl. Exhibits 24 at 259: 7-16; 25 at ¶¶20, 24; Exhibit 28 at 147:16-25, 148:23-22.; Exhibit 41 at 18; Laursen Decl.  The FSA review team listened to 2388 recorded outbound and inbound student borrower calls during and after their March 2017 site visit. Apton Decl., Exhibit 30 at 1-2.  The review team also did a side-by-side review with Navient's representatives to listen to live inbound borrower calls. *Id.*   Navient provided the FSA over two million calls from 2014 to 2017, which was queried for calls that resulted in forbearance. *Id.* at 10.  This resulted in a list of over 219,000 calls, of which the FSA randomly selected the calls to review. *Id.*

In their report titled "Navient Use of Forbearance" and dated May 18, 2017,

the FSA described its findings. According to the report:

> [T]he objective of the site visit was to assess whether the use of forbearance by the Navient CSRs met the standards outlined in federal regulations, contractual requirements, and implemented Change Requests. More specifically, the review team evaluated whether or not the Navient agents offered all the applicable options before placing a borrower in forbearance. *Id.*

The FSA's findings were as follows:

a.   FSA listened to 2,388 phone calls, including 388 inbound and 2,000 outbound calls. Of these, FSA determined almost 1/10 calls were only offered forbearance as an option.

b.   In several instances where only forbearance was offered, it was after a borrower had already made a promise to pay within a short time, without being given the opportunity to decide if another option (like one of the Income Driven plans or a deferment) would have been more favorable. And in some instances, interest was capitalized when another option may have prevented it."

c.   FSA recommended in the report that "Navient ask questions so that the borrower is able to determine which option (like promise to pay) would be most beneficial to resolve the delinquency. . . . FSA does not believe a borrow should use unnecessary forbearance time that will result in interest capitalization."

d.   "[M]any CSRs did not offer alternative or beneficial options when attempting to assist borrowers with bringing their account current or managing repayment. CSRs did not ask probing

questions to determine if it would be more beneficial for the borrower to enter a deferment or to change to one of the Income Driven Repayment (IDR) options."

e.     FSA recommended in the report that, "Navient provide borrowers with all options available so that the borrower may make an informed decision based on their current situation. The use of forbearance in lieu of any other options can cause more undue hardship to a borrower in the long term."

*Id.* at 2.

FSA also reported that "[o]f the forty accounts reviewed for servicing history,

the review team was able to determine that 21 of them offered the borrower an option

other than forbearance. For the other nineteen accounts, FSA asked for Navient to

provide the call that resulted in the notation on the account; eight of those did not

offer the borrower any other option." *Id.* at 3. Additional findings were as follows:

a.     Navient offered borrowers ONLY forbearance in 20% of the samples. In a few of these instances, where there was a change of circumstances, Navient did not suggest a new repayment plan or an unemployment deferment. In other instances, the borrower requested a month or two of forbearance and Navient provided the forbearance without probing to see if there was a better option available to the borrower.

b.     While the FSA acknowledges a difference in training processes after July 1, 2015, "FSA recommends that Navient provide communication/on-going training to their agents so

10

that borrowers consistently receive all of their options - repay, IDR, deferment and forbearance."

c.      "About half of the time (21 out of 40 accounts), Navient's notes were not clear enough to determine what happened on the account. For example, entries on the same day would have a comment suggesting that the borrower both accepted and rejected the forbearance. It was unclear whether this was the same call or a different call. One reason for this is the CLASS system does not provide the timestamp to show when a transaction happened, unless the call was routed through the IVR. Another reason for this is because Navient's CARES system used to notate the account that the borrower rejected the forbearance when CSRs went to a different section of the CARES system. This issue of "rejecting forbearance" was resolved with a system upgrade in June 2016. In other examples, the phone agent clearly provided several options (repay, IDR, deferment) before ultimately giving the borrower the forbearance option. However, the note only displayed that the forbearance was processed without a discussion of the other options."

