**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re NAVIENT CORPORATION SECURITIES LITIGATION | Master File No. 17-8373 (RBK/AMD)<br><br>**DECLARATION OF ADAM M. APTON IN SUPPORT OF MOTION FOR FINAL APPROVAL OF SETTLEMENT** |

I, ADAM M. APTON, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 as follows:

1. I am a partner of the law firm of Levi & Korsinsky, LLP, attorneys for Lead Plaintiff Jessie Wayne Pritchard and Lead Counsel in this Action. I am admitted to practice before this Court and have personal knowledge of the various matters set forth herein based on my day-to-day participation in the prosecution and settlement of this Action. I submit this Declaration in support of Plaintiffs' Motions for: (i) Final Approval of Class Action Settlement and Plan of Allocation of Settlement Proceeds; and (ii) an Award of Attorneys' Fees and Reimbursement of Litigation Expenses.[1]

## FINAL APPROVAL

2. I previously submitted a declaration in support of Plaintiff's Unopposed Motion for Preliminary Approval of the Settlement on November 16, 2021 (Dkt. No.

---

[1] All capitalized terms not otherwise defined herein have the same meanings as set forth in the Stipulation and Agreement of Settlement, dated as of November 16, 2021 (Dkt. No. 124) (the "Stipulation").

1

125-2). In that declaration, I expressed support for the Settlement and explained why I believed that it represented an excellent result for the Class. I continue to believe that today and, in fact, even more so based on the absence of any objections to the Settlement from potential Class Members.

3.   The Court-appointed claims administrator, A.B. Data, has faithfully carried out its obligation to disseminate notice to potential Class Members. As described in the accompanying Declaration of Jack Ewashko, A.B. Data, Ltd., has published notice of the Settlement in print and online. It also mailed the Postcard Notice it to over 83,500 potential Class Members. Neither the Claims Administrator nor I have received any objections to the Settlement and, to date, only one request for exclusion has been received. In my experience as a class action securities litigator, this suggests that the Settlement is broadly supported by the Class.

4.   In addition to the above and what I identified in my previous declaration, I also believe the Settlement should be approved due to increased risk surrounding the outcome of the Consumer Financial Protection Bureau's regulatory action against Navient.

5.   Plaintiff's claims against Navient centered around allegations of "forbearance steering," *i.e.*, an internal company policy at Navient whereby its customer service representatives would place borrowers into forbearance instead of other repayment plans for the purpose of financially benefitting Navient. These "forbearance steering" claims were also at issue in the Consumer Financial Protection Bureau's regulatory action against Navient.

6.   Significant time and effort was spent attempting to obtain evidence and prove (or, in the case of Defendants, disprove) that "forbearance steering" was occurring and/or that it was occurring on a company-wide level. As referenced in my previous declaration, Defendants maintained that Navient had not engaged in "forbearance steering" but rather it had complied with all servicing obligations under

its contracts with the Department of Education. *See* Dkt. No. 125-2 at ¶28. Defendants had adopted the same position in defense of the Consumer Financial Protection Bureau's regulatory action.

7. When the parties agreed to the Settlement presently before the Court, the Consumer Financial Protection Bureau's regulatory action against Navient was ongoing. The Consumer Financial Protection Bureau and Navient had recently cross-moved for summary judgment on *inter alia* its "forbearance steering" allegations under the Consumer Financial Protection Act. A win for the Consumer Financial Protection Bureau on the motion would have strengthened Plaintiff's claims substantially; however, a loss would have potentially gutted the merits of the claims depending on the grounds of the court's ruling. Alternatively, a denial of both motions would have interjected a significant amount of uncertainty into the case as it would have ultimately necessitated a trial on the merits of the claims.

8. The Consumer Financial Protection Bureau's and Navient's motions for summary judgment remains pending at this point. They have been *sub judice* since August 2020. Although it is unknown when a decision will be rendered, it appears that both the Consumer Financial Protection Bureau and Navient want to receive a decision on the motion and are intent on proceeding to trial. This is especially evident based on the fact that Navient has recently settled a number of the regulatory actions pending against it by the States Attorneys General (including Pennsylvania) and **not** the Consumer Financial Protection Bureau.

9. Thus, in light of the foregoing, approving the Settlement avoids the risk that Plaintiff would otherwise have to assume if the litigation were to continue. An adverse factual or legal finding from the Consumer Financial Protection Bureau's action could have potentially damning effects on the viability of Plaintiff's claims. Given Navient's refusal to settle the Consumer Financial Protection Bureau's action, it appears that Navient strongly believes in the defensibility of its conduct.