*See id.*

In its response, which was included in the FSA's report, Navient admitted the

following calls were improperly handled:

a.      Customer "advised she was going through a divorce that should be settled in a few months and asked to postpone payments. Prior to the call, the customer had temporary hold expire that was applied after we qualified her for hardship deferment and were awaiting the required documentation. The customer was also in IDR (ICR, but in the permanent standard

11

payment) and these should have been clues to the agent to ask if payment amount was affordable after forbearance expired or other probing questions to ensure hardship was in fact temporary and not long term. Although other options were not discussed, a letter was sent to the customer after the call that did include other options, including IDR."

b.      Customer "requested 2 months of postponement due to other obligations and advised that she would likely be able to resume payments in August or September making the relief temporary in nature. However, because [customer] was already in IDR (processed in 04/2014) the agent should have reminded the customer that she did have the option of recalculating her IDR payment if needed. In addition, the agent should have asked probing questions to determine if deferment was an option given the short term nature of the requested relief."

c.      Customer "was in IDR at the time of the call (processed on 03/25/2015) and requested postponement for 3-month due to financial issues. Since this was short term, the agent offered forbearance. Customer did not indicate there was an overall change in financial circumstance, just a temporary inability to pay but he agent could have confirmed that recalculation of current payment amount wasn't needed before offering forbearance."

d.      Customer "requested forbearance, which the agent granted based on available time. Since the customer wanted 6-months of forbearance the agent should have asked probing questions to definitively rule out other options.

        *Id.* at 14, 16, 17, 20.

12

### 2.  The FSA review was a targeted non-routine review.

The FSA conducted a non-routine responsive review that was targeted to address the Lawsuits' allegations. Plaintiff's expert, Christopher Laursen, reached these conclusions upon reviewing legal filings, Navient's SEC filings, Department of Education reports, and other materials. Laursen Decl.; Apton Decl., Exhibit 25 at ¶24.  Defendants' expert, Cyrus Soltani, Esq., confirmed this point, agreeing that the FSA commenced its investigation in response to the CFPB's lawsuit and, therefore, the investigation was not part of an annual review plan. Apton Decl., Exhibits 27 at ¶¶19-22; Exhibit 28 at 93:9-12, 148:12-22.

Mr. Laursen is senior advisor at StoneTurn Group, LLP and has 28 years of financial industry experience, including 17 years as a federal financial regulator and 11 years as a consultant for both private clients and government entities. He distinguished reviews conducted by Federal regulatory agencies that are part of an annual plan, which are characterized as routine, versus those that are not part of an annual plan and responsive to circumstances, as non-routine. Apton Decl., Exhibit 26 at ¶25; Exhibit 26 at 33:19-34:3, 34:9-20, 70:8-10. Federal agencies pre-plan normal onsite reviews or examinations well in advance of their occurrence, which helps ensure the needed coverage of regulatory compliance and other issues across supervised institutions given available resources. *Id.* at ¶25. Certain institutions necessitate periodic examinations based on legislative requirements, while specific

examinations at the largest institutions were scheduled in advance based on pre-determined supervisory priorities. *Id.*; Exhibit 26 at 76:2-23, 169:2-25.

Mr. Laursen concluded the review at issue was not a broad-scope assessment of regulatory compliance or servicer contractual compliance of the type that the FSA would pre-plan and perform regularly. *Id.* at 89:2-90:12. Rather, the FSA's 2017 review was narrowly targeted and focused on how Navient customer service representatives ("CSRs") handled loan forbearance. He noted that the exact objective of the Review as stated in the report was: "…to assess whether the use of forbearance by Navient CSRs met the standards outlined in federal regulations, contractual requirements, and implemented Change Requests. Apton Decl., Exhibit 25 at ¶26. More specifically, he notes, the FSA's review team evaluated whether the Navient agents offered all the applicable options before placing a borrower in forbearance. *Id.*

The narrow scope of the review is one indication that the FSA had concerns about how Navient was handling borrower forbearance interactions. *Id.* at ¶27. Such an examination or review, which was targeted to a narrow area and was not pre-planned within a regular planning cycle, is considered a non-routine review. *Id.* at ¶29. Such a review occurs when new information becomes available to a supervisor that indicates a potential for significant problems and compels an investigation. *Id.* Notably, on February 2, 2017, just prior to the start of the targeted review, the FSA

had issued a separate report evidencing a broader review of Navient's regulatory compliance, including forbearance. *Id.* at ¶30. The purpose and scope of the broad review was, "to determine whether loan servicing is in compliance with applicable federal law and requirements". *Id.* at ¶31.