10. Additionally, since agreeing to the Settlement, the terms of Navient's settlement in another related class action litigation have been made public. The related action, styled *Lord Abbett Affiliated Fund, Inc. v. Navient Corporation, et al.*, No. 1:16-cv-00112-MN (D. Del.), alleged violations of the securities laws against Navient for *inter alia* misrepresentations related to "forbearance steering" but for a different time period (or "class period").

11. According to motion papers filed in support of the settlement in the *Lord Abbett* action, the settlement represents approximately 5% of maximum recoverable damages according to the plaintiffs' estimated damages. *See Lord Abbett*, Dkt. No. 344 at 12. The Settlement at bar equates to a recovery of 3.8% of damages, which falls in line with the *Lord Abbett* action. This further suggests that the Settlement is fair, reasonable and adequate.

12. For all the above reasons in addition to the ones I listed in my previous declaration, I support the Settlement and respectfully request that the Court approve it in its entirety.

## ATTORNEYS' FEES

13. As compensation for our efforts, Lead Counsel is applying for an award of attorneys' fees in the amount of $2,500,000 of the total Settlement Fund. Lead Counsel is also requesting reimbursement of out-of-pocket expenses in the amount of $988,508.88.

14. Lead Counsel has prosecuted this case for approximately four years without any compensation and has incurred hundreds of thousands of dollars in expenses without any guarantee of success. The fee request is within the range of fees awarded by courts in the Third Circuit, as further detailed and discussed the Memorandum of Law in Support of Plaintiffs' Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses filed concurrently herewith.

15.  Lead Counsel undertook representation of Plaintiff and the Class on a wholly contingent basis.  Lead Counsel knew from the outset that they would expend a substantial amount of time prosecuting this Action yet receive no compensation if the Action ultimately proved unsuccessful. Thus, the contingent nature of payment of fees and expenses and the risks and complexity of the Action should be given substantial weight by the Court in considering the instant application for fees and expenses.

16.  Lead Counsel's request for attorneys' fees is also supported by the amount of time and effort they invested in the litigation. Lead Counsel dedicated 3,610 hours to prosecuting this Action. These hours were compiled from contemporaneous time records maintained by each attorney and professional staff member affiliated with Lead Counsel. Applying Lead Counsel's current hourly rates, which are consistent with those charged by similarly skilled firms in their respective geographic areas, to the hours expended in this Action yields a lodestar amount of $2,622,351.25. Thus, assuming the Court grants Lead Counsel's request for attorneys' fees, the amount received would in fact be slightly less than our "lodestar," *i.e.*, Lead Counsel would not be receiving a "multiplier" on the fee award.

17.  The following table lists the professionals who worked on this matter, the role of each of the professionals, the number of hours expended by each such professional, and their hourly rates at Levi & Korsinsky, LLP:

| Employee | Total Hours | Hourly Rate | Lodestar |
|---|---:|---:|---:|
| Joseph Levi (P) | 7.5 | $1,050 | 7875 |
| Alexander A. Krot (A) | 22.75 | $675 | 15356.25 |
| Andrew Lencyk (OC) | 172.1 | $850 | 146285 |
| Adam McCall (A) | 921.4 | $600 | 552840 |
| Adam Apton (P) | 612.1 | $900 | 550890 |

| | | | |
|---|---|---|---|
| Brian Stewart (A) | 11.75 | $650 | 7637.5 |
| Elizabeth K. Tripodi (P) | 650.5 | $900 | 585450 |
| Nicholas Porritt (P) | 370.3 | $1,000 | 370300 |
| Cecille Cargill (A) | 2.5 | $495 | 1237.5 |
| Jonathan Gitlen (A) | 79.5 | $625 | 49687.5 |
| Mark Levine (A) | 4 | $450 | 1800 |
| Michelle Gruesbeck (A) | 475.75 | $455 | 216466.25 |
| Max Weiss (A) | 146.05 | $500 | 73025 |
| Paralegal* | 133.85 | $325 | 43501.25 |
| Total: | 3,610 | | $2,622,351.25 |

P – Partner | OC – Of Counsel | A – Associate

18. Lead Counsel also incurred $988,508.88 in unreimbursed expenses in connection with the prosecution of this litigation. The following table, compiled from the records regularly maintained by Levi & Korsinsky, LLP, lists the expenses it incurred in furtherance of this Action:

| **Expense** | **Amount** |
|---|---|
| Notices | $8,502.84 |
| Filing fees | $1,141.24 |
| E-discovery | $183,627.53 |
| Investigation | $13,847.30 |
| Printing | $1,140.91 |
| Postage/Courier | $515.42 |
| Mediation | $31,920.00 |
| Court Reporters | $36,005.9 |
| Meals | $145.00 |
| Travel | $2,702.50 |

| Process Servers | $1,412.00 |
|---|---|
| Expert fees | $427,744.51 |
| Staff attorney/document review | $279,803.73 |
| **Total** | $988,508.88 |

19. The expenses listed in the above table were necessary and reasonable for the litigation of this Action, which spanned approximately four years and entailed a significant mass of discovery encompassing hundreds of thousands of documents and well over a dozen depositions. The expenses incurred by Lead Counsel are summarized below.