Mr. Laursen also noted that both the February 2, 2017 report and the May 24, 2017 report listed the federal regulations that they were reviewed against. The February 2, 2017 report was a broad-scope review that cited 34 C.F.R. § 682 for the FFEL Loan Program and 34 C.F.R. § 685 for the Direct Loan Program. *Id.* at ¶36. The May 24, 2017 Review report cited only sub-sections, 34 CFR 682.211 and 682.215 for FFEL Loans, and 34 C.F.R. §§ 685.205, 685.208-210 and 685.221 for Direct Loans. *Id*. This difference in the regulatory citations is further indication that the responsive review at issue was narrowly targeted and not a broad-based regularly scheduled assessment. *Id*. The fact that the FSA initiated this narrow review of Navient's forbearance activities shortly after the FSA issued its February 2, 2017 broad review report, finding "no issues" in the forbearance area is notable. *Id*. This suggests the FSA's forbearance concerns arose quickly, and they believed a near-immediate onsite review was necessary. *Id.*

From the various circumstances surrounding the FSA's March 2017 review – the timing relative to broader review, events preceding review, scope, depth, and resources used for the review—this was a nonroutine review, targeted to investigate

forbearance steering allegations made by the CFPB and State Attorneys General in their lawsuits. *Id.* at ¶41.

Defendants' rebuttal expert, Mr. Soltani, in both his report and deposition testimony demonstrates there is no genuine dispute of material fact with respect to Mr. Laursen's characterization of the FSA's review. At his deposition, Mr. Soltani testified that a review that is not part of an annual plan is "unplanned" and that a responsive review, such as the one at issue in this case, is not part of the FSA's annual plan. Apton Decl., Exhibit 28 at 93:9-12, 148: 12-14.  He also confirmed that the site visit in this matter was a responsive review, thus unplanned, and conceded that it was conducted in response to the CFPB's lawsuit. *Id.* at 147:16-25, 148:20-22.  This testimony further highlights that there is no genuine dispute that the FSA's review was non-routine and targeted to address the claims raised by the CFPB and State Attorneys General's lawsuits.

### 3. Defendants failed to disclose the FSA's review and the "Navient Use of Forbearance" Report.

Defendants' responses to the FSA review were included in the "Navient Use of Forbearance" report, demonstrating they were informed there was a genuine dispute as to the characterization of Navient's practices from their major contractual partner, the Department of Education. Apton Decl., Exhibit 30.  Nevertheless, Defendants omitted this from their public statements and SEC filings.

16

These filings concealed the fact that Navient was investigated by its regulator in response to the Lawsuits concerning allegations of the company's student loan origination, servicing, and collections practices. The following filings during the Class Period omitted these facts: the first quarter report of 2017 on Form 10-Q, filed on March 31, 2017; the second quarter report of 2017 on Form 10-Q, filed on June 30, 2017; the third quarter report of 2017 on Form 10-Q, filed on September 30, 2017; Navient's annual report for 2017 on Form 10-K, filed on December 31, 2017; the first quarter report of 2018 on Form 10-Q, filed on March 31, 2018; the second quarter report of 2018 on Form 10-Q, filed on June 30, 2018; and the third quarter report of 2018 on Form 10-Q, filed on September 30, 2018.  Apton Decl., Exhibits 29, 31, 32, 33, 35, 36, 37, and 38. Instead of disclosing the FSA's March 2017 review and its findings, Navient only provided the following generic disclosure in each of the above listed filings:

> In addition, Navient and its subsidiaries are subject to examination or regulation by the SEC, CFPB, FDIC, [Department of Education] and various state agencies as part of its ordinary course of business. Items or matters similar to or different from those described above may arise during the course of those examinations. We also routinely receive inquiries or requests from various regulatory entities or bodies or government agencies concerning our business or our assets. The Company endeavors to cooperate with each such inquiry or request.