20. Lead Counsel's "notice" expenses includes charges for publishing notice of the filing of the action and various events during the course of the litigation, such as motions filed at the lead plaintiff stage and class certification. These notices were predominantly disseminated using electronic wire service and intended to inform class members of the action and their respective rights in accordance with the intent of the Private Securities Litigation Reform Act of 1995.

21. Filing fees were paid to the United States District Court for the District of New Jersey for *pro hac vice* admissions and related annual renewal fees. Several of the key members of Lead Counsel's litigation team are not members of the New Jersey bar and, therefore, required special admission to litigate the case.

22. E-discovery in this case was extensive. Through the course of the litigation, Plaintiff obtained over 450,000 documents in discovery comprising more than 3.4 million pages of material. Plaintiff's e-discovery vendor, vDiscovery, is a well-known vendor. Through vDiscovery, Lead Counsel maintained a Relativity document review database that facilitated the review and cataloging of the discovery in this action. Lead Counsel incurred monthly charges relative to the number of users

allowed to access the review database as well as the total size of the information on the review platform. Given the extent of the material on the platform, the monthly charges were significant and accumulated to the above-listed total by the time the case came to an end. Lead Counsel instructed vDiscovery to terminate the review platform as soon as the Settlement was reached in order to stop incurring unnecessary expenses.

23. At the outset of this litigation, Lead Counsel retained an outside investigator to interview potential witnesses. The investigator spent several dozen hours identifying and contacting potential witnesses. He then interviewed those that had relevant information and were willing to discuss what they knew concerning the allegations at bar. Those interviews provided beneficial information for the case that, at least in part, formed the allegations in the operative complaint.

24. Lead Counsel's printing and postage costs generally related to providing the Court with courtesy copies of various filings as well as preparing preparation materials for depositions and hearings. The expenses incurred equate to the costs associated with the printing and postage fees.

25. The parties mediated this Action with the Hon. Daniel Weinstein (ret.) and former Ambassador David Carden. Judge Weinstein is a preeminent mediator in the field of securities litigation and is widely regarded as one of the most experienced mediators amongst securities practitioners. The fees he charged are customary for these sorts of engagements. They covered pre-mediation briefing, the full-day session itself, and follow-up by and between the parties to finally reach an agreement in response to the "mediator's recommendation" he issued.

26. Court reporter fees were substantial namely due to the fact that the parties conducted twenty depositions during the course of discovery. These included party depositions as well as fact and expert witnesses concerning class certification, merits, and damages. Many, if not all, of the depositions were videotaped because

the witnesses were not located within the District and therefore would have been "unavailable" for trial potentially. This added additional cost to the court reporter expenses.

27. Travel and meals were required in connection with the preparation and conducting of Plaintiff's deposition. Lead trial counsel met with Plaintiff and defended the deposition in person, which necessitated travel to Billings, Montana. Due to the fact that discovery occurred predominantly during the COVID-19 pandemic, travel was relatively minimal.

28. Process servers were required in connection with Plaintiff's third-party discovery and, in particular, service of subpoenas on non-parties. The third-party entities were located in various cities across the country and therefore necessitated different process services to effect service of the subpoenas. Plaintiff subpoenaed entities in the student loan servicing industry as well as the various States Attorneys General who were litigating regulatory actions against Navient.

29. Lead Counsel incurred extensive expert fees. In total, three experts were retained to assist with the prosecution of this case, including a damages expert and two merits experts. The damages expert, Chad Coffman, also opined on the "market efficiency" of Navient's stock during class certification proceedings. Lead Counsel's other experts, Adam Levitin and Chris Laursen, opined on the legality of Navient's loan servicing practices as well as the circumstances surrounding the Department of Education's "audit" or "review" of Navient in response to the Consumer Financial Protection Bureau's regulatory action.

30. Finally, Lead Counsel's staff attorney expenses were necessary for the purposes of reviewing the extensive amount of documents obtained during the course of discovery. As discussed previously, Plaintiff received over 3.4 million pages of discovery. To review the entirety of this material for relevant evidence, Lead Counsel employed fifteen (15) staff attorneys to assist with the document

review project. Lead Counsel closely oversaw the document review project and structured it so as to provide the best, most comprehensive results as efficiently as possible. This included organizing the project so as to include two supervising staff attorneys to provide quality control over the day-to-day review and holding regular meetings to discuss pertinent documents during the course of the litigation.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 8th day of March 2022.

_____
Adam M. Apton