The FSA's review and report did not become public until November 20, 2018 when the Associated Press published an article regarding Senator Elizabeth Warren's November 13, 2020 letter to Remondi accusing him of lying to her during their June 6, 2018 meeting. Apton Decl. Exhibits 39, 40. The Associated Press also provided a copy of the FSA's report, which was obtained by Senator Warren's office. *Id.*

## III.   ARGUMENT

### A. Legal Standard

A moving party is entitled to summary judgment where "the movant shows that there is no genuine dispute as to any material fact ..." Fed. R. Civ. P. 56(a). A fact in dispute is material when it "might affect the outcome of the suit under the governing law" and is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

A court's role in deciding a motion for summary judgment is not to evaluate the evidence and decide the truth of the matter but rather "to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. A party moving for summary judgment has the initial burden of showing the basis for its motion and must demonstrate that there is an absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the nonmoving

party to show that there is a "genuine issue for trial." *Id.* at 324. To withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict the moving party. *Anderson*, 477 U.S. at 250.

Even the issue of materiality of misrepresentations or omissions is appropriately resolved as a matter of law by summary judgment, where the misrepresentations or omissions are so obviously important to an investor that reasonable minds cannot differ on the question. *Federal Housing Finance Agency v. Nomura Holding America Inc.,* 68 F. Supp. 3d 439 (S.D.N.Y. 2014), aff'd, 873 F.3d 85 (2d Cir. 2017).

### B. Plaintiff is entitled to Partial Summary Judgment on Certain Elements of his Section 10(b) Claims Against Defendants.

The elements of a Section 10(b) securities fraud claim are: "(1) a material misrepresentation (or omission), (2) scienter, (3) a connection with the purchase or sale of a security, (4) reliance, often referred to in cases involving public securities markets (fraud-on-the-market cases) as 'transaction causation,' (5) economic loss; and (6) 'loss causation..." *Dura Pharms., Inc. v. Broudo,* 544 U.S. 336, 341-42 (2005). Plaintiff is entitled to partial summary judgment on the first element.

**1. There is no genuine dispute that Defendants made misstatements of material fact with respect to the Washington State Attorney General's lawsuit.**

To establish falsity under Rule 10(b)(5), a plaintiff must demonstrate how and why the defendant's statements are false and misleading. *California Pub. Employees' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 145 (3d Cir. 2004); *Institutional Investors Group v. Avaya, Inc.*, 564 F.3d 242, 259 (3d. Cir. 2009) (Internal Citations and Quotations Omitted). "[F]alsity goes to why a statement is untrue or misleading." *Lord Abbett Affiliated Fund, Inc. v. Navient Corp.*, 363 F. Supp. 3d 476, 487 (D. Del. 2019); *see also Vancouver Alumni Asset Holdings Inc. v. Daimler AG*, No. CV 16-02942 SJO (KSx), 2017 U.S. Dist. LEXIS 83621, at *39-41 (C.D. Cal. May 31, 2017) (defendants misled investors when they denied use of "defeat devices" in response to claims made by regulatory agencies); *In re ArthoroCare Corp. Sec. Litig.*, 726 F. Supp. 2d 696, 710-11 (W.D. Tex. 2010) (defendant made affirmative misrepresentation by denying "rumors being spread by hedge funds" when in fact the subject of the rumor was true); *In re Apollo Grp. Inc. Sec. Litig.*, 395 F. Supp. 2d 906, 910-18 (D. Ariz. 2005) (statements about ongoing DOE investigation were misleading, because they minimized illegality of conduct occurring internally). To be actionable, a statement must have been misleading at the time it was made; liability cannot be imposed based on subsequent events. *In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1330 (3d Cir. 2002).

Defendants made false and misleading statements about the Lawsuits filed against Navient on January 18, 2017. In three press releases, Defendants stated that "The allegations…are unfounded…," and characterized each lawsuit as an "unsubstantiated, unjustified and politically driven action." Apton Decl., Exhibits 21-23. During a January 24, 2018, earnings call, Remondi characterized the lawsuits as "unsubstantiated claims." Apton Decl., Exhibit 34. Remondi again made false and misleading statements about the Lawsuits in a June 28, 2018 press release: "The allegations are unfounded, and the lawsuit is another attempt to blame a single servicer for the failures of the higher education system and the federal student loan program to deliver desired outcomes . . . The need to blame someone has driven these lawsuits." Apton Decl., Exhibit 36.

The evidence introduced by the WA AG in support of their motion for partial summary judgment demonstrated that Navient used a different definition of "on-time" payments for cosigner release than for late fees or delinquency. Based on the plain-language of the cosigner release eligibility criteria, reasonable borrowers understood that paying their loans ahead would constitute an "on-time payment" and would count toward qualifying for cosigner release. Nothing about paying ahead suggests a failure to make an on-time payment and this interpretation is supported by Navient's repeated statements that "there's no penalty for making an additional payment." Navient also stressed in its promissory notes and billing statements that

21

payments made ahead counted as consecutive payments with no obligation by the borrower in the interim. These representations had the capacity to deceive borrowers into believing that their paid-ahead status did not cause a break in the borrower's consecutive timely payments. An external audit in 2015, confirmed that even Navient's employees were confused by the two standards.

Under Washington State law, a party violates the Consumer Protection Act when it engaged in (1) an unfair or deceptive act or practice; (2) occurring in trade or commerce; and (3) that affects the public interest. Apton Decl., Exhibit 43. The Washington State Superior Court found that the WA AG's motion for partial summary judgment demonstrated that Navient's "cosigner release" program violated the Consumer Protection Act. The WA AG's claims therefore had merit and are definitive evidence that Defendants' repeated statements in 2017 and 2018 about the WA AG's lawsuit were false and misleading when they were made.

Under Washington State's Superior Court Rule 56, summary judgment is proper where no genuine issue of material fact exists, and the moving party is entitled to judgment as a matter of law. *Id.* at 2; *W. Telepage, Inc. v. City of Tacoma Dep't of Fin.,* 140 Wn.2d 599, 607 (2000). On a motion for summary judgment, the court considers all the facts in the light most favorable to the nonmoving party. *Id.* at 3, *citing Indoor Billboard/Washington. Inc. v. Integra Telecom of Washington, Inc.,* 162 Wn.2d 59, 70 (2007). The evidence, which included promissory notes and

billing statements going back to 2009, internal emails going back to 2010, and a 2015 third-party audit that showed that Navient's employees did not understand the "on-time" payment requirements when making eligibility determinations for the cosigner release program, showed that Navient engaged in unfair and deceptive practices for years in violation of Washington State's Consumer Protection Act.

Since there is no genuine dispute that Defendants' statements about the WA AG's lawsuit were false when made, Plaintiff is entitled to summary judgment on this element. *Sec. & Exch. Comm'n v. Murray*, No. 12-CV-01288-EMC, 2016 WL 6893880, at *5 (N.D. Cal. Nov. 23, 2016); *S.E.C. v. Weintraub*, No. 11-21549-CIV, 2011 WL 6935280, at *5 (S.D. Fla. Dec. 30, 2011); *S.E.C. v. Glob. Telecom Servs., L.L.C.*, 325 F. Supp. 2d 94, 112 (D. Conn. 2004); *S.E.C. v. Gorsek*, 222 F. Supp. 2d 1099, 1109 (C.D. Ill. 2001); *see also In re Media Vision Tech. Sec. Litig.*, No. C94-1015 MJJ, 2003 WL 22227875, at *2 (N.D. Cal. Sept. 23, 2003) (*citing Parklane Hosiery v. Shore* 99 S.Ct. 645, 58 (1979) (summary judgment is appropriate where defendants were found to have violated the law in an earlier suit).

### 2. There is no genuine dispute that Defendants' concealment of the FSA review of its forbearance practices was materially misleading.

Defendants concealed that the DOE investigated Navient in response to the CFPB's lawsuit. The following filings during the Class Period omitted these material facts: the first quarter report of 2017 on Form 10-Q, filed on March 31, 2017; the

23

second quarter report of 2017 on Form 10-Q, filed on June 30, 2017; the third quarter

report of 2017 on Form 10-Q, filed on September 30, 2017; Navient's annual report

for 2017 on Form 10-K, filed on December 31, 2017; the first quarter report of 2018

on Form 10-Q, filed on March 31, 2018; the second quarter report of 2018 on Form

10-Q, filed on June 30, 2018; and the third quarter report of 2018 on Form 10-Q,

filed on September 30, 2018. Apton Decl., Exhibits 29, 31, 32, 33, 35, 36, 37, and

38.

    Instead of disclosing the FSA's 2017 review and its findings, Navient only

provided the following generic disclosure in each of the above listed filings:

> In addition, Navient and its subsidiaries are subject to
> examination or regulation by the SEC, CFPB, FDIC,
> [Department of Education] and various state agencies as
> part of its ordinary course of business. Items or matters
> similar to or different from those described above may
> arise during the course of those examinations. We also
> routinely receive inquiries or requests from various
> regulatory entities or bodies or government agencies
> concerning our business or our assets. The Company
> endeavors to cooperate with each such inquiry or request.

Had Defendants disclosed the FSA review in March 2017 and the findings when

they were made available in May 2017, investors would have been less likely to

believe their categorical denials about the Lawsuits' claims and better able to assess

the regulatory risk associated with their investments in Navient.

24

### a. The March 2017 FSA review constitutes a material legal proceeding for the purposes of Regulation S-K and, therefore, should have been disclosed.

Section 10(b) prohibits the "use or employ, in connection with the purchase or sale of any security, . . .[of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe." *Semerenko v. Cendant Corp.*, 223 F.3d 165, 174 (3d Cir. 2000) (quoting 15 U.S.C. § 78j(b)). Disclosure is required under these provisions only when necessary "to make ... statements made, in the light of the circumstances under which they were made, not misleading. *Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309, 1321-22 (2011) (quoting 17 CFR § 240.10b-5(b)) "Disclosure, and not paternalistic withholding of accurate information, is the policy chosen and expressed by Congress." *Basic v. Levinson,* 108 S.Ct. 978, 99 (1988); *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 268 (2d Cir. 1993) ("A duty to disclose arises whenever secret information renders prior public statements materially misleading, not merely when that information completely negates the public statements."). While some form of a duty to disclose is a predicate to liability for nondisclosure under Section 10(b), a party can assume a duty to disclose by choosing to speak on a subject, because any statements made must be "complete and accurate." *Roeder v. Alpha Indus., Inc.*, 814 F.2d 22, 26 (1st Cir. 1987) (quoting *Grossman v. Waste Mgmt., Inc.*, 589 F. Supp.

395, 409 (N.D. Ill. 1984) ("If . . . a company chooses to reveal relevant, material information even though it had no duty to do so, it must disclose the whole truth.").

Accordingly, a corporation has an affirmative duty to disclose material information when there is regulation requiring disclosure. 17 C.F.R. § 229.103 requires a company to describe any material pending legal proceedings, other than ordinary routine litigation incidental to the business, to which the registrant or any of its subsidiaries is a party or of which any of their property is the subject.

The future threat of regulatory action alone does not trigger the need for disclosure. *Jaroslawicz v. M&T Bank Corp.*, 962 F.3d 701, 716 (3d Cir. 2020), cert. denied, 141 S. Ct. 1284, 209 L. Ed. 2d 19 (2021). Rather, when a lawsuit or regulatory action is ongoing or imminent, generic statements regarding a review process are misleading when a defendant knows their regulator will investigate them and that the outcome of that investigation could be significant. *Id.* (analyzing defendants' omissions under Sections 103 and 105, the Appellate Court found that the risk to the merger posed by the regulatory inspection of the bank's anti-money laundering compliance, which allegedly skirted regulatory standards, triggered the need for disclosures). Incomplete descriptions of disclosed litigation will not satisfy the requirements of Section 103. *In re Signet Jewelers Ltd. Sec. Litig.,* 2018 WL 6167889, at *17 (S.D.N.Y. Nov. 26, 2018) (Defendants disclosed that claims related

26

to "store-level employment practices" that were supposedly "discriminatory as to compensation and promotional opportunities" with respect to "gender," when the allegations were about pervasive sexual harassment that reached the highest offices in the company).

Section 103 also requires disclosing related actions whether they are discrete legal proceedings or as a small part of a greater whole. *Wielgos v. Commonwealth Edison Co.*, 688 F. Supp. 331, 342 (N.D. Ill. 1988), *aff'd,* 892 F.2d 509 (7th Cir. 1989) ("Licensing Board hearing might take on such importance as to require detailed disclosure. And that in turn would depend on the status and reasonably perceived significance of the proceeding at the time the registration statement made its disclosures.") "It really doesn't matter whether the required disclosure is seen as providing more details about a regulatory system or as disclosing a discrete legal proceeding." *Id.* at n.28.

The parties agree and there is no genuine dispute that the FSA's March 2017 review was conducted in response to the CFPB and State AGs' lawsuits and not part of the FSA's annual oversight plan.  Because the review was targeted to address concerns over Navient's forbearance practices and occurred outside of the FSA's annual planned review (*i.e.,* it was unplanned), the review was non-routine and needed to be disclosed along with the lawsuits. As such, by the plain language of Section 103, Defendants had a duty to disclose the FSA review and its findings.

27

Considering the risk for Navient's investors had already blossomed into multiple lawsuits, Defendants' generic statements regarding being subject to examination or regulation by the CFPB and the Department of Education failed to satisfy Regulation S-K. *Jaroslawicz*, 962 F.3d 701, 716-7. In *Jaroslawicz*, the Third Circuit reversed the District Court's dismissal of the Shareholders' complaint, finding that they stated a plausible claim against M&T Bank for making false and misleading proxy solicitations in advance of their merger with Hudson City Bank. Defendant M&T knew that its regulators would investigate its compliance program, and specifically its Bank Secrecy Act/Anti-Money Laundering ("BSA/AML") effectiveness and consumer checking practices, in advance of the merger. *Id.* Defendant M&T also knew that failure to obtain regulatory approval would be fatal to the merger, which was a possibility considering that it allegedly skirted regulatory standards. *Id.* The Third Circuit found that the BSA/AML deficiencies and consumer checking practices posed significant risks to the merger before M&T issued the Joint Proxy and disclosing these weaknesses "would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *Id.* (quoting *EP Medsystems, Inc. v. EchoCath, Inc.* 235 F.3d 865, 872 (3d Cir. 2000)).

Here too, Navient's disclosure was too generic because it omitted the FSA's review and subsequent report from its SEC filings.  While Defendants publicly stated

there was no truth to the allegations in the Lawsuits, Navient received a Department of Education FSA review that found it was not meeting federal standards or adequately servicing student loan borrowers. Defendants knew that the FSA review was targeted to address the Lawsuits' allegations and not part of the FSA's annual plan, or non-routine. Defendants also knew that the FSA's findings corroborated the lawsuits' claims. Had Defendants disclosed the FSA review and its findings, this would have significantly altered the total mix of information made available to investors, who would have been less likely to believe Defendants' categorical denials about the Lawsuits' merits and been better able to assess the regulatory risk associated with their investments in Navient.

Finally, whether the FSA's review is a discrete legal proceeding or a part of a greater whole, its status and reasonably perceived significance *vis-à-vis* the Lawsuits at the time when Defendants concealed the review's existence required detailed disclosure under Regulation S-K. *Wielgos,* 688 F. Supp. 331, 342.

As there is no genuine dispute that the Defendants' disclosures about the FSA's review and subsequent report were inadequate to satisfy the requirements of Regulation S-K, Plaintiff is entitled to summary judgment on this element of the 10(b)(5) claim.

### b. Failing to inform investors about the FSA's March 2017 review was a material omission.

Separate and apart from the duty imposed by Regulation S-K, Defendants have a duty to ensure that the information they revealed was both accurate and complete as to not mislead the investing public. *Menaldi v. Och-Ziff Cap. Mgmt. Grp. LLC*, 164 F. Supp. 3d 568, 583 (S.D.N.Y. 2016); *Operating Local 649 Annuity Tr. Fund v. Smith Barney Fun. Mgmt., LLC*, 595 F.3d 86, 92 (2d Cir. 2010). "In addition to the duty to disclose specific information required by law . . . Rule 10b-5 imposes a duty to disclose any material facts that are necessary to make disclosed material statements, whether mandatory or volunteered, not misleading." *In re Craftmatic Sec. Litig.*, 890 F.2d 628, 641 (3d Cir. 1990). Assuming, *arguendo,* that defendants technically complied with SEC reporting requirements such as § 229.103, they may still have omitted material information that should have been disclosed. *City of Philadelphia v. Fleming Cos.*, 264 F.3d 1245, 1267 (10th Cir. 2001) (citing *Zell v. Intercapital Income Sec., Inc.*, 675 F.2d 1041, 1044 (9th Cir. 1982)); *cf Zhengyu He v. China Zenix Auto Int'l Ltd.,* 2020 U.S. Dist. LEXIS 103673 *21-23 (D.N.J. June 12, 2020) (Defendants specifically disclosed that the NYSE requested information regarding knowledge of subject trading practices and that this investigation could lead to delisting).

Considering the FSA's investigation, Defendants' statements were materially misleading. Given Defendants' public comments dismissing the lawsuits'

allegations as unfounded, when Defendants made generic statements about federal investigations into their business practices, they "did not speak in an accurate and complete manner." *Menaldi* 164 F. Supp 3d 583 (quoting *In re BioScrip, Inc. Sec. Litig.* 95 F. Supp 3d 711, 727 (S.D.N.Y. 2015) (holding that plaintiffs had plausibly alleged that boilerplate legal compliance statements were misleading where they suggested that the defendant "routinely responded to investigatory requests from the Government, but was not presently in the process of responding to such a request"); *see also City of Westland Police & Fire Ret. Sys.*, 928 F. Supp. 2d 705, 718-19 (S.D.N.Y. 2013) (holding that defendants' statements about, *inter alia*, "the strength of the life insurance business" were actionable where defendants were under a nationwide investigation into whether its business practices violated state laws).

As Senator Warren made clear in her letter to Defendant Remondi: "[The FSA Report] bolsters allegations that Navient illegally cheated struggling student borrowers out of their rights to lower repayments." Apton Decl., Exhibit 39. Senator Warren's letter further noted that:

> It appears that, while the company was publicly stating that there was no truth to the allegations about Navient's misbehavior by CFPB, the company had received an official Education Department audit that revealed your company was not meeting federal standards or adequately servicing student loan borrowers.
> *Id.*

31

A reasonable investor would agree with this sentiment and consider a regulatory review concerning allegations in multiple lawsuits and a corresponding report corroborating those allegations to be important to their investing decisions. Accordingly, there is no genuine dispute that these omissions were material and Plaintiff is entitled to summary judgment on this element of the 10(b)(5) claim.

## IV.   Conclusion

This case is ripe for summary judgment on certain elements of Plaintiff's claims because discovery has conclusively demonstrated that the Defendants' statements about the Washington State Attorney General's lawsuit and concealment of the FSA's March 2017 investigation were false and materially misleading.

Dated: July 30, 2021

**LEVI & KORSINSKY, LLP**

s/ Adam M. Apton
Adam M. Apton
55 Broadway, 10th Floor
New York, New York 10006
Tel.: (212) 363-7500
Fax: (212) 363-7171
email: aapton@zlk.com

Nicholas I. Porritt (admitted *pro hac vice*)
1101 30th Street NW, Suite 115
Washington, DC 20007
Tel.: (202) 524-4290
Fax: (212) 363-7171
email: nporritt@zlk.com

*Attorneys for Class Representative
and Class Counsel*